**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| ASBIEL BENITEZ, YOUSSEF | ) | |
| WAHID, OMAR ABDULQADER, | ) | |
| ARNOBIO GOMEZ and | ) | |
| LABINOT KOLSHI, | ) | **CASE NO. 3:18-cv-00491** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **JURY DEMAND** |
| v. | ) | |
| | ) | **JUDGE ELI RICHARDSON** |
| TYSON FRESH MEATS, INC.,  | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Come now the Plaintiffs, by and through undersigned counsel, and hereby submit these responses pursuant to Local Rule 56.01(b) to the Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment:

**Undisputed Material Facts Common to All Plaintiffs**

1.    Doug Griffin was promoted from Operations Manager at the Goodlettsville plant to Plant Manager at Tyson's Council Bluffs, Iowa plant on November 17, 2014.  (Doc. 35-8, ¶ 4).

**RESPONSE: Admitted.**

2.    Griffin was promoted from Plant Manager at the Council Bluffs plant to Plant Manager at the Goodlettsville plant on August 16, 2016. (Doc. 35-8 ¶ 5).

**RESPONSE: Admitted.**

3.      Derrick Ausbrooks resigned from his employment at the Goodlettsville plant on October 18, 2013.  (Doc. 35-8 ¶ 7).

**RESPONSE: Admitted for the purposes of summary judgment.**

4.      Ausbrooks was rehired at Tyson's Goodlettsville plant as a Supervisor on B Shift in the Beef department on May 31, 2017.  (Doc. 35-8 ¶ 8).

**RESPONSE:  Denied.  Ausbrooks was hired as a General Manager, not a line supervisor.   Griffin Depo., p. 139. Benitez was replaced by Derek Ausbrooks, Caucasian American born when he was demoted from a general position. Benitez Depo., Vol. II, p. 178-179.**

5.      Steve Grant was hired as Operations Manager at the Goodlettsville plant after Plaintiff Lab Kolshi's resignation on May 1, 2017.  (Grant Dep. at 16; Griffin Dep. at 125).

**RESPONSE: Admitted.**

6.      Prior to Plaintiff Lab Kolshi's resignation, Grant worked in a corporate position assisting various plants, including Goodlettsville, as needed.  (Grant Dep. at 15).

**RESPONSE: Admitted.**

7.      Grant was demoted and transferred to Tyson's Sherman, Texas plant in June 2018.  (Grant Dep. at 86; Griffin Dep. at 125).

**RESPONSE: Admitted.**

8.      Following Grant's demotion, Falah Al-Saadawi was promoted to Operations Manager at the Goodlettsville plant; a position he still holds today.  (Griffin Dep. at 125-26).

**RESPONSE: Admitted that Mr. Al-Saadawi was promoted but Plaintiffs do not believe he still holds that position today, but the discovery period has ended and Plaintiffs' testimony on this topic would be hearsay.**

9.      Falah previously worked in Operations at Tyson's Sherman, Texas plant. (Benitez Dep. at 220-22).

**RESPONSE: Admitted.**

10.     Falah emigrated to the U.S. from Iraq.  (Griffin Dep. at 126).

**RESPONSE: Admitted.**

11.     Gary Denton was the Complex Human Resources Manager at the Goodlettsville plant for 14 years.  (Denton Dep. at 25).

**RESPONSE: Admitted.**

12.     In October 2014, Denton was promoted to Human Resources Director ("HRD") over Tyson's poultry division and moved to the corporate headquarters in Springdale, Arkansas. (Denton Dep. at 25).

**RESPONSE: Admitted.**

13.     In approximately July 2017, Denton transitioned to HRD over Tyson's case ready facilities, which includes the Goodlettsville plant. (Denton Dep. at 26).

**RESPONSE: Admitted.**

14.     Crystal Dyer was employed as the Goodlettsville plant's Complex Human Resources Manager from January 2015 to September 2017.  (Dyer Dep. at 17, 21).

**RESPONSE: Admitted.**

15.     Plaintiffs all held management positions within production, which consists of three separate departments: Ground Beef, Beef, and Pork. (Griffin Dep. at 21; Doc. 36).

**RESPONSE: Admitted.**

16.     Plaintiffs admit that they understood Tyson's Harassment and Discrimination policy and that they were trained on it during orientation and thereafter, on an annual basis. (Gomez Dep. at 103-04, Wahid Dep. at 71-73, Omar Dep. at 45-48, Kolshi Dep. at 80-82, Benitez Dep. at 70-74).

**RESPONSE: Admitted.**

## Undisputed Material Facts Concerning Gomez's Claims

17.     Gomez started working for Tyson as a Production Supervisor at its Norfolk, Nebraska plant in 2004. (Gomez Dep. at 41-42, Ex. 2).

**RESPONSE: Admitted.**

18.     Approximately one year later, Gomez applied for an open position at the Goodlettsville plant.  (Gomez Dep. at 46, Ex. 3).

**RESPONSE: Admitted.**

19.     Denton and Griffin were among the individuals who approved Gomez's transfer to the Goodlettsville plant.  (Gomez Dep. at 47, 70-71).

**RESPONSE: Admitted.**

20.     Gomez's date of birth is March 6, 1967.  (Gomez Dep. at 14).

**RESPONSE: Admitted.**


21.     Denton and Griffin were born in 1963 and 1959, respectively.  (Denton Dep. at 9; Griffin Dep. at 8).

**RESPONSE: Admitted.**


22.     On December 4, 2005, Gomez began his employment at the Goodlettsville plant as a Production Supervisor.  (Gomez Dep. at 46).

**RESPONSE: Admitted.**


23.     During the 13 years that Gomez was employed at the Goodlettsville plant, he received only one written warning in 2011 for failing to notify his supervisor that he would be late for work.  (Gomez Dep. at 118-19, Ex. 9).

**RESPONSE: Admitted.**


24.     Gomez voluntarily resigned his employment on May 12, 2017; accepting a promotion and higher salary with a competitor.  (Gomez Dep. at 137, 140).

**RESPONSE: Admitted.**


25.     Gomez's resignation letter states, in pertinent part:

I have accepted a position with another company that will further my growth and development in my career. I have enjoyed working at Tyson Foods and will miss my peers; however, this new position will challenge my growth and further my career.

(Gomez Dep. Ex. 10).

**RESPONSE: Admitted.**

26.    Dyer, Griffin, and Grant all asked Gomez not to leave Tyson.   (Gomez Dep. at 121, 132, 134; Grant Dep. at 78-79).

**RESPONSE: Admitted that Griffin said he didn't want Gomez to leave but Gomez didn't believe Griffin. Gomez Depo., p. 132.  During the same conversation Griffin was speaking so badly about Kolshi and saying that you cannot trust Muslims. Gomez Depo, p. 133-134.**

27.    Gomez admits that Tyson offered him a salary increase if he agreed to stay at the Goodlettsville plant, but he declined.  (Gomez Dep. at 50, 132, 134-35; Grant Dep. at 79).

**RESPONSE: Admitted that Tyson offered to pay Plaintiff Gomez a raise that was promised to him several years ago.  Gomez Depo. p. 134-135.**

28.    Following Gomez's resignation, Griselda Guerra Quiroz ("Quiroz") filled his position. (Griffin Dep. at 313).

**RESPONSE: Admitted.**

29.    Quiroz is Latino.  (Griffin Dep. at 313, Gomez Dep. at 14, 152-53).

**RESPONSE:  Admitted for summary judgment purposes.**

30.    To support his race, color, and national origin discrimination claims, Gomez identifies the following discriminatory actions: (1) an alleged promise to provide him a pay increase in 2005, and (2) incidents with past supervisors that he considered discriminatory. (Gomez Dep. at 47-48, 53-56, 67-68, 74-75).

**RESPONSE: Admitted that these were part of Plaintiff Gomez's testimony; however, Gomez also testified that Griffin said, "If you are not from here, you have to pay the price" and made comments about foreigners having to learn English. Gomez Depo., p. 82-83, 199. Additionally, American born employees were treated**

**more favorably than non-American born employees. (Gomez Depo., pp. 122, 127, 161-163, 195, 198. Gomez was denied opportunities to transfer to a more favorable department and/or discouraged from moving to a more favorable shift. Gomez Depo., p. 98. Gomez was discouraged from moving to A shift by Crystal Dyer with human resources and Gomez was also prevented from moving to the load out shift. Gomez Depo., p. 50; Kolshi Depo. p. 173-174. Griffin picked on Gomez, unfairly scrutinizing his line and work. Omar Depo., p. 232. Rusty Rainey American born employee was treated more favorably than Gomez. Gomez Depo., p. 177. Griffin would pick out problems in Gomez's line and criticize them but didn't say anything when those things also existed in other lines with non-foreign-born supervisors. Omar Depo., p. 229. The general discriminatory comments and increased negative attention by Griffin had gotten so bad that Gomez was feeling very bad about the situation with Griffin leading up to his resignations, and he expressed his concerns and feelings to Omar who reported it up his chain of command to Kolshi. Omar Depo., p. 232. Griffin bragged about getting rid of foreign-born employees and wanted the foreign managers out so he could hire new staff of his choice. Gomez depo., p. 198. Benitez also heard Griffin make comments about Gomez's English language skills. Benitez Depo., p. 389. Gomez submits all of these facts as evidence to support his Title VII claims.**

31.     Gomez claims that Tyson reneged on an alleged promise to give him a seven percent pay increase for transferring to the Goodlettsville plant from the Norfolk, Nebraska plant in 2005.  (Gomez at 47-48, 160).

**RESPONSE: Admitted.**

32.     Gomez intended to leave the Norfolk plant regardless of Tyson's promise to increase his pay.  (Gomez Dep. at 48).

**RESPONSE: Admitted.**

33.     Gomez did not raise this pay issue with Tyson until he resigned in May 2017. (Gomez Dep. at 49).

**RESPONSE: Admitted.**

34.     Gomez first claims that when he reported to Tim Merryman in 2005, Merryman made a comment to him about "think[ing] with intelligence." (Gomez Dep. at 46, 68).

**RESPONSE: Admitted.**

35.     Gomez confronted Merryman about his choice of words and Merryman explained that it was not personal, and that he would try to refrain from using that terminology with Gomez in the future. (Gomez Dep. at 73).

**RESPONSE: Admitted for the purposes of summary judgment.**

36.     Gomez had issues with Bob Beasley's treatment of him in 2011. (Gomez Dep. at 74).

**RESPONSE: Admitted.**

37.     Gomez admits that Tyson terminated Beasley's employment after an investigation by Human Resources. (Gomez Dep. at 87).

**RESPONSE: Admitted for the purposes of summary judgment.**

38.     Gomez also takes issue with Steve Ligon based on a comment that Ligon made in 2010 about "foreigners," which Gomez found offensive. (Gomez Dep. at 53, 55, 90).

**RESPONSE: Admitted.**

39.     Gomez claims that Ligon criticized his job performance but admits that Ligon apologized when Gomez confronted him about this issue. (Gomez Dep. at 57-58).

**RESPONSE: Admitted.**

40.     Gomez filed an EEOC charge in August 2011 regarding Beasley and Ligon, which he decided not to pursue further.  (Ex. A to Motion; Gomez Dep. at 87-88).

**RESPONSE: Admitted.**

41.     Gomez testified that he also had issues with Plaintiffs Kolshi and Omar when they supervised him.  (Gomez Dep. at 94, 106).

**RESPONSE:  Denied.  Gomez testified that he didn't think the evaluation was "right" but doesn't say he had "issues" with Kolshi and Omar.  Gomez Depo., p. 108.  Additionally, he explained that Omar said everything had to be perfect and was just passing down the instructions from those above him.  Gomez Depo., p. 106.**

42.     Gomez claims that the performance evaluations he received when Omar supervised him were discriminatory, but he admits the evaluations did not actually affect his employment.  (Gomez at 105-07).

**RESPONSE: Admitted that the evaluations didn't affect his employment, submit he actually elaborated and described the fact that he received a lower than perfect score as not "right," but that explained the discrimination as not so much the evaluations as the way he was treated by others.  Gomez Depo., p. 107.**

43.     Gomez claims to have experienced discriminatory treatment by Denton when Denton was the Complex Human Resources Manager at the Goodlettsville plant, which was prior to October 2014.  (Gomez Dep. at 145-46; Denton Dep. at 25).

**RESPONSE: Admitted.**

44.     Gomez believes that Denton dislikes Latinos because Denton told Gomez on one occasion that he would like to hire more Asian employees.  (Gomez Dep. at 146, 156).

**RESPONSE: Admitted.**

45.     Gomez also relies on an incident that occurred when Denton's daughter visited the Goodlettsville plant.  (Gomez Dep. at 149).

**RESPONSE: Admitted.**

46.     Gomez recalls that when Denton's daughter visited the Goodlettsville plant, Denton said that anyone who had romantic intentions for his daughter would be terminated immediately.  (Gomez Dep. at 149).

**RESPONSE: Admitted.**

47.     Gomez believes that Denton's comment was discriminatory towards Latinos because Denton was looking at him when he made this comment.  (Gomez Dep. at 149).

**RESPONSE: Admitted.**

48.     Regarding Griffin, Gomez points to a statement that he overheard Griffin make to another employee along the lines of "If you're not from here, you have to pay the price. You must learn English."  (Gomez Dep. at 82-83).

**RESPONSE: Admitted.**

49.     Gomez admits that when he raised the topic of his English skills to Griffin, Griffin responded, "[you're] English [is] fine." (Gomez Dep. at 199).

**RESPONSE: Admitted Griffin said that to Gomez but denied because Griffin also made negative comments about Gomez's English language skills in front of Benitez. Benitez Depo., p. 389.**

50.     Gomez did not report to Griffin during his employment and he explained that Griffin was always two to three positions above him.  (Gomez Dep. at 100).

**RESPONSE: Admitted.**


51.     Gomez admits that Griffin never disciplined him.  (Gomez at 128).

**RESPONSE: Admitted.**


52.     Gomez admits that Griffin encouraged him to apply for promotions, but that he chose not to apply for them.  (Gomez Dep. at 110-11, 116, 179).

**RESPONSE: Admitted.  Gomez did not apply for these general positions because he felt he would be closer to Griffin and more likely to be terminated if he advanced. Gomez Depo., p. 110.**


53.     Gomez admits that he never had any problems with Dyer.  (Gomez Dep. at 145).

**RESPONSE: Admitted that Gomez states he never had any problems with Dyer, but he also cited Dyer as a reason he had to leave Tyson, despite not having problems himself with her.  Gomez Depo., p. 145.  The way Dyer treated others affected Gomez's view even if she didn't do anything personal to Gomez.**


54.     To support his belief that he was discriminated against because of his race, color, or national origin, Gomez testified that the following employees serve as comparators: (1) Billy Parker; (2) Shantae Brinkley; (3) Rob Nelson; (4) Rusty Rainey; (5) Mark McCreary; (6) Derek Wiser; (7) Raphael Bonilla; and (8) Alban Kolshi.

**RESPONSE: Admitted.**


55.     Gomez admits that he did not work with Billy Parker, but that he "saw [Parker] from a distance."  (Gomez Dep. at 168).

**RESPONSE:  Admitted.**

56.     Gomez believes that Parker was treated better than him because, on one occasion, Parker threw down his hard hat but was not disciplined.  (Gomez Dep. at 168).

**RESPONSE: Admitted.**


57.     Gomez admits that he never threw down his hard hat, and thus does not know whether he would have been disciplined if he did.  (Gomez Dep. at 168).

**RESPONSE: Admitted.**


58.     Shantae Brinkley worked as an hourly employee who was later promoted to Supervisor and then General.  (Gomez Dep. at 178-79).

**RESPONSE: Admitted.**


59.     Gomez admits that he does not know Brinkley's qualifications for the General position and he never applied for the General position that Brinkley received. (Gomez Dep. at 179).

**RESPONSE: Admitted.**


60.     Rob Nelson did not work in Gomez's department, report to Gomez's supervisor, or hold the same position as Gomez. (Gomez Dep. at 167).

**RESPONSE:  Admitted.**

61.     Gomez believes that Nelson was treated better than him because he was often late to work, but Gomez admits that he is unaware if Nelson notified his supervisors that he was going to arrive late on these occasions.  (Gomez Dep. at 127, 130).

**RESPONSE: Admitted.**

62.     Rusty Rainey did not work in Gomez's department, report to Gomez's supervisor, or hold the same position as Gomez.  (Gomez Dep. at 176-77).

**RESPONSE:  Admitted.**

63.     Gomez believes that Rainey was treated better than him because it appeared that Rainey always had days off, but Gomez admits that he does not know the reasons why Rainey had days off or why they were approved.  (Gomez Dep. at 177).

**RESPONSE: Admitted.**

64.     Mark McCreary did not work in Gomez's department, but reported to Gomez's supervisor at some point.  (Gomez Dep. at 167-68).

**RESPONSE: Admitted.**

65.     Gomez believes that McCreary was treated better than him because McCreary was included in the rotation schedule for days off before the rotation schedule was cancelled. (Gomez Dep. at 162).

**RESPONSE: Admitted.**

66.     Gomez admits that McCreary was first in the rotation because McCreary was first to put his name on the list. (Gomez Dep. at 162-63).

**RESPONSE: Admitted but the reason McCreary was first to put his name on the list was because those close to Griffin, American born employees, knew when the rotation was going to be posted, so they were in the first few slots and then it was canceled halfway through, so Gomez never received a turn. Gomez Depo., p. 162-163.**

67.     Gomez believes that he could have offered his name before McCreary if he had reached the list first before him.  (Gomez Dep. at 162-63).

**RESPONSE: Admitted.**

68.     Derek Wiser did not work in Gomez's department or report to the same supervisor.  (Gomez Dep. at 166).

**RESPONSE: Admitted.**

69.     Gomez believes that Wiser was treated better than him because, years ago, he received a position in the Palletizing department that Gomez wanted. (Gomez Dep. at 158-59).

**RESPONSE: Admitted.**

70.     Gomez admits that he never applied for the position that Wiser received in the Palletizing department.  (Gomez Dep. at 158-59).

**RESPONSE: Admitted.**

71.     Gomez did not apply for the position Wiser received in the Palletizing department because Denton told him that the application period had closed. (Gomez Dep. at 159, 194).

**RESPONSE: Admitted.**

72.     Gomez believes that Wiser applied after the application period had closed but still received the position in the Palletizing department. (Gomez Dep. at 159, 194).

**RESPONSE: Admitted.**

73.     Gomez admits that nothing prevented him from completing the application form like Wiser did.  (Gomez at 194).

**RESPONSE: Admitted.**

74.     Further, Gomez admits that he never followed up with Denton for an explanation upon hearing that Wiser applied for the position in the Palletizing department after the application period has closed.  (Gomez Dep. at 195).

**RESPONSE: Admitted.**

75.     Raphael Bonilla worked in Gomez's department as a Supervisor.  (Gomez Dep. at 116).

**RESPONSE: Admitted.**

76.     Gomez believes that Bonilla was paid more than him and received a seven percent increase when he transferred to the Goodlettsville plant from another plant. (Gomez Dep. at 116-17).

**RESPONSE: Admitted.**

77.    Gomez is unaware of Bonilla's tenure with Tyson but admits that Bonilla is one of Tyson's longest-tenured employees.  (Tyson Dep. at 116).

**RESPONSE: Admitted.**


78.    Bonilla is Latino.  (Gomez Dep. at 115).

**RESPONSE: Admitted for summary judgment purposes.**


79.    Alban Kolshi reported to Gomez until he was promoted to Supervisor.  (Gomez Dep. at 181).

**RESPONSE: Admitted.**


80.    At some point before November 2012, Alban Kolshi was offered the opportunity to transfer to an open A shift position. (Gomez Dep. at 180).

**RESPONSE: Admitted.**


81.    Gomez believes that this open A shift position should have been offered to him first.  (Gomez Dep. at 180).

**RESPONSE: Admitted.**


82.    Gomez discussed this A shift transfer issue with Denton, who explained that Gomez had already been offered that position several times but had turned it down.  (Gomez Dep. at 180).

**RESPONSE: Admitted.**

83.     Gomez was offered an open A shift position in the Pork department approximately five or six months later in 2012, which he accepted. (Gomez Dep. at 180-81, 92-93).

**RESPONSE:  Admitted.**

84.     Alban Kolshi is Albanian and Plaintiff Lab Kolshi's brother.  (Gomez Dep. at 181).

**RESPONSE: Admitted.**

85.     One basis for Gomez's age discrimination claim is that Griffin called him "old man" on one occasion.  (Gomez Dep. at 185).

 **RESPONSE:** **Admitted.**

86.     Gomez admits that Griffin is older than him and that the comment was made in jest.  (Gomez Dep. at 157, 186, 188).

**RESPONSE:  Admitted the comment was made.  Gomez also overheard a conversation between his plant manager, Griffin, and human resources manager, Dyer, who are the main decision makers, about recruiting young people for supervisor positions while Gomez held a supervisor position.  Gomes Depo., p. 124-125, 127.  This is after Griffin had referred to him as "old man."  Gomez Depo., p. 185.  Additionally, Gomez was replaced by Griselda who was in her thirties at the time.  Griffin Depo., p. 313.**

87.     Gomez admits that he did not tell Griffin that he was offended by this "old man" comment and he did report it to anyone at Tyson.  (Gomez Dep. at 187, 189).

**RESPONSE: Admitted.**

88.     Gomez was present for a conversation in which Griffin and Dyer were allegedly discussing a plan to recruit young people to serve as supervisors.  (Gomez Dep. at 124-25, 127).

**RESPONSE: Admitted.**

89.    Gomez admits that neither Dyer nor Griffin ever said that they were thinking about replacing him with these individuals.  (Gomez Dep. at 125).

**RESPONSE: Admitted they didn't specifically mention replacing Gomez, but the plant manager, Griffin, and human resources manager, Dyer, who are the main decision makers, were talking about recruiting young people for supervisor positions while Gomez held a supervisor position.  Gomes Depo., p. 124-125, 127.**

90.     Gomez felt that he would be indirectly affected if Tyson hired young supervisors because he would have to train them and that one day, they would be his superiors.  (Gomez Dep. at 126-27).

**RESPONSE: Admitted.**

91.    In support of his retaliation claim, Gomez identifies a complaint that he made to Griffin about Ausbrooks prior to October 2013, before Griffin became the Plant Manager.  (Gomez at 171, 189-92; Doc. 35-8).

**RESPONSE: Denied. Gomez also reported that he was feeling very bad about the situation with Griffin leading up to his resignation to Omar. Omar Depo., p. 232. He shared his concerns and feelings to Omar who reported it up his chain of command to Kolshi.  Omar Depo., p. 232.**

92.    In October 2013, Gomez complained to Griffin that Ausbrooks had given him instructions on how to run his line, which Gomez did not believe were safe.  (Gomez Dep. at 171-72, 189-92).

**RESPONSE: Admitted.**

93.     After this complaint in October 2013, Gomez believes that Griffin watched his line more closely.  (Gomez Dep. at 171-72, 189-92).

**RESPONSE: Admitted.**

94.     Gomez admits that he was not disciplined for complaining about Ausbrooks's instructions in October 2013.  (Gomez Dep. at 193).

**RESPONSE: Admitted.**

**Undisputed Material Facts Concerning Wahid's Claims**

95.     Wahid started working for Tyson as a Production Trimmer at the Goodlettsville plant in 2003.  (Wahid Dep. at 18).

**RESPONSE: Admitted.**

96.     Over the course of his employment, Wahid held several positions and received promotions.  (Wahid Dep. at 18-19, 20-21, 23-24, 48-49, 52-53, 65-67, 68).

**RESPONSE: Admitted.**

97.     When he resigned, Wahid was employed as a Production Supervisor on A shift in the Beef department.  (Wahid Dep. at 65-67, 68).

**RESPONSE: Admitted.**

98.     On May 15, 2017, Wahid resigned; accepting a promotion and higher salary with a competitor.  (Wahid Dep. at 115, 163).

**RESPONSE: Admitted.**

99. Wahid's resignation letter states in pertinent part:

My last day at Tyson food, will be 5/31/2017. This wasn't an easy decision, because I am grateful for the rewarding employment I've had with (Tyson food). But after long hours of consideration, My decision is now final and I have accepted a position with another comparative food company.

(Wahid Dep. Ex. 25).

**RESPONSE: Admitted.**

100. Wahid claims that he resigned because "many issues happened [and] [n]o action [was] taken." (Wahid Dep. at 115).

**RESPONSE: Admitted.**

101. Wahid identifies the foregoing unresolved issues as: (1) he was unhappy with his pay rate in 2003 (Wahid Dep. at 115); (2) a co-worker attempted to attack him with machete in May 2016 (Wahid Dep. at 116, Ex. 24); (3) he was prevented from praying with his subordinate employees and instructed to issue discipline to employee if they returned late from prayer breaks prior to October 2013 (Wahid Dep. at 129-30, 158-59); (4) Ausbrooks made a comment to him about a tattoo and embarrassed him at a restaurant sometime before October 2013 (Wahid Dep. at 131-32); (5) he was mistreated by Beasley and Ligon in 2011 (Wahid Dep. at 141); and (6) he thought Griffin had a bad attitude when he returned to Goodlettsville as Plant Manager in 2016 (Wahid Dep. at 144).

**RESPONSE: Denied. Wahid also submits that Griffin told him he makes twice as much here as he would in Morocco and told Wahid that because he was from Morocco it shouldn't have bothered him when an employee tried to attack him with a machete at work. Wahid Depo., p. 154, 182, 269. Griffin would pick out problems in Wahid's line and criticize him but didn't say anything when those things also existed in other lines with non-foreign-born supervisors. Omar Depo., p. 229. Griffin also made Omar call Wahid to come back to work when Wahid's child was ill, but Griffin didn't make him do that with other supervisors who needed to be out, they would just cover the absence. Omar Depo., p. 230. Omar could not remember**

additional specifics of unfair treatment but remembers it occurring and that Wahid felt very bad about the situation with Griffin leading up to his resignations, and he expressed his concerns and feelings to Omar who reported it up his chain of command to Kolshi. Omar Depo., p. 232. Rusty Rainey was treated more favorably than Wahid. Wahid Depo., pp. 49-50. Additionally, Griffin frequently questioned Wahid about his Muslim faith denied him a day off for a religious request and asked Wahid to put a Muslim lady in the back of the line Wahid Depo., pp. 189, 198. Wahid, Kolshi and Omar didn't "even dare to practice prayer in Goodlettsville. And the reason why is because of all the negative comments the plant manager does and makes toward all Muslim team members who are trying to practice their prayer time." Omar Depo., p. 262. Wahid agreed and explained Griffin, the plant manager, was all the time asking him why he was Muslim, why Muslims prayed and other questions about faith that he found offensive. Wahid Depo., p. 203-204, 207. Griffin made a lot of "jokes" about all the Muslim people, making references to the way they wear their scarf, the way they pray, the way they wash themselves before they prayed. Omar Depo., p. 262. Griffin especially spoke badly about some Somali Muslim ladies saying things like, "What beauty she thinks she's hiding with this scarf? Even if she don't have the scarfs, nobody's going to look at her." Omar Depo., p. 263. Griffin hated having to accommodate the prayer times and especially during fasting period because of the way it affected production, Griffin always complained and made derogatory jokes. Omar Depo., p. 265. Griffin also complained that Muslims are not serious about prayer and were just using the system when going to pray. Omar Depo., p. 266. Griffin also told Wahid to get his "Moroccan ass over here" at least twice. Wahid Depo., p. 269-270.

102.   Regarding Griffin's bad attitude upon returning to Goodlettsville as Plant Manager, Wahid explained that Griffin often seemed impatient and upset when he was on the production floor. (Wahid Dep. at 142, 144).

**RESPONSE: Admitted that Griffin was upset with foreign-born supervisors and generals. Omar Depo., p. 229.**

103.   As an example of Griffin's bad attitude, Wahid recalls Griffin asking, "What is this? . . . Why is the trash in the floor?" (Wahid Dep. at 144).

**RESPONSE: Admitted.**

104.     Wahid admits that Griffin's questions on these occasions concerned production issues and that this "bad attitude" was primarily directed at the Generals. (Wahid Dep. at 142, 144).

**RESPONSE: Admitted but it was only directed at foreign born generals and supervisors. Omar Depo., p. 229.**

105.     Regarding his pay, Wahid claims that he was underpaid back in 2003 and that Spanish-speaking employees received higher pay. (Wahid Dep. at 87, 115).

**RESPONSE: Admitted.**

106.     Wahid told Griffin on one occasion that he thought his pay was incorrect and Griffin responded that he would take care of it. (Wahid Dep. at 88).

**RESPONSE: Admitted.**

107.     Wahid admits that, by 2007, he had no further complaints about his pay. (Wahid Dep. at 89).

**RESPONSE: Admitted.**

108.     Wahid also relies on an incident in which an hourly employee brought a machete to work and planned to attack him. (Wahid Dep. at 116-20).

**RESPONSE: Admitted.**

109.     This event occurred in May 2016, before Griffin's promotion to Plant Manager. (Wahid Dep. at 127-28; Doc. 38-5).

**RESPONSE: Admitted.**

110.    The machete-wielding employee was stopped before he reached Wahid and Tyson promptly terminated his employment.  (Wahid Dep. at 116-17, 126-27).

**RESPONSE: Admitted.**


111.    Wahid also alleges that, in approximately 2011, he was discriminated against by Beasley and Ligon.  (Wahid Dep. at 25).

**RESPONSE: Admitted.**


112.    Wahid admits that Beasley's employment was terminated.  (Wahid Dep. at 40-41).

**RESPONSE: Admitted.**


113.    Wahid's complaint about Ligon concerns an occasion in which Ligon allegedly flicked a piece of fatty meat in Wahid's face.  (Wahid Dep. at 29).

**RESPONSE: Admitted.**


114.    Ligon was issued a written warning for this incident and later demoted.  (Wahid Dep. Ex. 3; Kolshi Dep. at 57).

**RESPONSE: Admitted.**


115.    On March 28, 2011, Wahid signed a complaint resolution form confirming that he considered the meat flicking incident resolved and that his relationship with Ligon was fine. (Wahid Dep. Ex. 2).

**RESPONSE: Admitted.**

116.    Wahid filed an EEOC charge related to his issues with Beasley and Ligon in August 2011, and the EEOC issued him a Right to Sue letter on March 8, 2012.  (Ex. B to Motion).

**RESPONSE: Admitted.**

117.    Wahid claims that he applied for, but was denied, three positions in January 2016, March 2016, and May 2016.  (Wahid Dep. at 55-56).

**RESPONSE: Admitted.**

118.    The positions Wahid applied for were awarded to ethnically diverse candidates and these promotion decisions occurred before Griffin's promotion to Plant Manager.  (Wahid Dep. at 55-56; Doc. 38-5).

**RESPONSE: Admitted.**

119.    Wahid admits that he cannot identify any Production Supervisors who were treated better than him.  (Wahid Dep. at 193).

**RESPONSE:  Denied. Wahid identified Mena Khalil.  Wahid Depo., p. 199-200.**

120.    To support his religious discrimination claim, Wahid recalls alleges that when he was an hourly employee, Beasley, Ligon, and Ausbrooks would time prayer breaks taken by Muslim employees.  (Wahid Dep. at 201).

**RESPONSE: Admitted that occurred but Denied that is all Wahid is claiming to support his religious discrimination claim.  Mena Khalil was permitted a day off for**

**a religious event while Wahid was denied a day off for a religious event by Griffin. Wahid Depo., p. 199-200. Additionally, Griffin asked Wahid to put a Muslim lady in the back of the line Wahid Depo., pp. 189, 198. Wahid, Kolshi and Omar didn't "even dare to practice prayer in Goodlettsville. And the reason why is because of all the negative comments the plant manager does and makes toward all Muslim team members who are trying to practice their prayer time." Omar Depo., p. 262. Wahid agreed and explained Griffin, the plant manager, was all the time asking him why he was Muslim, why Muslims prayed and other questions about faith that he found offensive. Wahid Depo., p. 203-204, 207. Griffin made a lot of "jokes" about all the Muslim people, making references to the way they wear their scarf, the way they pray, the way they wash themselves before they prayed. Omar Depo., p. 262. Griffin especially spoke badly about some Somali Muslim ladies saying things like, "what beauty she thinks she's hiding with this scarf? Even if she don't have the scarfs, nobody's going to look at her." Omar Depo., p. 263. Griffin hated having to accommodate the prayer times and especially during fasting period because of the way it affected production, Griffin always complained and made derogatory jokes. Omar Depo., p. 265. Griffin also complained that Muslims are not serious about prayer and were just using the system when going to pray. Omar Depo., p. 266.**

121.    Wahid admits that he never complained to management or HR about Beasley, Ligon, and Ausbrooks timing Muslim prayer breaks. (Wahid Dep. at 201-202).

**RESPONSE: Admitted.**

122.    Wahid alleges that on two occasions prior to October 2013, Ausbrooks prevented Wahid from praying with his subordinate employees. (Wahid Dep. at 129-30, 139-40, 196).

**RESPONSE: Admitted.**

123.    Wahid admits that he did not complain about the foregoing incidents to anyone at Tyson. (Wahid Dep. at 140).

**RESPONSE: Admitted.**

124.    On one occasion prior to October 2013, Ausbrooks told Wahid to discipline employees who returned late from prayer breaks. (Wahid Dep. at 155-56, 196).

**RESPONSE: Admitted.**

125.    Wahid recalls that when Griffin was Operations Manager, he gave Wahid a similar instruction on three occasions.  (Wahid Dep. at 155-56, 196).

   **RESPONSE: Admitted.**

126.    Wahid admits that he declined to follow these instructions from Ausbrooks, and Griffin and he did not issue any such disciplinary actions to employees who returned to work late from prayer breaks.  (Wahid Dep. at 158).

   **RESPONSE: Admitted.**

127.    Wahid admits that he was not disciplined for refusing to follow these instructions from Ausbrooks and Griffin.  (Wahid Dep. at 158).

   **RESPONSE: Admitted.**

128.    Wahid admits that he did not complain to anyone at Tyson about these instructions about prayer breaks from Ausbrooks and Griffin.  (Wahid Dep. at 158).

   **RESPONSE: Admitted.**

129.    Wahid recalls that Griffin would ask him questions about his religion, such as "Why are you Muslim?" and "Why do you [pray] five times [a day]?" (Wahid Dep. at 207).

   **RESPONSE: Admitted.**

130.    Wahid cannot recall how many times Griffin asked him these questions, but he believes it was more than once.  (Wahid Dep. at 208).

   **RESPONSE: Admitted.**

131.    Apart from these questions from Griffin, Wahid cannot recall any other statements that were made to him about his religion that he found offensive.  (Wahid Dep. at 203-204).

   **RESPONSE: Denied.  Griffin frequently questioned Wahid about his Muslim faith and denied him a day off for a religious request and asked Wahid to put a Muslim lady in the back of the line Wahid Depo., pp. 189, 198.  He found all of these things offensive.  Additionally, Wahid, Kolshi and Omar didn't "even dare to practice prayer in Goodlettsville.  And the reason why is because of all the negative comments the plant manager does and makes toward all Muslim team members who are trying to practice their prayer time."  Omar Depo., p.  262.  Wahid agreed and explained Griffin, the plant manager, was all the time asking him why he was Muslim, why Muslims prayed and other questions about faith that he found offensive. Wahid Depo., p. 203-204, 207.  Griffin made a lot of "jokes" about all the Muslim people, making references to the way they wear their scarf, the way they pray, the way they wash themselves before they prayed.  Omar Depo., p. 262.  Griffin especially spoke badly about some Somali Muslim ladies saying things like, "what beauty she thinks she's hiding with this scarf? Even if she don't have the scarfs, nobody's going to look at her."  Omar Depo., p. 263.  Griffin hated having to accommodate the prayer times and especially during fasting period because of the way it affected production, Griffin always complained and made derogatory jokes.  Omar Depo., p. 265.  Griffin also complained that Muslims are not serious about prayer and were just using the system when going to pray.  Omar Depo., p. 266.**

132.    Wahid admits that his retaliation claim is based on two complaints that he made to Griffin about Ausbrooks prior to October 2013.  (Wahid Dep. at 206; Doc. No. 35-8).

   **RESPONSE: Denied. That is the basis of Wahid's retaliation claim.  Wahid reported the harassment and discrimination from Griffin and Dyer to Omar.  Omar Depo., p. 232.  Omar reported this to his chain of command Kolshi.  Omar Depo., p. 232-233. Kolshi discussed this with Griffin and Sorensen.  Griffin retaliated and began to scrutinize Wahid, and the other Plaintiff's, line even more.   Omar Depo., p. 130-131, 133-134, 241; Benitez Depo., pp. 46, 47, 318-321, 325; Kolshi Depo., p. 121.**

133.    The first incident was a comment Ausbrooks made to Wahid about getting a "Doug Griffin power tattoo" on his neck.  (Wahid Dep. at 131).

 **RESPONSE: Admitted.**


134.    Wahid does not know what Ausbrooks meant by the "Doug Griffin power tattoo" comment and he did he ask him.  (Wahid Dep. at 131).

**RESPONSE:  Admitted.**


135.    The second incident occurred after hours at a restaurant during which Wahid claims that Ausbrooks paid a female server $20 dollars to put her chest in Wahid's face.  (Wahid Dep. at 132).

**RESPONSE: Admitted.**


136.    Wahid admits that nothing like either of the foregoing events ever happened again after he complained to Griffin about them.  (Wahid Dep. at 132).

 **RESPONSE: Admitted.**


137.    Wahid admits that he never made any other reports of harassment or discrimination about Griffin or others.  (Wahid Dep. at 195, 213).

**RESPONSE:  Denied. Wahid reported the harassment and discrimination from Griffin and Dyer to Omar.  Omar Depo., p. 232.  Omar reported this to his chain of command Kolshi.  Omar Depo., p. 232-233. Kolshi discussed this with Griffin and Sorensen.   Griffin retaliated and began to scrutinize Wahid, and the other Plaintiff's, line even more.   Omar Depo., p. 130-131, 133-134, 241; Benitez Depo., pp. 46, 47, 318-321, 325; Kolshi Depo., p. 121.**

**<u>Undisputed Material Facts Concerning Omar's Claims</u>**

138.     Tyson hired Omar in June 2009 to work at its poultry plant in Shelbyville, Tennessee as an hourly employee. (Omar Dep. at 23-24, 25).

**<u>RESPONSE:</u> Admitted.**


139.     Omar received various promotions at the Shelbyville plant and later applied for an open position at the Goodlettsville plant.  (Omar Dep. at 26).

**<u>RESPONSE:</u> Admitted.**


140.     Omar's transfer request was approved, and he started working at the Goodlettsville plant as a Production Supervisor in December 2012.  (Omar Dep. at 24-28, Ex. 2).

**<u>RESPONSE:</u> Admitted.**


141.     Tyson promoted Omar to General within a year of his transfer to the Goodlettsville plant.  (Omar Dep. at 32).

**<u>RESPONSE:</u> Admitted.**


142.     Tyson coached Omar about his management style and temper throughout his employment.  (Omar Dep. Ex. 9-10, 12, 15-18).

**<u>RESPONSE:</u> Admitted.**


143.     In his 2013 Performance Evaluation, Omar's supervisor, Plaintiff Lab Kolshi, wrote the following comments: "Omar needs to work on giving and receiving negative

feedback"; "Omar struggle[s] to get along with his hourl[ies] and his peers"; and "the most important thing you are missing here is showing concern to your team members. There ha[ve] been several times that you have been to[o] aggressive with your team members which has caused a lot of issues." (Omar Dep. at 51-54, Ex. 9).

**RESPONSE:** **Admitted.**


144.    In his 2014 Performance Evaluation, Plaintiff Lab Kolshi wrote that Omar "needs to do a better job on building relations with the support groups that he works with" and that "Omar doesn't always adapt to change well . . ." (Omar Dep. Ex. 10).

**RESPONSE:** **Admitted.**


145.    In his 2016 evaluation, Omar was rated as an "inconsistent performer" and Kolshi noted again that Omar needed to work on candor and building relationships with support departments. (Omar Dep. at 59, 61, 65, Ex. 12).

**RESPONSE:** **Admitted.**


146.    Omar's mid-year review for 2017 contained no comments but noted how Omar was behind on almost every "goal." (Omar Dep. at 69, 71, Ex. 13).

**RESPONSE:** **Admitted.**


147.    Omar believes that his "last" performance evaluation was discriminatory, and that Griffin was responsible for its content. (Omar Dep. at 63, 69).

**RESPONSE:  Admitted. Tyson criticizes Omar for being unable to articulate which performance review was the one that upset him, but Sorensen (Human Resources Director) clarified that a quirk of Tyson's system used to capture performance reviews was that the name of the supervisor would pull from when you printed the**

document instead of who performed the review if the supervisor had changed during that time period. For example, Kolshi's review done in 2015 shows Doug Griffin as the supervising reviewer but was completed by Jeff Rowan. Sorensen Depo., p. 105. This makes it very confusing to try and recreate a timeline or identify which evaluation was completed by whom.

148.     Omar does not know whether it was his 2016 evaluation or 2017 mid-year evaluation that upset him. (Omar Dep. at 73).

**RESPONSE:** **Admitted. Tyson criticizes Omar for being unable to articulate which performance review was the one that upset him, but Sorensen (Human Resources Director) clarified that a quirk of Tyson's system used to capture performance reviews was that the name of the supervisor would pull from when you printed the document instead of who performed the review if the supervisor had changed during that time period. For example, Kolshi's review done in 2015 shows Doug Griffin as the supervising reviewer but was completed by Jeff Rowan. Sorensen Depo., p. 105. This makes it very confusing to try and recreate a timeline or identify which evaluation was completed by whom.**

149.     Omar admits that Tyson uses performance evaluations to give constructive criticism and to identify areas in which company goals are not being met. (Omar Dep. at 78).

**RESPONSE:** **Admitted.**

150.     Omar received a pay increase shortly after his 2016 evaluation. (Omar Dep. Ex. 14).

**RESPONSE:** **Admitted.**

151.     Omar did not receive any written disciplinary actions for his performance in the Beef department after Griffin returned to the Goodlettsville plant to serve as Plant Manager. (Omar Dep. Ex. 15).

**RESPONSE:** **Denied. Omar received a memorandum regarding his performance from Griffin in February of 2017. Omar Depo., p. 121. Omar understood this was something Griffin was using to get him out. Omar Depo., p. 124.**

152. The disciplinary actions that Omar received were issued to him by Plaintiff Lab Kolshi in 2013 and concerned team member treatment issues:

| Date | Level | Description | Supervisor | Citation |
|------|-------|-------------|------------|----------|
| 3/20/13 | Written Warning | "Investigation revealed that; while in process of observing the QA perform a routine quality check of product on line one beef slice, Omar and Hamdi (QA) became engaged in a verbal confrontation over a call on the product 'bnfs stripe', that resulted in foul and abusive language" | Lab Kolshi | Omar Dep. Ex. 15, Tyson 001195 |
| 4/8/13 | Counseling | "After performing an investigation into TM treatment issues it was determined that Omar: uses too loud of a voice, failed to respond timely to TM's wanting to use the restroom; didn't hand out pay stubs timely, tosses meat on the line, didn't have sharp knives available and jokes with TM's about their weight" | Lab Kolshi | Omar Dep. Ex. 15, Tyson 001202 |
| 6/25/13 | Written Warning | "After investigation, it was determined that 1) Omar discuss team member issues with other team members 2) timed TM going to the restroom by holding up a stop watch in front of the TM and other TM 3) yelled or made unprofessional remarks that team members heard" | Lab Kolshi | Omar Dep. Ex. 15, Tyson 001203 |

**RESPONSE:  Admitted.**


153. Tyson received three separate helpline calls from hourly employees related to Omar's treatment of them.  (Omar Dep. Ex. 16-18).

**RESPONSE:  Admitted.**


154. On February 2, 2017, Griffin met with Omar to discuss his performance and to review a corresponding memorandum that Sorensen assisted in drafting.  (Omar Dep. 121, 123, Ex. 15. P. "Tyson 001235").

**RESPONSE:  Admitted.**

155.    The memorandum explains that its purpose is not to discipline Omar, but to share concerns about his performance as a General related to his composure, the perception by Omar's employees that he is arrogant and impatient, and his listening skills.  (Omar Dep. at 123, Ex. 15, p. "Tyson 001235;" Griffin Dep. at 242).

**RESPONSE:** **Denied. Omar understood this was something Griffin was using to get him out.  Omar Depo., p. 124.**

156.    Omar does not dispute Griffin's critique of his performance and explains that, during this time, there was a lot of pressure on him from a production standpoint, which affected his behavior.  (Omar Dep. at 136-37).

**RESPONSE:** **Denied.  Omar explained that his performance was suffering because of his treatment and the pressure put on him.  Omar Depo., p. 139.  He had pleaded with Dyer for help, explained that every morning Griffin humiliated him in front of his team, made him miserable, told jokes about him to his team, threw trash on his workplace and called him a terrorist.  Omar Depo., p. 131-132.  After Omar reported this to Dyer, Griffin and Dyer came in and "chewed my butt so bad." Omar Depo., p. 132.  They said, "This is what we have. If you don't like it leave." Omar Depo., p. 132.  Omar would cry at the treatment from his Griffin and Dyer, he reported to human resources and no change, he reported to Kolshi and no change.  Omar Depo., p. 132-134.**

157.    Omar admits that he was not terminated for any of his past disciplinary issues, helpline calls, or because of the February 2, 2017 memorandum.  (Omar Dep. at 140, 144-45, 150, 153).

**RESPONSE:** **Admitted.**

158.    On May 1, 2017, Tyson received a note from Omar's doctor to excuse him from work until June 1, 2017.  (Omar Dep. at 163-64, Ex. 20, p. "Tyson 001360").

**RESPONSE:** **Admitted.**

159.    On May 1, 2017, Dyer sent Omar a letter by certified mail requesting that he return a Certification of Health Care Provider form to Tyson to determine if his condition qualified for FMLA leave.  (Omar Dep. at 165, Ex. 20, p. "Tyson 001361").

**RESPONSE: Admitted.**

160.    Omar admits that he received Dyer's May 1 letter and then asked his physician to complete the certification paperwork.  (Omar Dep. at 165).

**RESPONSE: Admitted.**

161.    Omar's doctor returned the completed certification form to Tyson Omar's FMLA leave was approved.  (Omar Dep. at 166-97, Ex. 20, pp. "Tyson 001362-001366").

**RESPONSE: Admitted.**

162.    On May 15, 2017, Tyson received another note from Omar's doctor that released him to return to work if he could perform a "sit down job only" until June 1, 2017.  (Omar Dep. at 167, Ex. 20, p. "Tyson 001368").

**RESPONSE: Admitted that this occurred after Tyson contacted Omar's doctor and asked him to change his restriction of off work status. Omar Depo., p. 167.**

163.    Cooper sent Omar a letter by certified mail notifying him that Tyson had work available for him and asked that he return to work on May 17, 2017.  (Omar Dep. at 173, Ex. 20, p. "Tyson 001369;" Griffin Dep. at 248).

**RESPONSE:  Denied that Omar received this letter.  Omar Depo., p. 175.**

164.     Omar did not return to work on or after May 17, 2017.  (Omar Dep. at 174, 179-80).

**RESPONSE:  Admitted.**


165.     On May 16, 2017, Omar visited another doctor and obtained a note excusing him from work until May 22, 2017.  (Omar Dep. at 181-83, Ex. 20, p. "Tyson 001370").

**RESPONSE:  Admitted.**


166.     Instead of reporting to work on May 22, 2017, Omar visited an orthopedic clinic and provided two doctor's notes to Tyson indicating that he was to remain off work for "now." (Omar Dep. at 184, Ex. 20, pp. "Tyson 001371-72").

**RESPONSE: Admitted Omar attended an appointment on May 22, 2017, denied it was instead of reporting to work. At that time, Omar had approved FMLA leave through June 1, 2017.  Omar Depo., p. 166.**


167.     In response to these new doctors' notes, Dyer sent Omar a letter by certified mail on May 31, 2017, notifying him that his doctor needed to complete FMLA certification paperwork and return it to Tyson by June 15, 2017.  (Omar Dep. at 186-88, Ex. 20, p. "Tyson 001374").

**RESPONSE: Admitted.**


168.     Neither Omar nor his doctors returned the FMLA certification paperwork to Tyson as requested in Dyer's May 31 letter.  (Ex. 21, p. "Omar 000046").

**RESPONSE: Admitted.**


169.     Instead of terminating Omar's employment on June 15, 2017, Gary Denton called

Omar to inquire about the status of his certification paperwork and to give him an extension until the end of the week to return it to Tyson. (Denton Dep. at 103-105; Omar Dep. at 188, 190-91, 192).

> **RESPONSE: Denied. Omar doesn't recall Denton asking about the paperwork; he does recall discussing the situation with Griffin with Denton and the fact he needed time off to heal. Omar Depo., p. 190-192.**

170. Omar did not return the FMLA certification paperwork by Denton's extended deadline and Denton tried to call him again but received no answer. (Denton Dep. at 106; Ex. 21, p. "Omar 000046").

> **RESPONSE: Admitted.**

171. On June 29, 2017, Dyer sent Omar a letter by certified mail notifying him that due to his failure to return the requested FMLA certification form or provide further medical documents extending his current LOA, Tyson had no choice but to terminate his employment. (Omar Dep at 199-200, Ex. 21, p. "Omar 000046").

> **RESPONSE: Denied. Tyson had choices. Tyson could have chosen to extend Omar additional leave so that he could have the surgeries he needed to return to work. Omar Depo., p. 169-170, 179-180. It would have helped if Tyson hadn't terminated his health insurance on May 18, 2017 so Omar could have received the additional care. Omar Depo., p. 279, 281. Tyson also could have chosen not to interfere with Omar's leave by calling his physicians and asking them to change his restrictions and contributing to a hostile environment. Omar Depo., p. 167. Tyson also could have chosen to take action any one of the numerous times Omar and other Plaintiffs reported discrimination to Dyer, Sorensen, Griffin and Denton so that we wouldn't be in this situation. Omar Depo., pp.130-132, 232-233, 247, 319-320; Dyer Depo., p. 51, 55; Kolshi Depo., p. 121, 123;283-285. Sorensen Depo., p. 28.**

172. Dyer's June 29 letter provided, in relevant part, "[i]f there is a valid reason or special circumstances that prevented you from contacting me prior to the end of your current LOA, which ended on June 25, 2017, please call me to discuss." (Omar Dep., Ex. 21, p. "Omar

000046").

**RESPONSE: Admitted.**

173.    Omar did not contact Tyson in response to Dyer's June 29 letter. (Denton Dep. at 106; Dyer Dep. at 137; *see also* Omar Dep. at 201).

**RESPONSE: Admitted.**

174.    Omar produced copies of both the May 31, 2017 and June 25, 2017 letters in response to Tyson's discovery requests.  (Ex. C to Motion; Omar Dep. Ex. 21).

**RESPONSE: Admitted.**

175.    Omar identifies as "white."  (Omar Dep. at 245).

**RESPONSE: Admitted.**

176.    To support his discrimination claims, Omar relies on an incident when Griffin threw trash on his desk when he shared an office with Juan Lorenzo and Alban Kolshi.  (Omar Dep. at 131, 253, 255).

**RESPONSE: Admitted that is one incident Omar claims was discriminatory.  Omar also submits that his termination around June 20, 2017 was discriminatory.  Omar Depo., pp. 199-200. Among other things, Griffin made jokes about Omar being a terrorist, called him "the Iraqi guy," showed other employees pictures of Omar and said, "Doesn't he look like a terrorist?" and told Omar, "This is the way things are here, and if you don't like it get out" when Omar reported him. Omar Depo., pp.130-132, 247.  Even Human Resources Manager Dyer witnessed Griffin say in a management meeting that Omar looked like a terrorist.  Dyer Depo., p. 51. Tyson's nurse called Omar's physicians and asked them to return Omar to light duty work despite original notes removing Omar completely from work and Omar's testimony that he needed some time off to heal. Omar Depo., p.192.  Further, Omar was convinced that Griffin would not accommodate any restrictions given to him by his doctor if he returned to work.  Omar Dep., p. 179-180.  This is a reasonable fear**

when you consider the intolerable situation he was dealing with before he went out on leave, where he was at times reduced to tears. **Omar Depo., p. 318.**

177.     Omar admits that he did not complain about this incident to anyone at Tyson.

(Omar Dep. at 256).

> **RESPONSE:  Denied, Omar complained to Griffin that what he did was disrespectful.  Omar Depo., p. 254.**

178.     To Omar states that Griffin jokingly commented that he looked like a terrorist.

(Omar at 131, 239-40).

> **RESPONSE:  Admitted Griffin called Omar a terrorist. Griffin made many jokes about Spanish guys and what they do and don't do, and Omar didn't laugh at these jokes. They reminded him of the statements Griffin makes about him being a terrorist.  Omar Depo., p. 239.  Omar reported one of the times Griffin took a picture of him and said to other team members this is how a terrorist is supposed to look to Dyer.  Omar Depo., p. 240.  Omar explained that every time Griffin did this it made him scared for his job and  he felt like he had to pretend it was okay but in his heart he was wondering "Okay, what's he trying to do right now?" Omar Depo., p. 239-240.  Griffin made the terrorist comment in front of a lot of people one time. Omar Depo., p. 247.**

179.     Omar admits that he smiled when Griffin made the comment and never told

Griffin that he was offended.  (Omar Dep. at 239-40).

> **RESPONSE: Admitted. Griffin made many jokes about Spanish guys and what they do and don't do, and Omar didn't laugh at these jokes. They reminded him of the statements Griffin makes about him being a terrorist.  Omar Depo., p. 239.  Omar reported one of the times Griffin took a picture of him and said to other team members this is how a terrorist is supposed to look to Dyer.  Omar Depo., p. 240. Omar explained that every time Griffin did this it made him scared for his job and he felt like he had to pretend it was okay but in his heart he was wondering "Okay, what's he trying to do right now?" Omar Depo., p. 239-240.  Griffin made the terrorist comment in front of a lot of people one time.  Omar Depo., p. 247.**

180.     Omar complained to Dyer about this comment.  (Omar Dep. at 241-42).

> **RESPONSE: Admitted.**

181.    Dyer met with Griffin in response to Omar's complaint and told him the comment was inappropriate.  (Dyer Dep. at 51, 55-57).

**RESPONSE: Admitted.**


182.    Griffin agreed with Dyer and was receptive to her coaching about this comment. (Dyer Dep. at 51, 55-57).

**RESPONSE:  Denied.    Griffin  denies  he  made  the  statement  or  that  he  was counseled.  Griffin Depo., p. 310; 86.**


183.    Omar attended sexual harassment training in which Tyson's corporate trainer made a reference to Iraq, which Omar found offensive.  (Omar Dep. at 241).

**RESPONSE: Admitted.**


184.    Omar believes that Dyer addressed this comment with the trainer.  (Omar Dep. at 242).

**RESPONSE: Admitted.**


185.    Omar did not attend any more training sessions conducted by this trainer.  (Omar Dep. at 242).

**RESPONSE: Admitted.**


186.    Omar claims that he applied for two positions in the Material Handling department but did not receive them due to his national origin.  (Omar Dep. at 249, 256-57, 260).

**RESPONSE: Admitted.**

187.    Omar's recollection is that he applied for one of these positions when he was a supervisor in 2013, and then again when he was a General, although he cannot recall the year. (Omar Dep. at 257-58).

> **RESPONSE: Denied. Omar applied for the load out department with more favorable hours, three or four times and was never even interviewed. The last time falls within the relevant time frame and he was a General, but he doesn't recall the exact date, and Tyson failed to produce documentation of this attempt. Omar Depo., p. 249, 259-260**

188.    Omar does not know how many applicants applied for these positions and has no knowledge of the other applicants' qualifications. (Omar Dep. at 259-60).

> **RESPONSE: Admitted.**

189.    Omar claims that Rusty Rainey and Shantae Brinkley were treated better than him. (Omar Dep. at 304, 307).

> **RESPONSE: Admitted.**

190.    Omar admits that both Rainey and Brinkley worked as Generals in different departments. (Omar Dep. at 304-05, 307-08).

> **RESPONSE: Admitted.**

191.    Omar admits that his belief that Tyson treated Rainey better than him is based on Omar's perception that Rainey made mistakes but was not terminated. (Omar Dep. at 305).

> **RESPONSE: Admitted.**

192.    Omar admits that he does not know whether Rainey was ever disciplined or counseled for job performance. (Omar Dep. at 306).

**RESPONSE: Admitted.**


193.    Omar believes that Brinkley's job performance was poor and that he would have been terminated for any one of the mistakes that she made.  (Omar Dep. at 308-09).

   **RESPONSE: Admitted.**


194.    Omar admits that he does not know whether Brinkley was ever discipled or counseled for her job performance. (Omar Dep. at 301-11).

   **RESPONSE: Admitted.**


195.    To support his claim for religious discrimination, Omar relies on a joke that Griffin made about a female employee from Somalia.  (Omar Dep. at 263).

   **RESPONSE: Admitted this is part of his claim, but Omar relies upon many other facts as well.   Griffin made derogatory comments about the Muslim religion to all the Plaintiffs.  Griffin told Gomez he shouldn't trust Muslims, including Kolshi. Gomez Depo., p. 136.   Griffin told Kolshi, among other things, that it didn't matter how much the Muslim team members prayed, they were still going to hell, even though Griffin knew Kolshi was Muslim.  Kolshi Depo., p. 204, 207.  Griffin frequently questioned Wahid about his Muslim faith denied him a day off for a religious request and asked Wahid to put a Muslim lady in the back of the line Wahid Depo., pp. 189, 198.   For example, Wahid, Kolshi and Omar didn't "even dare to practice prayer in Goodlettsville.  And the reason why is because of all the negative comments the plant manager does and makes toward all Muslim team members who are trying to practice their prayer time."  Omar Depo., p. 262. Wahid agreed and explained Griffin, the plant manager, was all the time asking him why he was Muslim, why Muslims prayed and other questions about faith that he found offensive. Wahid Depo., p. 203-204, 207.  Griffin made a lot of "jokes" about all the Muslim people, making references to the way they wear their scarf, the way they pray, the way they wash themselves before they prayed.  Omar Depo., p. 262. Griffin especially spoke badly about some Somali Muslim ladies saying things like, "what beauty she thinks she's hiding with this scarf? Even if she don't have the scarfs, nobody's going to look at her."  Omar Depo., p. 263.  This type of discriminatory badgering is "what make all of us believe that we are intimidated to practice our religion up there."  Omar Depo., p. 263. Griffin hated having to accommodate the prayer times and especially during fasting period because of the way it affected production, Griffin always complained and made derogatory jokes.**

**Omar Depo., p. 265.  Griffin complained that Muslims are not serious about prayer and were just using the system when going to pray.  Omar Depo., p. 266.  Griffin tried to eliminate a Muslim prayer time in front of Dyer and other generals.  Omar Depo., p. 271.**

**Griffin also dumped trash on Omar and Kolshi's workspace and called Omar a terrorist in front of other employees, made inappropriate comments/jokes about how Muslims prayed, the way they prayed, the way the wore their scarves, and the way they wash before praying.  Omar Depo., pp. 131, 262-263.  Omar's religious beliefs would be doubted in management meetings and Omar would have to explain his Muslim faith. Benitez Depo., p. 375.  Dyer, who is not Muslim, would argue with Omar and tell him he was wrong about his religious beliefs.  Kolshi Depo., p. 121-123.  For example, Dyer openly argued with Omar and then Kolshi about the prayer times and when they should occur with respect to sunset.  Kolshi Depo., p. 122-123.  Despite Tyson's attempts to portray any discriminatory events as occurring remotely in the past, Kolshi clarified that the inappropriate comments about Muslims and Omar being an Iraqi terrorist occurred after Griffin returned to Goodlettsville as plant manager.  Kolshi Depo., p. 205.**

196.     Omar did not tell Griffin that he was offended by his joke about a female Somalian employee and he did not report it to Tyson.  (Omar Dep. at 262).

**RESPONSE: Admitted.**


197.     Omar believes that Griffin disliked Muslim prayer time because Griffin would complain or make jokes about it during management meetings.  (Omar Dep. at 265, 266-67).

**RESPONSE: Admitted.**


198.     Omar admits that Tyson never denied any of his requests to practice the tenets of his Muslim faith.  (Omar Dep. at 271).

**RESPONSE: Denied. Omar didn't "even dare to practice prayer in Goodlettsville. And the reason why is because of all the negative comments the plant manager does and makes toward all Muslim team members who are trying to practice their prayer time."  Omar Depo., p.  262.**


199.     Omar claims that he complained to Dyer on one occasion about Griffin.  (Omar Dep. at 128-31).

**RESPONSE: Admitted.**

200.    Following his complaint to Dyer about Griffin, Omar alleges that Griffin frequently visited his department and admonished him for production issues.  (Omar Dep. at 317).

 **RESPONSE:** **Admitted.**

201.    Omar admits that he does not know if Griffin knew that Omar complained about him to Dyer.  (Omar Dep. at 130, 132).

**RESPONSE:** **Admitted.**

202.    One of Griffin's responsibilities as Plant Manager was to walk the plant and observe production, which he did on a daily basis depending on his schedule.  (Griffin Dep. at 143-44).

 **RESPONSE:**  **Admitted.**

203.    Griffin often spent more time in the Beef department because it generated the most profit.  (Griffin Dep. at 144).

    **RESPONSE: Denied. After Omar reported Griffin to his supervisor, Kolshi, Kolshi talked to Griffin and things got worse. Griffin started nit-picking Omar's lines. Omar Depo., p. 133-134.**

204.    Omar claims that he complained to Brian Sorenson about the way Dyer treated him in front of others.  (Omar Dep. at 312-13).

 **RESPONSE:** **Admitted.**

205.    Following his complaint to Sorensen about Dyer, Omar claims that Dyer continued to embarrass him in meetings.  (Omar Dep. at 316).

**RESPONSE: Admitted.**


**Undisputed Material Facts Concerning Kolshi's Claims**

206.    Tyson hired Kolshi in 2003 as an hourly employee. (Kolshi Dep. at 29, Ex. 1).

 **RESPONSE: Admitted.**


207.    Kolshi held various positions and was promoted throughout his tenure with Tyson.  (Kolshi Dep. at 30).

 **RESPONSE: Admitted.**


208.    Kolshi was the second-highest ranking manager at the Goodlettsville plant when he resigned in May 2017.  (Kolshi Dep. at 70, 77).

 **RESPONSE:  Admitted.**


209.    Kolshi admits that he received excellent performance evaluations over the course of his employment and does not recall receiving any disciplinary actions prior to his suspension in March 2017.  (Kolshi Dep. at 82, 96-98).

 **RESPONSE: Admitted.**


210.    In March 2017, Kolshi was suspended due to a failed audit by one of Tyson's largest customers.  (Kolshi Dep. at 98; Griffin Dep. at 251-52).

**RESPONSE: Admitted.**

211.    The March 2017 audit found multiple defects across a spectrum of products produced by the Goodlettsville plant.  (McGaugh Dep. at 13-15; Griffin Dep. at 252).

**RESPONSE: Denied. The bad product was produced by B shift.  Kolshi Depo., p. 98.**

212.    The severity of the audit findings put Tyson's contract with the customer in jeopardy.  (McGaugh Dep. at 14; Griffin Dep. at 253).

**RESPONSE: Admitted.**

213.    Kolshi learned of the failed audit when he was called into a meeting with Griffin and Vice President Mark Gordon. (Kolshi Dep. at 98-99).

**RESPONSE: Admitted in part; Brian McFarland was also present at this meeting. Kolshi Depo., p. 98.**

214.    During his meeting with Griffin and Gordon, Griffin and Kolshi were shown pictures of the product defects discovered by the customer. (Kolshi Dep. at 99).

**RESPONSE: Admitted.**

215.    Kolshi acknowledges that the quality of the product was defective and admits that this incident was a serious issue that could have resulted in a large financial loss for the Goodlettsville plant if they had lost the customer.  (Kolshi Dep. at 100).

**RESPONSE: Admitted.**

216.    Kolshi's responded to Gordon during the meeting by saying: "This is B-shift product."  (Kolshi Dep. at 117).

**RESPONSE: Admitted.**

217.    Kolshi's response angered Gordon and he replied with words to the effect that Kolshi was responsible because he was the Operations Manager. (Kolshi Dep. at 117).

**RESPONSE:  Admitted.**

218.    When Kolshi returned to work following his suspension, he was called into a meeting that included Griffin, Gordon, and Senior Vice President Ray McGaugh.  (Kolshi Dep. at 105).

**RESPONSE:  Admitted.**

219.    Kolshi admits that McGaugh called the meeting after learning that Kolshi was looking for another job.  (Kolshi Dep. at 105-108).

**RESPONSE: Admitted.**

220.    Kolshi admits that McGaugh said that he did not want Kolshi to leave Tyson and he complimented Kolshi's job performance up to that point.  (Kolshi Dep. at 108-09).

**RESPONSE: Admitted.**

221.    Kolshi admits that he was shocked by his suspension and it caused him to make up his mind to leave Tyson.  (Kolshi Dep. at 102, 121).

 **RESPONSE: Admitted that Kolshi felt the need to resign after the suspension in this manner because: "At that point, I was tired of Doug – I mean, the treatment that was given me I just couldn't take it anymore.  I was just – even though I performed, I was just tired of mistreatment. I mean, it was just every day, every day." Kolshi Depo., p. 120-121.**

222.    Kolshi believes that because the defective product was produced primarily on B shift, Assistant Operations Manager Roger Delepierre or Doug Griffin should have been held responsible for it.  (Kolshi Dep. at 99).

**RESPONSE:  Admitted.**


223.    Roger Delepierre was issued a written warning and placed on a Performance Improvement Plan due to the failed audit. (Ex. D to Motion; Griffin Dep. at 256).

**RESPONSE: Admitted.**


224.    Tyson's upper management considered whether to suspend Griffin for the failed audit.  (McGaugh Dep. at 14).

 **RESPONSE: Admitted.**


225.    Tyson decided not to suspend Griffin because he had multifaceted areas of responsibility at the plant versus Operations, which is solely responsible for quality issues. (McGaugh Dep. at 14-15, 28).

**RESPONSE: Admitted.**


226.    Kolshi believes that Griffin did not take responsibility for the failed audit because Griffin was concerned that he would lose his job if he stepped in:

Q.    Did you think Doug [Griffin] was worried that he was going to get fired for this –

A.    Yes.

Q.    -- if he stepped in and tried to save you?

A.      Yes. I truly think that's what it was.

(Kolshi Dep. at 118).

**RESPONSE:** **Admitted.**


227.    Kolshi resigned from Tyson on May 1, 2017; accepting a promotion and higher

pay with a competitor.  (Kolshi Dep. at 127, 134, 143-44, Ex. 16).

**RESPONSE:** **Admitted.**


228.    Kolshi admits that Steve Grant also was responsible for his resignation.  (Kolshi

Dep. at 241-244, 247).

**RESPONSE:** **Admitted.**


229.    Kolshi believes that Grant was sending false information to Gordon and Griffin

about purported issues with the Goodlettsville plant's production without speaking to Kolshi or

Delepierre beforehand.  (Kolshi Dep. at 243).

**RESPONSE:** **Admitted.**


230.    Kolshi believes that tension between him and Griffin increased as a result of these

reports to Gordon and Griffin.  (Kolshi Dep. at 243-44).

**RESPONSE:** **Admitted.**


231.    Kolshi believes that Grant's main goal was to be an operations manager and that

his intention was to force Kolshi to leave or get him fired to advance this goal.  (Kolshi Dep. at

243-44).

**RESPONSE:** **Admitted.**

232.     Kolshi admits that his belief about Grant's intentions influenced his decision to resign.  (Kolshi Dep. at 247).

**RESPONSE: Denied. Kolshi testified that Grant's behavior started things changing. Kolshi Depo., p. 246-247.**


233.     Regarding Griffin, Kolshi believes: "I truly believe that Doug was intimidated by me because of my performance.  I was an overachiever all the time.  And he was always afraid that one day I would take his position. That's what I believe.  Do I know for a fact?  I don't know, but that's – and that's what he made me believe every single time."  (Kolshi Dep. at 51).

**RESPONSE: Admitted.**


234.     To further support of his discrimination claim, Kolshi claims that Griffin resisted his promotions.  (Kolshi Dep at 190-92).

**RESPONSE: Admitted.**


235.     Kolshi admits that Griffin asked him to transfer to the Council Bluffs, Iowa plant when Griffin was promoted to Plant Manager of that plant.  (Kolshi Dep. at 61; Griffin Dep. at 48).

**RESPONSE: Admitted.**


236.     Kolshi went to the Council Bluffs plant and interviewed for the Operations Manager position.  (Kolshi Dep. at 61).

**RESPONSE: Admitted.**

237.    Griffin asked Kolshi to join him in Council Bluffs because he thought they had a good working relationship, produced good numbers as a team, and that Kolshi would be a good fit at that plant.  (Griffin Dep. at 49).

**RESPONSE: Denied. Griffin asked Kolshi to join him so that Jeff Rowen would fail, and Griffin could come back as plant manager at Goodlettsville.  Kolshi Depo., p. 61.**

238.    In further support of his discrimination claim, Kolshi claims that Griffin threw dirty work uniforms on his desk and commented on his Albanian heritage by stating: "You're Albanian, and you make this much money."  (Kolshi Dep. at 51, 191, 195, 199).

**RESPONSE: Admitted.**

239.    Kolshi admits that he never complained to anyone at Tyson about Griffin's comment about his Albanian heritage in relation to his pay.  (Kolshi Dep. at 192-93).

**RESPONSE: Admitted.**

240.    Kolshi admits that he is not a practicing Muslim.  (Kolshi Dep. at 212).

**RESPONSE: Denied. Kolshi doesn't participate in prayer but he does participate in fasting.  Kolshi Depo., p. 212.**

241.    Kolshi claims that Griffin made negative remarks about Muslims in general but admits that Griffin never directed any of these comments to him.  (Kolshi Dep. at 204-05, 214).

**RESPONSE: Admitted.**

242.    Kolshi admits that he never reported Griffin's alleged comments about Muslims to anyone at Tyson.  (Kolshi Dep. at 207).

**RESPONSE: Admitted he didn't report a specific Muslim comment, but he did**

**report the disparate treatment. Kolshi Depo. p. 123, 275.**

243.    Kolshi admits that Dyer never made any comments to him about religion, and he is not even sure that Dyer had knowledge of his former connection to the Muslim faith. (Kolshi Dep. at 214, 259).

**RESPONSE: Admitted.**

244.    Kolshi admits that his retaliation claim is based on his belief that he was retaliated against by Griffin for confronting him. (Kolshi Dep at 282-95).

**RESPONSE: Admitted. When human resources failed to respond to Kolshi's reports and complaints, he addressed Griffin's discriminatory acts directly with him and things got worse from that point on. Kolshi Depo., p. 194, 286-288.**

245.    Kolshi confronted Griffin about his interactions with Kolshi's Generals. (Kolshi Dep. at 283).

**RESPONSE: Admitted.**

246.    Kolshi told Griffin that if Griffin had an issue with one of his Generals, then Griffin should report the issues to him and not deal with the Generals directly. (Kolshi Dep. at 284-85).

**RESPONSE: Admitted.**

247.    Kolshi admits that Griffin disagreed and responded, "As I told you earlier, [e]verybody works for me." (Kolshi Dep. at 285).

**RESPONSE: Admitted.**

248.     Kolshi also confronted Griffin about placing dirty frocks on his desk and Griffin's comment about Kolshi's Albanian heritage.  (Kolshi Dep. at 283-86).

**RESPONSE: Admitted.**


249.     Kolshi believes that Griffin started to retaliate against him in response to him confronting Griffin, as referenced above.  (Kolshi Dep. at 286-87).

**RESPONSE: Admitted.**


250.     According to Kolshi, Griffin's retaliation consisted of walking the production floor, giving Kolshi dirty looks, yelling at Kolshi's Generals, and making statements like, "If things don't change, people are going to lose their jobs."  (Kolshi Dep. at 287-88).

**RESPONSE: Admitted.**


251.     Kolshi interpreted Griffin's reference to "things" as performance or product quality. (Kolshi Dep. at 288).

**RESPONSE: Admitted.**


**Undisputed Material Facts Concerning Benitez's Claims**

252.     Benitez was hired by Tyson in 2008 as an hourly employee in the Material Handling division, which deals with shipping and logistics.  (Benitez Dep. at 9, 39).

**RESPONSE: Admitted.**


253.     Benitez admits that he held various positions at Tyson and received "promotion after promotion."  (Benitez Dep. at 68).

**RESPONSE: Admitted.**


254.     In May 2015, Benitez was promoted to General on B shift in the Ground Beef department.  (Benitez Dep. at 51).

**RESPONSE: Admitted.**


255.     Benitez claims that he was discriminated against in June 2016 after his bid for the A shift Pork General position.  (Benitez Dep. at 53, 60).

**RESPONSE: Admitted for summary judgment purposes.**


256.     Benitez admits that he was awarded the Pork General position for which he bid, but then was transferred to the A shift Ground Beef General position before he could begin working in his new Pork General position.  (Benitez Dep. at 53-54).

**RESPONSE: Admitted for summary judgment purposes.**


257.     This change in Benitez's position occurred because Tyson realigned its A-Shift Generals to maximize their strengths.  (Doc. 35-9).

**RESPONSE: Admitted for summary judgment purposes.**


258.     The realignment affected all A-Shift Generals, not just Benitez.  (Doc. 35-9).

**RESPONSE: Admitted.**


259.     As a result of the realignment, Benitez was moved from Pork to Ground Beef General, Valon Arifi (who is Albanian-American) was moved from Beef to Pork General, and

Plaintiff Omar was moved from Ground Beef to Beef General.  (Doc. 35-9; Benitez Dep. at 65).

**RESPONSE: Admitted.**

260.    Tyson's decision to realign the A-Shift Generals was made before Griffin became Plant Manager at the Goodlettsville plant.  (Doc. 35-8, 35-9).

**RESPONSE: Admitted.**

261.    Benitez received several disciplinary actions over the course of his employment; none of which he claims were discriminatory until April 17, 2017.  (Benitez Dep. at 130-220, 152).

**RESPONSE: Admitted.**

262.    On April 17, 2017, Benítez was issued a counseling statement for producing 13,000 pounds of ground beef without applying a preservative spray to extend shelf life. (Benitez Dep. at 152, 54).

**RESPONSE:  Admitted.**

263.    Benitez admits that this event occurred.  (Benítez Dep. at 153-54).

 **RESPONSE: Admitted.**

264.    Benitez admits that Griffin told him that, as the General, the mistake was ultimately his responsibility. (Benitez Dep. at 157).

**RESPONSE: Admitted.**

265.     On June 18, 2017, Tyson demoted Benitez from Ground Beef General to Supervisor over the Multivac line after metal was found in product on one of the Ground Beef lines that Benitez managed.  (Benitez Dep. at 183-84; Griffin Dep. at 176).

   **RESPONSE: Admitted.**

266.     At the time, Steve Grant was employed as Operations Manager and instructed Benitez to correct the issue on his Ground Beef line.  (Grant Dep. at 28).

   **RESPONSE: Admitted.**

267.     Grant told Benitez to remove all product from the ground beef machine, place a hold tag on the product, tear down the equipment, and completely rinse it to remove any residual metal pieces.  (Grant Dep. at 28; Griffin Dep. at 177).

   **RESPONSE: Denied. Benitez was told to do a wash out and he did wash out part of the machine, but only the final grinder.  Grant Depo., p. 62.  Grant intended for Benitez and his lead to wash out other parts of the grinder but didn't specifically instruct Benitez to do so, he felt like he should have known to do that.  Grant Depo., p. 62-63.**

268.     Once the line was back up and running, it was only a few minutes later before metal was detected again in product running on the same equipment.  (Grant Dep. at 29).

   **RESPONSE: Admitted.**

269.     Grant and Benitez had another conversation in which Benitez confirmed that he had followed Grant's instructions and completely rinsed the equipment.  (Grant Dep. at 29).

   **RESPONSE: Denied.  Benitez cleaned the machine the way they always did, and he Grant disagree on this topic.  Benitez Depo., p. 191.  Benitez did wash out part of the machine, but only the final grinder.  Grant Depo., p. 62.  Grant intended for Benitez and his lead to wash out other parts of the grinder but didn't specifically instruct Benitez to do so, he felt like he should have known to do that.  Grant Depo., p. 62-63.**

270.    After this conversation, Grant reviewed video footage and discovered that the equipment in question had not been thoroughly rinsed.  (Grant Dep. at 29-30; Griffin Dep. at 177; Benitez Dep. at 188).

**RESPONSE:  Denied.  Benitez washed the machine.  Benitez Depo., p. 191.**

271.    Tyson suspended Benitez instead of terminating his employment and gave him the opportunity to run a new line called "the Multivac."  (Grant Dep. at 39; Griffin Dep. at 178; Benitez Dep. at 195).

**RESPONSE:  Admitted.**

272.    Tyson concluded that the incident that caused Benitez to be suspended was egregious and could have resulted in his termination.  (Denton Dep. at 142-144, 201; Griffin Dep. at 177, 185, 197).

**RESPONSE: Admitted.**

273.    Griffin and Grant discussed Benitez's tenure with Tyson and decided against termination. (Grant Dep. at 69; Dyer Dep. at 100-01).

**RESPONSE: Admitted.**

274.    Griffin and Grant decided to give Benitez an opportunity to step down, attend training, and work his way back up to a General position, or higher.  (Griffin Dep. at 201, Grant Dep. at 69; Dyer Dep. at 100-01).

**RESPONSE: Denied. After this incident, Grant felt like Benitez needed additional training so he could work his way back up to a general level or higher, but he wasn't sure Dyer and Griffin agreed. Grant Depo., p. 69**

275. In addition to claiming that his demotion was discriminatory, Benítez claims that his demotion was in retaliation for a complaint he had made to McGaugh about Griffin during McGaugh's June 2017 visit to the Goodlettsville plant. (Benitez Dep. at 169-70, 176-77, 179-80, 184).

**RESPONSE: Admitted.**

276. McGaugh testified that his visit to the Goodlettsville plant occurred on June 20 through June 22, 2017, which was after Tyson demoted Benitez. (McGaugh Dep. at 32; Benitez Dep. at 183).

**RESPONSE: Admitted that is McGaugh's testimony but the fact is denied. Both Grant and Benitez recall Benitez meeting with McGaugh before he was demoted. Grant stated that McGaugh told him there were some things Benitez wasn't happy about while he was still a general before he was demoted. Benitez Depo., p. 169-170; Grant Depo., p. 59-61.**

277. Griffin had no knowledge that Benítez had complained to McGaugh about him. (Griffin Dep. at 198-99).

**RESPONSE: Denied. Benitez stated that Griffin knew because Griffin walked in on Benitez's conversation with McGaugh. Benitez Depo., p. 169-170.**

278. Benitez admits that everything was going fine for him at Tyson until his allegations against Tyson became public. (Benítez Dep. at 125).

**RESPONSE: Denied. Benitez felt he was discriminated against as a general when he was demoted so that Griffin could build his white American team, and then there was a second phase after they found out about his charge of discrimination with the EEOC and Human Rights Commission. Benitez Depo., p.126. This continued and escalating abuse left Benitez with no alternative but to resign. Grant, who replaced Kolshi as operations manager, even told Ausbrooks, who was assistant operations**

manager at the time, that they couldn't fire Benitez, but they could make Benitez quit for filing the charge of discrimination. Benitez Depo., p. 255, 260. In fact, Benitez's disciplines increased during this time period and he was threatened with discipline for leaving the plant to conduct an interview with the THRC. Grant Depo., p .37. Griffin even went so far as to spread rumors that Benitez was having an affair with a team member and in a conversation with Benitez about these "perceptions" that Benitez was favoring a female employee Griffin mentioned Benitez's wife working at the plant. Benitez Depo., p. 276. When the January discipline attempt following Benitez's interview with the Tn Human Rights Commission failed, Tyson succeeded on February 27, 2018 when Benitez received a discipline for failure to add an ingredient when he wasn't present on the floor at the time. Benitez depo., Exhibit 21. Benitez was placed on a performance improvement plan on May 23, 2018 which he refused to sign, and he then resigned shortly thereafter. Benitez Depo., Exhibit 22. As the environment grew more hostile, Benitez's blood pressure issues increased. Benitez Depo., p.361.

279. Benitez believes that Grant retaliated against him with "his tone, his approach, [and] his way of trying to help . . . ." (Benitez Dep. at 358-59).

**RESPONSE: Admitted.**

280. Benitez believes that Griffin retaliated against him by watching his lines more closely, telling him to get back to the floor when he found him in his office, and asking hourly workers how Benitez was doing as a supervisor. (Benitez Dep. at 339, 344, 348).

**RESPONSE: Admitted. Benitez additionally believed that Griffin retaliated against him with continued disciplines. Benitez's disciplines increased during this time period and he was threatened with discipline for leaving the plant to conduct an interview with the THRC. Grant Depo., p .37. Griffin even went so far as to spread rumors that Benitez was having an affair with a team member and in a conversation with Benitez about these "perceptions" that Benitez was favoring a female employee Griffin mentioned Benitez's wife working at the plant. Benitez Depo., p. 276. When the January discipline attempt following Benitez's interview with the Tn Human Rights Commission failed, Tyson succeeded on February 27, 2018 when Benitez received a discipline for failure to add an ingredient when he wasn't present on the floor at the time. Benitez depo., Exhibit 21. Benitez was placed on a performance improvement plan on May 23, 2018 which he refused to sign, and he then resigned shortly thereafter. Benitez Depo., Exhibit 22.**

281. Benítez admits that when he asked Griffin why he was watching his line, Griffin

would offer feedback such as, "Look at this machine. Look at that; they have bad setup." (Benitez Dep. at 353).

> **RESPONSE:** Admitted Griffin said that, but Griffin's critique of Benitez was disproportionate to other American born supervisors. Grant thought Benitez was doing a "great" job on Multivac. Grant Depo., p. 39. It was a new product that the plant was not used to seeing and Grant thought the startup went well and was very pleased. Grant Depo., p. 42. However, Griffin expressed concerns to him and questioned whether Benitez was sharing the correct information, whether he would be ready when the time came to start the lines, etc. Grant Depo., p. 41. Griffin would tell Grant that he went out to the Multivac line and saw something Benitez did that concerned him and then Griffin would re-question Grant regarding Benitez's readiness or instruction. Grant Depo., p. 41. Grant participated in a conversation where Griffin told Benitez to be careful because there was a perception that he was spending too much time with a female team member. Grant Depo., p. 49. Regardless of Griffin's concerns, Grant thought Benitez did well starting up the new line. Grant Depo., p. 39. Griffin also complained that he was disappointed about the claims Benitez filed. Grant Depo., p. 40. Griffin's treatment of Benitez was demonstrably worse than Ausbrooks, Parks and Rainey.

282.    On February 27, 2018, Benitez was issued a written warning from Grant and Juan Lorenzo for failing to perform a mandatory label verification to confirm that the product coming off his lines contained the correct label, which Benitez alleges was retaliatory. (Benítez Dep. at 203-206, Ex. 21; Griffin Dep. at 196).

> **RESPONSE: Admitted.**

283.    Juan Lorenzo is Cuban. (Benitez Dep. at 109).

> **RESPONSE: Admitted.**

284.    Lorenzo is currently the Assistant Operations Manager at the Goodlettsville plant. (Benitez Dep. at 109, 211).

> **RESPONSE: Denied. Plaintiffs believe Lorenzo is in a different position currently.**

285.    In the incident for which Benitez was written up on February 27, 2018, product was sent to the customer with incorrect labels.  (Griffin Dep. at 195, 197).

**RESPONSE: Admitted.**

286.    In the incident for which Benitez was written up on February 27, 2018, the customer then pulled the incorrectly labelled product from their shelves and the Goodlettsville plant sustained a $18,000 loss.  (Griffin Dep. at 195, 197; Denton Dep. at 61).

**RESPONSE: Admitted.**

287.    Benitez does not deny the foregoing event occurred, but disputes that he should have been held accountable because he was not present to perform the label verification. (Benitez Dep. at 206-07).

**RESPONSE: Admitted.**

288.    At the time, Scott Kuck and Gary Denton investigated this incident and confirmed that it warranted discipline.  (Denton Dep. at 58-61; Kuck Dep. at 21).

**RESPONSE: Admitted.**

289.    Tyson's investigation concluded that there was a large amount of time during which Benitez was present at the plant, yet he still failed to verify the labels.  (Denton Dep. at 60).

**RESPONSE: Admitted.**

290.    Because failure to perform label verifications impacts the integrity of the product,

Tyson decided to issue Benitez a written warning rather than a counseling.  (Denton Dep. at 61).

**RESPONSE: Admitted that was Denton's testimony.**

291.    Benitez claims that his placement on a Performance Improvement Plan ("PIP") in May 2018 was retaliatory.  (Benitez Dep. at 220-22, Ex. 22)

**RESPONSE: Admitted.**

292.    Benitez was issued the PIP by Falah, who was filling in at the Goodlettsville plant while Griffin was out on medical leave.  (Benitez Dep. at 220-22, Ex. 22).

**RESPONSE: Admitted.**

293.    On June 27, 2018, Benitez resigned from his employment.  (Benítez Dep. at 266).

**RESPONSE:  Admitted.**

294.    He claims that Griffin was the reason he resigned.  (Benítez Dep. at 271).

**RESPONSE: Admitted.**

295.    Benitez believes that Griffin's goal upon assuming Plant Manager was to remove Benitez from management so that Griffin could hire his Caucasian friends.  (Benitez Dep. at 308).

**RESPONSE: Admitted.**

296.    Griffin considered Benitez a valued member of management and did not want him to resign.  (Griffin Dep. at 148, 212).

**RESPONSE:** Admitted that is what Griffin said, his actions said otherwise.


297.    Griffin believes that he and Benitez had a good working relationship.   (Griffin

Dep. at 213).

**RESPONSE: Admitted.**



Respectfully submitted,

/s/Nina H. Parsley_____
Nina H. Parsley, BPR # 23818
Michael D. Ponce & Associates
Attorney for Plaintiff
400 Professional Park Drive
Goodlettsville, TN  37072
(615) 851-1776

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that the foregoing document has been filed and transmitted via electronic mail, by mechanism of the Court's ECF system, on this the 27TH day of January 2020 to the following:

Kenneth A. Weber, Esq.
kweber@bakerdonelson.com
Megan M. Sutton, Esq.
msutton@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, TN 37201


               /s/Nina H. Parsley           
               Nina Parsley