IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ASBIEL BENITEZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | NO. 3:18-cv-00491 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| TYSON FRESH MEATS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MEMORANDUM OPINION

Pending before the Court are two motions filed by Defendant. Defendant has filed a Motion to Sever Plaintiffs' Claims, or in the Alternative, Motion for Separate Trials (Doc. No. 33, "Motion to Sever"). Plaintiffs have responded. (Doc. No. 36).[1] Defendant has replied. (Doc. No. 44, "Reply").

Also pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 51, "Motion"), and a memorandum in support thereof (Doc. No. 52). Plaintiffs filed a short response in opposition (Doc. No. 58), a response in opposition to Defendant's statement of material facts (Doc. No. 73, "Response to Statement of Facts,") and a memorandum in support thereof (Doc. No. 74, "Memorandum in Opposition to the Motion"). Defendant filed a Reply (Doc. No. 81). Both motions are ripe for review.

For the reasons discussed herein, the Court will grant in part and deny in part Defendant's Motion. The Court will deny Defendant's Motion to Sever as moot.

---

[1] As the Plaintiffs filed the "Memorandum in Opposition to the Motion" jointly, the Court at times will refer variously to arguments as being made by "Plaintiffs" and at times to argument being made by a particular Plaintiff, without worrying excessively about unnecessary precision in regard to the rather immaterial distinction between the phrasings.

There are five Plaintiffs in this matter: Asbiel Benitez, Youssef Wahid, Abdulqader Omar,[3] Arnobio Gomez, and Labinot Kolshi. The Court will first discuss facts relevant to all Plaintiffs, before discussing the facts relevant to each Plaintiff individually.

### A.  Facts relevant to all or multiple Plaintiffs

#### 1.  Plaintiffs' jobs and the Goodlettsville plant

Each Plaintiff held a production management position at the Tyson Fresh Meats, Inc. ("Tyson") plant in Goodlettsville, Tennessee ("the Goodlettsville plant"), where the facility consists of three separate departments: Ground Beef, Beef, and Pork. (Doc. No. 73 at ¶ 15). Each department runs multiple production lines, which process different kinds of meat. (Doc. No. 52 at 7).

The highest-ranking employee at the Goodlettsville plant is the Plant Manager. (*Id.*). The Plant Manager is responsible for the entire facility, including safety, surveillance of operations, performance, plant goals, profitability, accounting, warehouse operations, and the plant's appearance. (*Id.*). The second-highest ranking employee is the Operations Manager. (*Id.*). The Operations Manager reports to the Plant Manager and is responsible for the production and quality of both the A shift and B shift. (*Id.*). The Assistant Operations Manager oversees solely B shift

---

[2] The facts in this section are taken from Plaintiffs' Response to Statement of Facts (Doc. No. 73), which identifies some facts that are not in dispute but also other (alleged) facts asserted by Plaintiff (but not necessarily conceded by Defendant) and from Defendant's "Summary of Common Facts" contained in its memorandum supporting its Motion (Doc. No. 52). Herein, the Court has endeavored to make clear whether it is referring to facts that are undisputed, or to alleged facts that are (or at least may be) in dispute. The parties also stated some facts in briefing that appear to not be in dispute and are supported by the record. Where relevant, the Court has included these facts.

[3] Plaintiff Abdulqader Omar is referenced as Omar Abdulqader in the case caption. Both parties refer to him instead as Abdulqader Omar or as "Plaintiff Omar." The Court will refer to him as Plaintiff Omar.

operations and reports to the Operations Manager. (*Id.*). Each department at the plant is run by a General, who oversees either the A or B shift. (*Id.*). Thus, for example, there is an A shift Pork General and a B shift Pork General. Generals working on the A shift report to the Operations Manager, and Generals working on the B shift report to the Assistant Operations Manager. (*Id.*). Below each General are several Supervisors who are responsible for specific production lines in each department. (*Id.* at 7-8).

      2.  <u>Defendant's relevant employees that are not party to this suit</u>

Doug Griffin, who was born in 1959, was promoted on November 17, 2014 from Operations Manager at the Goodlettsville plant to Plant Manager at Defendant's plant in Council Bluffs, Iowa. (Doc. No. 73 at ¶¶ 1, 2). Then, on August 16, 2016, Griffin was promoted from that position to Plant Manager at the Goodlettsville plant (the plant relevant to this suit). (*Id.* at ¶ 2). Many of Plaintiffs' claims revolve around mistreatment they allegedly received from Griffin while he served as the Plant Manager at the Goodlettsville plant.[4]

---

[4] In their Response to the Motion, Plaintiffs state:

> [Defendant] Tyson's reliance on events that occurred prior to Doug Griffin's appointment as plant manager is misplaced and should not be used to dismiss these claims. During their depositions, counsel for [Defendant] Tyson asked Plaintiffs about events that occurred before this timeframe and they answered accurately as they did experience some discriminatory events before Griffin became plant manager. Notably, [Plaintiffs] Gomez and Wahid experienced discrimination back in 2011 that Tyson resolved by terminating the offender. However, the fact that Plaintiffs shared prior incidents of discrimination over their long history with [Defendant] Tyson does not mean that is appropriate grounds for dismissal of these claims as all the Plaintiffs have testified that the discrimination, harassment and hostile work environment either started or substantially worsened when Griffin was appointed plant manager of the Goodlettsville location and that is the timeframe referenced in Plaintiffs' Complaint.

(Doc. No. 74 at 3–4 n.2). From this statement, it would seem that Plaintiffs will focus their case on Griffin's actions after becoming Plant Manager in August 2016, and not events preceding Griffin's appointment as Plant Manager. However, Plaintiffs at other times appear to reference

There are two relevant human-resources employees who worked for Defendant. Gary Denton was the Complex Human Resources Manager at the Goodlettsville plant for 14 years before being promoted to Human Resources Director over Defendant's poultry division. (*Id.* at ¶¶ 11, 12). He later transitioned to be Human Resources Director over Defendant's "case ready facilities," including the Goodlettsville plant. (*Id.* at ¶ 13). Denton was born in 1963. (*Id.* at ¶ 21). Crystal Dyer was employed as the Goodlettsville plant's Complex Human Resource Manager from January 2015 to September 2017. (*Id.* at ¶ 14).

A few other employees of Defendant are relevant to multiple Plaintiffs' claims. Derrick Ausbrooks resigned from the Goodlettsville plant but subsequently was rehired as either a supervisor in the Beef department or Beef General (B shift) in May 2017 (*Id.* at ¶¶ 3, 4). (The parties dispute which position he was rehired for). Ausbrooks is white and American-born. (*Id.*). Steve Grant was hired as Operations Manager at the Goodlettsville plant after Plaintiff Kolshi's resignation. (*Id.* at ¶ 5). Grant had previously worked in a corporate position assisting various plants. (*Id.* at ¶ 6). Grant was demoted and transferred to Tyson's Sherman, Texas plant in June 2018. (*Id.* at ¶ 7).

The Court will now turn to the facts as they relate to each Plaintiff individually.

B. **Facts relevant to Plaintiff Benitez**

---

events outside what they claim is the relevant time period, *i.e.*, the period pre-dating Griffin becoming Plant Manager. The Court has attempted to include, in both the factual background section and in the analysis, the facts it considers relevant to this case (and Motion). In any event, the Court does agree with Plaintiffs that their various claims revolve, for the most part, around Griffin and his conduct.

Plaintiff Benitez's race is either Latino or Hispanic,[5] and his country of origin is Cuba. (Doc. No. 52 at 51; Doc. No. 74 at 36; Doc. No. 8 at 2).[6] Plaintiff Benitez was hired as an hourly employee by Defendant in 2008, and he was promoted to Ground Beef General (B shift) in 2015. (Doc. No. 73 at ¶¶ 252-54).

Plaintiff Benitez then applied for the position of Pork General (A shift) in June 2016, which he was awarded. (*Id.* at ¶¶ 255-56). After receiving the promotion but before beginning the new position, he was transferred to the position of Ground Beef General (A shift) before he could begin working in his new position as Pork General (A Shift). (*Id.* at ¶ 256). Defendant moved Plaintiff Benitez's position in order to realign all of its A-Shift Generals (not just Plaintiff Benitez) to maximize their strengths before Griffin became the new Plant Manager. (*Id.* at ¶¶ 257, 258, 260).

Over the course of his employment, Plaintiff Benitez faced several disciplinary actions (none of which Plaintiff Benitez claims were discriminatory), but he specifically claims that an action taken on April 17, 2017 was discriminatory. (*Id.* at ¶ 261). That day, Plaintiff Benitez was issued a counseling statement for producing 13,000 pounds of ground beef without applying a preservative spray. (*Id.* at ¶ 262).

In a separate action that Plaintiff Benitez contends was discriminatory, in June 2017, Defendant demoted Plaintiff Benitez from Ground Beef General to Supervisor when metal was found in a product on one of the lines Plaintiff Benitez managed. (*Id.* at ¶ 265). The parties dispute

---

[5] Though the use of the disjunctive when describing an individual's race seems odd, the Court will address further the confusion regarding the racial identities of various Plaintiffs, as relevant, in the legal analysis section.

[6] While Benitez's race and national origin are not mentioned in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), the parties do not appear to dispute that Benitez's country of origin is Cuba. Benitez is referred to as being either "Latino" and "Hispanic" at different points in the parties' briefing, and the Amended Complaint describes Benitez as "a Hispanic male born in Cuba." (Doc. No. 8 at 2).

whether Grant gave Benitez detailed instructions as to how to clean the affected machine in accordance with company policies (including to "remove all product from the ground beef machine, place a hold tag on the product, tear down the equipment, and completely rinse it to remove any residual metal pieces"), or whether Grant instructed Benitez to "do a wash out" of only the final grinder, with the other instructions being merely implied.[7] (*Id.* at ¶ 267). After

---

[7] Defendant claims that Grant provided specific instructions regarding the cleaning of the machine and that Plaintiff Benitez did not follow them. Plaintiff Benitez claims that Grant did not provide specific instructions on how to clean the machine. In the Plaintiffs' Response in Opposition to Defendant's Statement of Undisputed Material Facts, Defendant responds to the statement that "Grant told [Plaintiff] Benitez to remove all product from the ground beef machine, place a hold tag on the product, tear down the equipment, and completely rinse it to remove any residual metal pieces." (Doc. No. 73 at ¶ 267). Plaintiff disputes this statement, citing Grant's deposition testimony for the proposition that "Grant intended for [Plaintiff] Benitez and his lead to wash out other parts of the grinder [than the final grinder] but didn't specifically instruct [Plaintiff] Benitez to do so, he felt like he should have known to do that." (*Id.*). Grant's deposition shows that Plaintiffs have mischaracterized his testimony. Early in his deposition, Grant described the incident and his interactions with Plaintiff Benitez as follows:

> And one day we hit metal while we were running one of the lines, and our policies, our requirements, anytime that we hit a foreign object that we can't identify, we have to tear down each step of the process and wash, clean, and then -- and we called it develop a clean break, which basically means that you have to get the product out of whatever piece of equipment it's in, wash it down, and then start back up. So that particular day we started -- we hit metal. I came down there -- this was before the 9:00 o'clock meeting -- and we couldn't identify what the metal was. So [Plaintiff Benitez] knew what needed to be done. He had been a general supervisor for a while. So we talked about making sure that we got all the product out, get a hold tag on that product, wash the final, the augers, the blender and then doing the tear down on the initial grinder.

(Doc. No. 62-1 at 28-29). Later in his deposition, when asked "had you specifically told Mr. Benitez to clean other parts of the grinder or did you assume that he knew he should do that?" Grant answered, "Well, he should have known that" and proceeded to re-explain the pre-break process. (*Id.* at 32). Grant was then asked "I understand that you believe that he knew that that is the procedure that he should follow, but did you specifically tell him to do all these steps but did you just tell him you need to do -- you need to do the clean break cleaning?" (*Id.*). Grant responded "Yes, something along that. Make sure you get your clean break and let's start back up." (*Id.*). Therefore, Grant did not ever admit or indicate that he only gave Plaintiff Benitez partial cleaning instructions, and instead confirmed that he gave Plaintiff Benitez thorough cleaning instructions. The only other citation provided by Plaintiff to rebut this is a citation to Plaintiff Benitez' testimony

Plaintiff Benitez cleaned the grinder of the machine (without completing the other steps), production was ramped back up and within a few minutes, the machine "hit metal" again. (Doc. No. 73 at ¶ 268). Plaintiff Benitez told Grant that he had followed Grant's instructions and rinsed the equipment. (*Id.* at ¶ 269). Grant reviewed video footage and believed that Plaintiff Benitez had not thoroughly washed the equipment. (*Id.* at ¶ 270). Defendant found this incident to be egregious enough that Plaintiff Benitez could have been terminated, but Defendant decided instead to suspend him and allow him to operate a new line. (*Id.* at ¶¶ 271-273).

Plaintiff Benitez believes his demotion was not only discriminatory, but also retaliatory because he made a complaint regarding Griffin's conduct to Senior Vice President Ray McGaugh when McGaugh visited the Goodlettsville plant. (*Id.* at ¶¶ 275). There are several factual disputes about Plaintiff Benitez's conversation with McGaugh. McGaugh testified that his visit to the Goodlettsville plant occurred after Plaintiff Benitez's demotion, but Plaintiff Benitez and Grant each testified that Plaintiff Benitez met with McGaugh before he was demoted. (*Id.* at ¶ 276). Defendant contends that Griffin had no knowledge that Plaintiff Benitez had complained to McGaugh about Griffin's conduct, but Plaintiff Benitez testified that Griffin knew about the complaint because he walked in on the conversation between Plaintiff Benitez and McGaugh. (*Id.*

---

for the statement that "[Plaintiff] Benitez cleaned the machine the way they always did, and he Grant [sic] disagree on this topic." (Doc. No. 73 at ¶ 269). In Plaintiff Benitez' testimony, he does state that "[w]e did exactly what we did every time we had that process." (Doc. No. 72-1 at 191). However, he does not actually state that he believes that that process is correct or was what Grant wanted, and (to the Court's knowledge) he never testified as to how Grant instructed him to clean the machine. Therefore, the Court does not find a material dispute of fact on this issue, as there appears to be no dispute that Grant gave Plaintiff Benitez specific instructions regarding how the machine should be cleaned and that Plaintiff Benitez did not follow *those instructions*. He does claim, in cleaning the machines, to have followed *the same steps that he had in the past*, but that is not necessarily the same thing.

at ¶ 277). Additionally, McGaugh denies meeting with Plaintiff Benitez at all. (Doc. No. 74 at 34).[8]

After this meeting, according to Plaintiff Benitez, Grant retaliated against him with his tone, approach, and method of trying to help Plaintiff Benitez. (Doc. No. 73 at ¶ 279). Plaintiff Benitez testified that Griffin retaliated against him by watching his work more closely, telling him to get back to the floor when he was in his office, and asking hourly workers about Plaintiff Benitez's work as supervisor. (*Id.* at ¶ 280). Plaintiff Benitez also points to increasing discipline and threats of discipline as additional alleged retaliatory behavior by Griffin. (*Id.*). Plaintiff Benitez also testified that Griffin spread rumors that Plaintiff Benitez was having an affair with a team member, then mentioned the alleged affair in a conversation with Plaintiff Benitez while also noting that Plaintiff Benitez's wife worked at the plant. (*Id.*).

In February 2018, Plaintiff Benitez was issued a written warning for failing to perform a mandatory label verification to confirm that a product had the correct label. (*Id.* at ¶ 282). Subsequently, a customer received the incorrectly-labeled product, and the Goodlettsville plant sustained an $18,000 loss. (*Id.* at ¶¶ 285, 286). Plaintiff Benitez disputes that he should have been held accountable for this incident because he was not present to perform the label verification. (*Id.* at ¶ 287). Defendant investigated the incident and concluded that Plaintiff Benitez was still present at the plant and should have verified the labels. (*Id.* at ¶¶ 288, 289). For this error, Plaintiff Benitez was issued a written warning from Grant and another individual (who is also Cuban). (*Id.* at ¶ 282).

---

[8] While this fact is not mentioned in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), Plaintiffs include this fact in their Response by citing to McGaugh's deposition testimony. (Doc. No. 74 at 34). Defendant does not appear to dispute (or have any incentive to dispute) that McGaugh denied having ever met with Plaintiff Benitez during his visit in 2017.

As a result of the labeling incident, Plaintiff Benitez was placed on a performance improvement plan ("PIP"), which he also claims was retaliatory. (*Id.* at ¶ 291).

As evidence of national-origin discrimination, Plaintiff Benitez points to a comment that he alleges Griffin made about not wanting a Cuban individual in his family after a relative started dating a Cuban individual. (Doc. No. 74 at 14).[9]

Plaintiff Benitez ultimately resigned from his employment on June 27, 2018. (Doc. No. 73 at ¶ 293).

## C. Facts relevant to Plaintiff Wahid

Plaintiff Wahid is Arabic, and his country of origin is Morocco. (Doc. No. 8 at 5; Doc. No. 73 at 20).[10] Plaintiff Wahid identifies as Muslim. (Doc. No. 73 at ¶¶ 101, 129).[11] Plaintiff Wahid started working for Defendant as a Production Trimmer at the Goodlettsville plant in 2003. (Doc. No. 73 at ¶ 95). During his time employed by Defendant, he held several positions and received

---

[9] While this fact is not mentioned in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), Plaintiffs include this fact in their Response by citing to page 171 of Benitez's deposition testimony. (Doc. No. 74 at 14; Doc. No. 37-2 at 14). Defendant does not appear to dispute that Benitez alleges that Griffin made this statement, but Defendant also does not affirmatively endorse the contention that Griffin indeed made this statement.

[10] The Amended Complaint states that Wahid is "an Arabic male" who "was originally born in the Republic of Morocco." (Doc. No. 8 at 5). Defendant's answer technically denied this allegation, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding the truth of it. (Doc. No. 10 at 4). While Wahid's race and national origin are not clearly established in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), at this juncture Defendant does not appear to actually dispute that Wahid is Arabic and his country of origin is Morocco.

[11] The Amended Complaint alleges that "Plaintiff Wahid is a practicing Muslim" (Doc. No. 8 at 5). Defendant's answer technically denied this allegation, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding the truth of it. (Doc. No. 10 at 4). Plaintiffs' Response to Statement of Facts indicates only by implication that Plaintiff Wahid identifies as Muslim, (*e.g.,* Doc. No. 73 at 20-21, 27), but at this juncture Defendant does not appear to actually dispute that Plaintiff Wahid identifies as Muslim.

promotions. (*Id.* at ¶ 96). When he resigned on May 15, 2017 to take a promotion and higher salary with a competitor, Plaintiff Wahid was a Production Supervisor on A shift in the Beef department. (*Id.* at ¶¶ 97, 98).

Defendant and Plaintiff present different views as to Plaintiff Wahid's concerns about his treatment at the Goodlettsville plant. Defendant claims that his concerns were that he: 1) was unhappy with his pay rate, 2) was prevented from praying with subordinate employees and was instructed to discipline an employee if they returned late from prayer breaks prior to October 2013, 3) was mistreated by two other employees in 2011, and 4) thought Griffin had a bad attitude. (*Id.* at ¶ 101).

Denying that these were his concerns (or at least that they were all of his concerns), Plaintiff Wahid responded by asserting: 1) that Griffin told him he makes twice as much as he would in Morocco, 2) that Griffin would scrutinize his line and pick out problems, but not do the same for non-foreign-born supervisors, 3) that Griffin made him come back to work when his child was ill, but did not do the same for other supervisors,[12] 4) that he found the treatment to be unfair, expressed his feelings to Plaintiff Omar, and it was reported up the chain of command to Plaintiff Kolshi, 5) that Griffin questioned him frequently about his Muslim faith and denied him a day off for a religious request, 6) that Griffin asked him to move a Muslim woman to the back of the line, 7) that Griffin made a lot of jokes about Muslims (their scarves, prayers, and washing before prayer), 8) that Griffin spoke negatively of Muslims taking time to pray and "hated" having to accommodate prayer times and fasting periods, and 9) Griffin told him to get his "Moroccan ass over here" at least twice. (*Id.*). Additionally, Plaintiff Wahid asserts that Griffin was impatient and

---

[12] Despite making this claim, Plaintiff Wahid did not bring a claim under the FMLA. Such a claim is relevant only to Plaintiff Omar.

upset when he was on the production floor and that Griffin generally had a bad attitude aimed at foreign born supervisors and generals. (*Id.* at ¶¶ 102, 103). Plaintiff Wahid also states that he was underpaid for a period of time. (*Id.* at ¶ 105). Plaintiff Wahid states further that he applied for and was denied three positions, which went to ethnically diverse candidates before Griffin was promoted to Plant Manager. (*Id.* at ¶¶ 117, 118).

Both parties seem to agree that an incident involving a machete is relevant to Plaintiff Wahid's claims. In 2016, another employee brought a machete to work and planned to attack him. (*Id.* at ¶¶ 108, 109). The employee was terminated. (*Id.* at ¶ 110). Plaintiff Wahid claims that Griffin told him that this incident "shouldn't have bothered him" because he is from Morocco. (Doc. No. 73 at ¶ 101).

Regarding his religious discrimination claim, Plaintiff Wahid states that when he was an hourly employee, other individuals would time the prayer breaks taken by Muslim employees. (Doc. No. 73 at ¶ 120). On two occasions, Ausbrooks prevented Plaintiff Wahid from praying with his Muslim subordinate employees. (*Id.* at ¶ 122). Ausbrooks also told Plaintiff Wahid once to discipline employees returning late from prayer breaks, and Griffin gave the same instructions to Plaintiff Wahid on three occasions. (*Id.* at ¶¶ 124, 125). Plaintiff Wahid refused to follow these instructions and was not disciplined. (*Id.* at ¶¶ 126, 127). Plaintiff Wahid additionally recites several of the facts recounted above regarding Griffin's treatment of Muslims. (*Id.*). Griffin also asked Plaintiff Wahid questions about his religion, such as "Why are you Muslim?" and "Why do you pray five times a day?" (*Id.* at ¶129). Although Plaintiff Wahid cannot recall how many times Griffin asked him these questions, he believes it was more than once. (*Id.* at ¶130).

Plaintiff Wahid made two complaints to Griffin about Ausbrooks prior to October 2013. (*Id.* at ¶ 132). The first complaint was regarding a comment Ausbrooks made about Plaintiff Wahid

getting a "Doug Griffin power tattoo," but Plaintiff Wahid admits that he does not know what Ausbrooks meant by a "Doug Griffin power tattoo." (*Id.* at ¶¶ 133, 134). The second complaint occurred when (after work) Ausbrooks paid a female server to put her chest in Plaintiff Wahid's face. (*Id.* at ¶ 135). Plaintiff Wahid additionally reported Griffin and Dyer's treatment of him to Plaintiff Omar, who reported it up the chain of command to Plaintiff Kolshi. (*Id.* at ¶ 137).

### D. Facts relevant to Plaintiff Omar

Plaintiff Omar is Arabic and his country of origin is Iraq. (Doc. No. 8 at 9; Doc. No. 73 at 37).[13] He is Muslim. (Doc. No. 8 at 9).[14] Plaintiff Omar was hired in June 2009 to work in Defendant's poultry plant in Shelbyville, Tennessee, as an hourly employee, and he transferred to the Goodlettsville plant to work as a Production Supervisor in December 2012. (Doc. No. 73 at ¶¶ 138-140). Within a year, he was promoted to General. (*Id.* at ¶ 141).

Throughout his employment, Defendant coached Plaintiff Omar about his management style and temper, and Plaintiff Omar's 2013 Performance Evaluation critiqued his job performance and stated, among other things, that "[Plaintiff] Omar needs to work on giving and receiving negative feedback," that "[Plaintiff] Omar struggle[s] to get along with his hourl[ies] and his peers," and that Plaintiff Omar had shown aggression towards his team on several occasions. (*Id.*

---

[13] The Amended Complaint states that Omar is "an Arabic male" who "was born in the Republic of Iraq." (Doc. No. 8 at 9). Defendant's Answer technically denied each of these allegations, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding the truth of them. (Doc. No. 10 at 8). While Omar's race and national origin are not clearly established in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), at this juncture Defendant does not appear to dispute that Omar is Arabic and his country of origin is Iraq.

[14] The Amended Complaint states "Plaintiff [Omar] is a practicing Muslim." (Doc. No. 8 at 9). Defendant's Answer technically denied this allegation, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding the truth of it. (Doc. No. 10 at 8). Plaintiff's Response to Statement of Facts establishes only implicitly that Omar identifies as Muslim, but at this juncture Defendant does not appear to dispute that Omar identifies as Muslim. (*e.g.,* Doc. No. 73 at 21, 41).

at ¶ 143). His performance reviews in 2014, 2016, and 2017 contained either similar critiques of his performance or noted that he was behind on his goals. (*Id.* at ¶¶ 144-146). Plaintiff Omar believes that one of his performance evaluations was discriminatory, but he has been unable to identify which evaluation he believes is discriminatory (though it is likely the 2016 or 2017 evaluation). (*Id.* at ¶¶ 147, 148). These performance evaluations are used by Defendant to give constructive criticism and determine areas where goals are not being met, not to punish employees, and Plaintiff Omar still received a pay increase shortly after his 2016 evaluation. (*Id.* at ¶¶ 149, 150).

In 2013, Plaintiff Omar received from Plaintiff Kolshi disciplinary actions (two written warnings and one counseling) on each of three different occasions based on Plaintiff Omar's treatment of team members, such as using inappropriate language, not allowing proper restroom breaks, yelling, and not handing out pay stubs in a timely fashion. (*Id.* at ¶ 152). Defendant claims that Plaintiff Omar never received a written disciplinary action after Griffin returned as Plant Manager, but Plaintiff Omar points to a memorandum regarding his performance Griffin sent in February 2017 as evidence that Griffin was trying to get rid of him. (*Id.* at ¶ 151). Defendant claims that the memorandum stated that the memorandum's purpose was not as a disciplinary action, but instead to share concerns about Plaintiff Omar's performance. (*Id.* at ¶ 155). Plaintiff Omar claims that his performance suffered because Griffin humiliated him every morning in front of his team, told jokes about him, threw trash on his workplace, and called him a terrorist. (*Id.* at ¶ 156). He reported this conduct to Dyer, human resources, and Plaintiff Kolshi, but there was no change. (*Id.*). Griffin and Dyer confronted Plaintiff Omar about his complaints regarding his treatment at Tyson and told him if he did not like his treatment, he could leave. (*Id.*). Plaintiff Omar was not terminated because of any of his disciplinary issues. (*Id.* at ¶ 157).

To support his discrimination claim, Plaintiff Omar relies in part on an incident in which Griffin threw trash on his desk. (*Id.* at ¶ 176). Plaintiff Omar claims that Griffin made many jokes and comments about him being a terrorist, such as 1) calling him "the Iraqi guy," 2) showing other employees pictures of him and asking "[d]oesn't he look like a terrorist," 3) stating in a management meeting in front of Dyer that Plaintiff Omar looked like a terrorist, and 4) taking a photo of Plaintiff Omar, showing it to others, and stating that this is what a terrorist is supposed to look like. (*Id.* at ¶¶ 176, 178). After Plaintiff Omar complained about one of Griffin's statements that he looked like a terrorist,[15] Dyer met with Griffin and told him the comment was inappropriate. (*Id.* at ¶ 181). Additionally, during a sexual harassment seminar, a trainer made a comment about Iraq that Plaintiff Omar found offensive. (*Id.* at ¶ 183). Plaintiff Omar claims that his national origin was the reason that he did not receive two positions for which he applied. (*Id.* at ¶ 186).

To support his religious discrimination claim, Plaintiff Omar points to several incidents: 1) a joke Griffin made about a female employee from Somalia, 2) Griffin's statement to Plaintiff Gomez that he shouldn't trust Muslims, 3) Griffin's statement to Plaintiff Kolshi that it did not matter how much a Muslim prayed, they would still go to hell, 4) Griffin's statements to Plaintiff Wahid (recounted above), 5) Plaintiff Omar's fear of practicing prayer at work, 6) Griffin's offensive questions about Muslims, 7) Griffin's jokes about Muslim people, 8) Griffin's complaints about Muslim prayer during the workday and his attempts to get rid of Muslim prayer time, 9) in management meetings his faith would be doubted, and he would have to explain his faith, and 10) Dyer (a non-Muslim) would argue that his beliefs were wrong, such as when Plaintiff Omar prayed. (*Id.* at ¶¶ 195-98).

---

[15] It is unclear which alleged statement of Griffin is involved here, as Griffin allegedly made multiple comments to the effect that Plaintiff Omar resembled a terrorist.

Finally, the parties dispute some of the facts surrounding Plaintiff Omar's leave time. On May 1, 2017, Defendant received a note from Plaintiff Omar's doctor excusing him from work until June 1, 2017. (*Id.* at ¶ 158). Plaintiff Omar contends that this note was based on Plaintiff Omar's inability to walk due to his frequent walking and standing on concrete floors. (Doc. No. 74 at 41).[16] The same day, Defendant sent a letter requesting Plaintiff Omar return a Certification of Health Care Provider form to determine whether he qualified for leave under the FMLA. (Doc. No. 73 at ¶ 159). Plaintiff Omar returned the completed certification form, and his FMLA leave was approved. (*Id.* at ¶ 161). Two weeks later, on May 15, 2017, Defendant received another letter from Plaintiff Omar's doctor releasing him to work if he could perform a job that involved only sitting until June 1, 2017. (*Id.* at ¶ 162; Doc. No. 54-3 at 61).[17] Defendant had work available that

---

[16] Neither Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) nor Defendant's Summary of Common Facts (Doc. No. 52 at 7–9) states the reason that the doctor gave in the note for excusing Plaintiff Omar from work. In Plaintiff Omar's deposition, he states that he received the doctor's note because he was unable to walk on the concrete floor at the Tyson plant any more due to issues related to his feet. (Doc. No. 41-2 at 63–65). But because the precise nature of the disability for which Plaintiff received a doctor's note does not impact the Court's analysis of Plaintiff Omar's claims, and because Defendant does not address this fact in its Statement of Facts or relevant briefing, the Court takes no position on the underlying medical condition that was the doctor's stated basis in the note for excusing Plaintiff Omar from work.

[17] Citing his own deposition testimony, Plaintiff Omar claims that Defendant's nurse called his physicians and asked them to return him to work. (Doc. No. 74 at 16). To support this claim, Plaintiff Omar cites page 192 of his deposition transcript (Doc. No. 41-1 at 192). The better citation would have been to pages 167-169 of the deposition, where Plaintiff testified (in more detail than on page 192) that someone from his physicians' office (either a nurse or a receptionist) told him that Defendant's "nurse manager," named "Pam," told him this.

Defendant argues that this statement of the nurse (or receptionist) is hearsay, correctly noting that "[Plaintiff] Omar's testimony on this point is not based on personal knowledge. Instead, he is simply reciting what his doctor's nurse allegedly told him about her conversation with [Defendant's] Tyson's nurse [manager]." (Doc. No. 81 at 12). From this, Defendant asserts that the nurse's (or receptionist's) statement to Plaintiff Omar "is inadmissible hearsay that the Court cannot consider at summary judgment." (*Id.*).

Generally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Hearsay evidence is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Plaintiff Omar

met this restriction and requested by letter that Plaintiff Omar return to work on May 17, 2017, though Plaintiff Omar denied receiving the letter. (Doc. No. 73 at ¶ 163; Doc. No. 54-3 at 65). However, Plaintiff Omar did not return to work that day, and instead visited another doctor who provided a note excusing him from work until May 22, 2017. (Doc. No. 73 at ¶¶ 164, 165).

Then, Plaintiff Omar provided two doctor's notes indicating that he was to remain off work for "now." (*Id.* at ¶ 166). The new notes were based on Plaintiff Omar suffering a shoulder injury at the gym (separate from his receiving treatment for his inability to walk on concrete floors). (Doc. No. 52 at 33)[18] Defendant sent Plaintiff Omar another letter requesting FMLA certification paperwork, which was never completed and returned. (Doc. No. 73 at ¶¶ 167, 168). When this paperwork was not returned by the requested deadline, Denton called to discuss his leave, but Plaintiff Omar still did not provide the paperwork by the extension, and he did not pick up when Denton tried to call again. (*Id.* at ¶¶ 169, 170).[19] Subsequently, on June 29, 2017, Dyer sent Omar

---

clearly offers his testimony as to what he was told by his physician's nurse (or receptionist) for the truth of what she asserted to Plaintiff Omar: that Defendant's nurse manager had called his physicians and asked them to return him to work. When invoking this statement, Plaintiff did not explain why this statement is not hearsay or identify any exception whereby it would be admissible even if it is hearsay. Perhaps this is because any such explanation would have been far-fetched in any event. So the Court agrees with Defendant that this evidence constitutes inadmissible hearsay, which the Court cannot and will not consider in ruling on the Motion.

[18] Neither Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) nor Defendant's Summary of Common Facts (Doc. No. 52 at 7–9) includes this fact, but it appears to be undisputed by the parties.

[19] Plaintiffs deny paragraph 169, stating: "Denied. [Plaintiff] Omar doesn't recall Denton asking about the paperwork; he does recall discussing the situation with Griffin with Denton and the fact he needed time off to heal. Omar Depo., p. 190-192." Thus, though Plaintiffs begin their objection with an uncategorical denial, Plaintiffs actually only appear to be disputing the part of paragraph 169 that references the paperwork, not that the call occurred or that Plaintiff Omar requested more time off to heal.

a letter stating that he was terminated. (*Id.* at ¶ 171).[20] The letter encouraged Plaintiff Omar to reach out to discuss any extenuating circumstances, but Plaintiff Omar did not contact Defendant in response to the letter. (*Id.* at ¶¶ 172, 173).

Plaintiff Omar believed that if he returned to work Griffin would not honor any accommodations. (*Id.* at ¶ 176). Plaintiff Omar also asserts that Defendant inappropriately canceled his health insurance during this time period:

> [Plaintiff] Omar believed he had already been terminated in May 2017 rather than later in June, 2017. [Plaintiff] Omar visited a physician around May 23, 207 and was told he had to pay the bill in full because he had no insurance. [Plaintiff] Omar asked the office to verify with [Defendant] who confirmed he was fired in May, so Omar was responsible for the bill. [Defendant's] pay records confirm that all health insurance premiums were stopped as of the May 18, 2017 paycheck period. The pay records also reflect an adjustment ran on May 18, 2017 as if that was the last date of employment.

---

[20] Plaintiffs ostensibly deny paragraph 171, stating:

> Denied. [Defendant] Tyson had choices. [Defendant] Tyson could have chosen to extend [Plaintiff] Omar additional leave so that he could have the surgeries he needed to return to work. Omar Depo., p. 169-170, 179-180. It would have helped if [Defendant] Tyson hadn't terminated his health insurance on May 18, 2017 so [Plaintiff] Omar could have received the additional care. Omar Depo., p. 279, 281. [Defendant] Tyson also could have chosen not to interfere with [Plaintiff] Omar's leave by calling his physicians and asking them to change his restrictions and contributing to a hostile environment. Omar Depo., p. 167. [Defendant] Tyson also could have chosen to take action any one of the numerous times [Plaintiff] Omar and other Plaintiffs reported discrimination to Dyer, [Brian] Sorensen, Griffin and Denton so that we wouldn't be in this situation. Omar Depo., pp.130-132, 232-233, 247, 319-320; Dyer Depo., p. 51, 55; Kolshi Depo., p. 121, 123;283-285. Sorensen Depo., p. 28.

Thus, though Plaintiffs again begin their objections with an uncategorical denial, Plaintiff Omar does not seem to dispute that the letter was sent by mail or the contents of that letter, and instead appears to deny only Defendant's characterization that Defendant "had no choice but to terminate his employment." Plaintiffs additionally do not deny the existence of the relevant letter referenced in paragraph 172.

(Doc. No. 74 at 43 (internal citations to the record omitted)).[21] On May 18, according to

Defendant's second letter to Plaintiff Omar, he was still on FMLA leave. (Doc. No. 54-3 at 55).

("According to our records, we have received medical documentation that takes you off work from

May 16, 2017 through May 22, 2017."). Defendant responded that:

> [Plaintiff] Omar also argues, without any evidence, that [Defendant] improperly
> terminated his health insurance before his termination date. (Doc. 74, pp. 43, 44,
> and 45). [Plaintiff] Omar was on an FMLA leave of absence, which is unpaid. As
> a result, he was required to pay his health care premiums while he was on that leave.
> [Plaintiff] Omar's failure to pay his health insurance premiums caused his health
> insurance to lapse. There is no evidence to support a contrary view.

(Doc. No. 81 at 12). Defendant's argument here assumes that Plaintiff Omar did not pay his health

insurance premiums. But Defendant cites no evidence to support that assumption, and therefore

the Court cannot accept this assumption as valid.

### E. Facts relevant to Plaintiff Gomez

Plaintiff Gomez was born in 1967. (Doc. No. 73 at ¶ 20). Plaintiff Gomez is Latino or

Hispanic, and his country of origin is Colombia. (Doc. No. 52 at 11; Doc. No. 8 at 7).[22] Plaintiff

Gomez began working for Defendant as a Production Supervisor at its Norfolk, Nebraska plant in

---

[21] Whether Tyson terminated Plaintiff Omar's health insurance during this time period is not
addressed in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc.
No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9). Plaintiffs' Response to
the Statement of Facts includes Plaintiff Omar's position that Tyson "terminated his health
insurance on May 18, 2017." (Doc. No. 73 at 36).

[22] The Amended Complaint states that Gomez "was originally born in Colombia and is a dark-
skinned Hispanic male." (Doc. No. 8 at 7). Defendant's answer technically denied these
allegations, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding
the truth of them. (Doc. No. 10 at 6). While Plaintiff Gomez's race and national origin are not
clearly established in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response
thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), at this
juncture Defendant does not appear to dispute that Gomez is Hispanic (or perhaps Latino) and his
country of origin is Colombia. Gomez states in his deposition that he was "born in Turbo,
Antioguia [sic]" and "raised in Cartagena, Columbia [sic]" (Doc. No. 39-1 at 14), and identifies as
"Hispanic." (*Id*. at 152).

2004, and one year later he applied for a transfer to the Goodlettsville plant, which was approved. (Doc. No. 73 at ¶¶ 17-19). Plaintiff Gomez worked as a Production Supervisor for 13 years (starting in 2005) at the Goodlettsville plant before voluntarily resigning on May 12, 2017, in order to accept a promotion and higher salary with a competitor. (*Id.* at ¶¶ 22-24).[23] Plaintiff Gomez was replaced by a Latino individual. (*Id.* at ¶¶ 28, 29).

Plaintiff Gomez points to numerous incidents to support his discrimination claims: 1) in 2005, an individual to whom Plaintiff Gomez reported said something about "think[ing] with intelligence"; 2) Plaintiff Gomez had issues with another individual's treatment of him in 2011;[24] 3) another individual made a comment about "foreigners" in 2010 and also criticized Plaintiff Gomez's job performance;[25] 4) when Denton was the Complex Human Resources Manager (prior to 2014) he remarked to Plaintiff Gomez that he would like to hire more Asian employees, and so Plaintiff Gomez believed Denton disliked Latinos; 5) when Denton's daughter visited the plant, Denton said that anyone with romantic intentions with her would be terminated, and Plaintiff Gomez believes this to have been discriminatory against Latinos because Denton was looking at Plaintiff Gomez as he made the comment; 6) Plaintiff Gomez overheard Griffin make a statement indicating that persons "not from here" would "have to pay the price" and must learn English; 7)

---

[23] Despite specifically admitting that he "voluntarily resigned," Plaintiff Gomez does not concede that this necessarily means he was not constructively discharged; to the contrary, he claims that his "resignation[ ] should be considered [a] constructive discharge[ ]." (Doc. No. 74 at 20–21).

[24] The other individual was terminated by Defendant after an investigation by human resources. (Doc. No. 70 at ¶ 37).

[25] Plaintiff Gomez filed an EEOC charge in 2011 regarding some of this treatment and some of the aforementioned 2011 treatment but opted not to pursue it. (Doc. No. 70 at ¶ 40).

Plaintiff Benitez heard Griffin make negative comments about Plaintiff Gomez's English skills;[26] 8) on one occasion, Griffin called him "old man"; and 9) Plaintiff Gomez was present for a conversation between Griffin and Dyer about plans to recruit young people for supervisor positions while Plaintiff Gomez held a supervisor position.[27] (*Id.* at ¶¶ 34, 36, 38, 39, 43-48, 85, 88).

Plaintiff Gomez additionally claims that Defendant reneged on a promise to give him a pay increase upon transferring from the Nebraska plant to the Goodlettsville plant, but Plaintiff Gomez also admits that he intended to leave the Nebraska plant regardless of such alleged promise. (*Id.* at ¶¶ 31, 32). He never raised this pay issue until May 2017 when he resigned (12 years later). (*Id.* at ¶ 33). During his 13 years at the Goodlettsville plant, Plaintiff Gomez received a written warning only once, in 2011, for failing to notify his supervisor that he would be late for work. (*Id.* at ¶ 23).

To support his retaliation claim, Plaintiff Gomez points to a complaint he made to Griffin about Ausbrooks prior to October 2013. (*Id.* at ¶ 91).[28] Plaintiff Gomez complained that Ausbrooks gave him instructions on how to run his line that he did not believe were safe, but he was not disciplined for complaining about the instructions. (*Id.* at ¶¶ 92-94). Plaintiff Gomez also reported his negative feelings about Griffin in the time period leading up to his resignation to Plaintiff Omar, who reported it up his chain of command. (*Id.* at ¶ 91).

## F. Facts relevant to Plaintiff Kolshi

---

[26] When Plaintiff Gomez raised the topic of his English skills with Griffin, Griffin told Plaintiff Gomez that his English was fine. (Doc. No. 70 at ¶ 49).

[27] During this conversation, Griffin and Dyer did not specifically mention replacing Plaintiff Gomez. (Doc. No. 70 at ¶ 89).

[28] Plaintiffs' response to paragraph 91 ostensibly denies that Plaintiff Gomez relies on this complaint to support his retaliation claim, but in context it appears that they are denying only that Plaintiff Gomez relies *solely* on this complaint to support his retaliation claim.

Plaintiff Kolshi is Albanian. (Doc. No. 8 at ¶ 80).[29] He is also Muslim, but the parties dispute the extent to which he is a "practicing" Muslim. (Doc. No. 40-1 at 212-14; Doc. No. 73 at 50).[30] Plaintiff Kolshi was hired in 2003 as an hourly employee. (Doc. No. 73 at ¶ 206). He held various positions and was promoted, and Plaintiff Kolshi was the second-highest ranking manager at the Goodlettsville plant when he resigned in May 2017. (*Id.* at ¶¶ 207, 208).

Plaintiff Kolshi was suspended due to a failed audit by one of Defendant's largest customers in March 2017, which found multiple defects across a spectrum of products[31] and put Defendant's contract with the customer in jeopardy. (*Id.* at ¶¶ 210-12). At a meeting discussing the audit, Plaintiff Kolshi asserted that the product was B-shift product, and Gordon responded that Plaintiff Kolshi was responsible because he was Operations Manager. (*Id.* at ¶¶ 216, 217). Plaintiff Kolshi believes that because the defective product was produced primarily on B-shift,

---

[29] The Amended Complaint states that "Plaintiff Kolshi was originally born in the Republic of Albania" and is an "Albanian male." (Doc. No. 8 at 10). Defendant's answer technically denied these allegations, but only on the basis that Defendant lacked a basis sufficient to form a belief regarding the truth of them. (Doc. No. 10 at 9–10). While Kolshi's race and national origin are not clearly established in Defendant's Statement of Facts (Doc. No. 53) and Plaintiffs' Response thereto (Doc. No. 73) or Defendant's Summary of Common Facts (Doc. No. 52 at 7–9), at this juncture Defendant does not appear to dispute that Kolshi is Albanian. Plaintiffs' Response to the Statement of Facts also makes several references in passing which suggest that Kolshi is Albanian (*e.g.*, Doc. No. 73 at 50, 52), and Defendant raises no disagreement with the suggestion that Kolshi is in fact Albanian.

[30] Plaintiff Kolshi does not participate in prayer, but he does participate in Muslim fasting. (Doc. No. 73 at ¶ 240).

[31] Plaintiff Kolshi's response to Defendant's assertion that the March 2017 audit found multiple defects across a spectrum of products, (Doc. No. 73 at ¶ 211), seems wholly inappropriate. The response was, "Denied. The bad product was produced by B shift." (*Id.*). In context, it strikes the Court as rather clear that Plaintiff Kolshi was admitting this asserted fact as it was stated, and that his purported unambiguous denial was not a denial of this fact at all, but rather an attempt at providing additional context for the fact. A response is a place to admit or deny the fact as stated, not to provide context for the fact. Plaintiffs elsewhere have had opportunities to provide, and have provided, copious context to all kind of circumstances at issue in this case, and should not have rendered a confusing response in order to provide context right here.

either Assistant Operations Manager Roger Delepierre or Griffin should have been held responsible. (*Id.* at ¶ 222). Delepierre was issued a written warning and placed on a PIP due to the failed audit. (*Id.* at ¶ 223). Upper management also considered suspending Griffin, but decided not to as he had multifaceted areas of responsibility, in contrast to the operations managers who are solely responsible for quality issues. (*Id.* at ¶¶ 224, 225).

When Plaintiff Kolshi returned from his suspension, he was called into a meeting because Defendant learned he had been looking for a new job. (*Id.* at ¶¶ 218, 219). At the meeting, Senior Vice President McGaugh told Plaintiff Kolshi that he did not want him to leave and complimented his job performance. (*Id.* at ¶ 220).

To support his discrimination claim, Plaintiff Kolshi claims that Griffin resisted promoting Plaintiff Kolshi (*Id.* at ¶ 234).[32] Plaintiff Kolshi also claims that Griffin once threw dirty work uniforms on his desk and commented, "You're Albanian, and you make this much money." (*Id.* at ¶ 238). Plaintiff Kolshi also states that Griffin made negative remarks about Muslims. (*Id.* at ¶ 241). Plaintiff Kolshi confronted Griffin about the dirty work uniforms and the comment about his heritage, and he believes that Griffin retaliated against him by walking the production floor, giving him dirty looks, yelling at Kolshi's Generals, and making statements like, "If things don't change, people are going to lose their jobs." (*Id.* at ¶¶ 248-250).

G. **Procedural background and claims**

The action was removed from state court to this Court in May 2018. (Doc. No. 1). The Complaint thereafter was amended, and the Amended Complaint (Doc. No. 8) is now the operative

---

[32] On the other hand, Griffin asked Plaintiff Kolshi to transfer to the plant (in Council Bluffs) where Griffin was promoted to Plant Manager. (Doc. No. 73 at ¶ 235).

complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

The Amended Complaint raises several different causes of action pleaded across numerous counts, some but not all of which are asserted by all Plaintiffs.[33] Count I asserts race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1967 on behalf of all

---

[33] The Court notes that Plaintiffs claim essentially that a work environment that could be deemed "hostile" led to their being constructively discharged, an adverse employment action capable of supporting numerous kinds of discrimination claims. As they are permitted to do, *see Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47 (2004), plaintiffs sometimes allege that particular circumstances and events create a hostile work environment that supposedly *both* supports a claim of hostile work environment *and* establishes a constructive discharge (upon which claims other than hostile work environment could be predicated). *See*, *e.g.*, *Cooper v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 957 (W.D. Tenn. 2010) (noting that the plaintiff had made a "constructive discharge claim . . . predicated on the same facts as his hostile work environment claim"); *Disler v. Target Corp.*, No. 3:04-CV-191, 2005 WL 2127813, at *20 (E.D. Tenn. Aug. 31, 2005) ("because [the plaintiff's] claim for a hostile working environment fails, it naturally follows that her claim for constructive discharge based on a hostile working environment also fails."). But no Plaintiff brings a discrimination claim *for* hostile work environment under any potentially applicable statute. Defendant notes in its Reply that in many places in their Response, Plaintiffs allude to such a claim. (Doc. No. 81 at 6). Plaintiffs have not brought such a claim in their Amended Complaint, and they did not argue any of the elements of a hostile work environment claim, *i.e.*: 1) they are a member of a protected class; 2) they were subjected to unwelcomed racial harassment; 3) the harassment was based on race; 4) the harassment created a hostile work environment; and 5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). A plaintiff cannot raise a new legal claim in a response to a motion for summary judgment. *E.g.*, *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005) (collecting cases)). Therefore, to the extent that Plaintiffs intended to add a hostile work environment claim through their Response, the Court will not consider such a claim. To the extent that Plaintiffs use the phrase "hostile work environment" colloquially (in a non-technical sense) to suggest the severity of the working conditions Plaintiffs faced, the Court finds that this generalized argument is typically not responsive to Defendant's argument.

Plaintiffs.[34] Count II asserts retaliation in violation of Title VII, the Tennessee Human Rights Act ("THRA"), and the Tennessee Public Protection Act on behalf of all Plaintiffs. Count III asserts negligent hiring, retention, and supervision practices on behalf of all Plaintiffs. Count IV asserts religious discrimination under Title VII and the THRA on behalf of Plaintiffs Wahid, Omar and Kolshi. Count V asserts color discrimination under Title VII and the THRA on behalf of Plaintiffs Gomez and Wahid. Count VI asserts age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA") and THRA on behalf of Plaintiff Gomez only. Count VII[35] asserts disability discrimination under the Americans with Disabilities Act Amendments Act of 2008 and the Tennessee Disability Act on behalf of Plaintiff Omar only. Count VIII brings a claim for interference and retaliation under the Family and Medical Leave Act on behalf of Plaintiff Omar only.

In a footnote in their Response, Plaintiffs state that:

Plaintiffs have agreed to the dismissal of any claims under the Tennessee Public Protection Act and common law retaliatory discharge, but maintain retaliation claims under Title VII and the Tennessee Human Rights Act. Additionally, Plaintiffs Omar and Kolshi have agreed to dismissal of their race claims but maintain their claims of national origin and religious discrimination and retaliation under Title VII and the Tennessee Human Rights Act.

(Doc. No. 58 at 2 n.1). Consistent with this statement, Plaintiffs do not brief or address these claims in their response to the Motion, and the Court concludes without difficulty that these claims have been abandoned. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)

---

[34] It is unclear why Plaintiffs brought their claims for race and national origin in a single count, instead of two separate counts.

[35] Due to what appears to be a typographical error, the Amended Complaint lists Plaintiff Omar's disability discrimination claim as Count VI when it should be Count VII. Therefore, the Court herein refers to this Count as Count VII and to the following Count (incorrectly numbered VII in the Amended Complaint) as Count VIII.

("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").[36]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

---

[36] Though it may seem appropriate to dismiss these claims with prejudice instead of granting summary judgment, courts regularly grant summary judgment on abandoned claims. *E.g.*, *Colston v. Cleveland Pub. Libr.*, No. 1:12-CV-204, 2012 WL 3309663, at *2 n. 2 (N.D. Ohio Aug. 13, 2012) ("The Court therefore concludes that [Plaintiff] has abandoned that claim and grants Defendants' motions for summary judgment on [Plaintiff's] Fifth and Fourteenth Amendment claim."), *aff'd*, 522 F. App'x 332 (6th Cir. 2013); *Purkey v. Green*, No. 01-3134-JAR, 2005 WL 627959, at *12 (D. Kan. Feb. 24, 2005) ("Plaintiff specifically abandons these claims in his response to defendants' motion for summary judgment, and the Court grants summary judgment on these claims." (internal citation omitted)), *aff'd*, 164 F. App'x 792 (10th Cir. 2006); *Ginalski v. Diocese of Gary*, No. 2:15-CV-95-PRC, 2016 WL 7100558, at *1 (N.D. Ind. Dec. 5, 2016) ("The Court grants summary judgment in favor of Defendants on the claims of negligent infliction of emotional distress and defamation, which [Plaintiff] abandons[.]"); *Southward v. FedEx Freight, Inc.*, 98 F. Supp. 3d 926, 933 (S.D. Ohio 2014) ("[T]he undersigned finds [Plaintiff] abandons this claim, and grants summary judgment in favor of [Defendant] on this basis.").

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed R. Civ. P. 56(c)(1)(B).[37]

_____

[37] This alternative was implemented (or at least confirmed) via 2010 amendments to Rule 56. *Pittman* did not address this alternative, perhaps because *Pittman* was focused on what the Supreme Court had to say in 1986 in *Celotex*, and not on the provisions newly added in Rule 56(c)(1)(B) eight years before *Pittman* was decided. The Advisory Committee notes to the 2010 amendments to Rule 56 explain the nature of and reason for this alternative:

> Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute. *And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.*

Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendments (emphasis added). As for what kind (and degree) of "showing" is required—including what kind of "showing" is required for a movant seeking to meet its initial burden under Rule 56(c)(1)—the case law is unclear. *Lansky v. Prot. One Alarm Monitoring, Inc.*, No. 17-2883, 2019 WL 575390, at *2 (W.D. Tenn. Feb. 12, 2019) (noting that where a defendant-movant "cites virtually no record material, it must make an adequate 'showing' of an absence of admissible evidence under Rule 56(c)(1)(B). Rule 56 and Sixth Circuit case law do not expressly define what is necessary for a proper 'showing' under Rule 56(c)(1)(B)."). A "showing" may well be adequate even if it is relatively minimal, but the undersigned declines to go nearly as far as cases, like *Lansky*, that state that it is enough for a defendant-movant merely to *assert* that the plaintiff could not adduce evidence sufficient to meet

If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

Consistent with the above observations made specifically about a defendant-movant seeking summary judgment on a plaintiff's claims, any party asserting that a fact cannot be or genuinely is disputed—*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all

───────────────

its burden of persuasion at trial, *i.e.*, that a defendant-movant meets its Rule 56 burden merely by challenging a plaintiff to "put up or shut up." *Id.* Such a statement seems inconsistent with cases like *Pittman* (although, admittedly, not *all* Sixth Circuit cases), which in no way suggest that a defendant-movant can meet its burden merely by making such a challenge; any such suggestion indeed would make a defendant's initial "burden" entirely illusory. Such a statement is also inconsistent with any reasonable definition of a "showing," which never would include a mere assertion; one does not "show" something to any degree whatsoever merely by asserting it. Suffice it to say that, pending clarification in pending precedent, the undersigned will deem a "showing" of the absence (or existence) of a genuine dispute to be sufficient under Rule 56(c)(1)(B) if the undersigned believes that there is demonstrably good reason—based on common sense, experience, and extant information not reasonably disputable though not in the record—to conclude at least preliminarily that a genuine dispute does not (or does) exist.

reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

To obtain summary judgment on Title VII or THRA claims, a defendant either (i) must show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case and it is entitled to judgment as a matter of law on that element; or, if it fails to do that, (ii) make an evidentiary showing[38] that there was a legitimate, nondiscriminatory reason for its alleged actions and then show that there is no genuine issue of material fact as to pretext and that it is entitled to judgment as a matter of law on that issue. The plaintiff, on the other

---

[38] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

hand, to avoid summary judgment, (i) must present sufficient evidence to demonstrate a genuine issue of material fact as to any elements of his *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and also (ii) show that the defendant (a) cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or (b) demonstrate that there is a genuine issue of material fact as to pretext.[39]

The Court pauses to make two more observations. First, it is not lost on the Court that a thorough description of the workings of Rule 56 is somewhat elaborate—more so than is typically acknowledged—but the Court and litigants must be aware of the details and proceed accordingly. Second, courts typically (and appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

## DISCUSSION

Defendant has moved for summary judgment on all claims (Counts) brought by all Plaintiffs. The Court will discuss the various claims in turn, in some cases by treating multiple claims together under a single heading for the sake of efficiency. The Court will not mince words: there is a dizzying array of claims here, a reality made even starker by the fact that most claims need to be analyzed under each of two different theories (direct evidence and indirect evidence), as discussed below. Considering the various permutations of plaintiffs, claims, and theories in support of claims, the Court must analyze literally several dozen theories herein.

The journey through the analysis of these claims is arduous and is complicated by the parties' (often understandable) use of incorrect legal standards and (less forgivable) incorrect

---

[39] As indicated below, the requirement to show "pretext" is actually, under Sixth Circuit case law, a requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

characterization of deposition testimony. But the Court undertakes and completes that journey below, one step at a time. Some steps are nuanced, and some redundant in that the Court cross-references other parts of the opinion. Many steps relate to the hugely significant—and generally under-analyzed—issue of who bears precisely what burdens, and under what circumstances, on a summary judgment motion in an employment discrimination case. But all are necessary to do justice to a Motion implicating so many claims, with so many theories, involving so many facts, for so many Plaintiffs.

**A.** **Counts I, IV, and V—Race, national origin, color, and religious discrimination**

    1.  Overview of relevant types of Title VII claims

Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Race, national origin, color, and religious discrimination are, respectively, separate types of Title VII claims. *Wakefield v. Child.'s Hosp.*, No. C2-06-1034, 2008 WL 3833798, at *6 (S.D. Ohio Aug. 13, 2008); *see also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991), *abrogated on other grounds by Igwe v. Salvation Army*, 790 F. App'x 28, 36 (6th Cir. 2019). Plaintiffs must show direct or sufficient indirect evidence specific as to each type of claim in order to survive summary judgment as to claims of that type. *Burrage v. FedEx Freight, Inc.*, No. 4:10CV2755, 2012 WL 1068794, at *6 (N.D. Ohio Mar. 29, 2012) ("[I]t does not follow that comments supporting one type of discrimination can provide the sole support for a claim for a separate and distinct form of discrimination.").[40]

---

[40] Plaintiffs seem to premise their arguments in many ways on the assumption that the Court will conflate the evidence not only of the various claims, but of the various Plaintiffs. The Court will

### a. Race and national origin

Count I (race and national original discrimination) is brought on behalf of all Plaintiffs under Title VII. "[R]ace and national origin are ideologically distinct under Title VII." *Burrage*, 2012 WL 1068794, at *7 (quoting *Kun v. Finnegan*, 949 F. Supp. 13, 19 (D.D.C. 1996)). Instead of referring to one's racial identity, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* "The legislative history [of Title VII] enunciates precisely that a person's national origin has nothing to do with color, religion, or race." *Id.* (quoting *Roach v. Dresser Indus. Valve & Instrument Div.*, 494 F. Supp. 215, 216 (W.D. La.1990)). However, in some cases, national origin and race "are so intertwined that it is difficult to separate the two for purposes of analysis; such as in the case where an employee believes that he has been subjected to discrimination but he cannot determine whether it can be traced to a personal characteristic common to people of a certain national origin or his national origin, itself." *Id.*

### b. Color discrimination

---

not engage in such a generalized review of the facts at hand, for several reasons. As noted, each Plaintiff must show evidence specific to each type of claim they bring, not of generalized questionable conduct they faced while employed by Defendant. Second, "[i]t is true that Title VII protects only those who are actually in a protected class . . ." *Burrage*, 2012 WL 1068794, at *5. Plaintiffs cannot attempt to use the statements made against an individual of another race, national origin, color, or religion to show that they also were discriminated against for their own protected status.

It is true that a plaintiff can seek protection under Title VII when he or she advocates for members of a particular class, even if he or she is not a member of that class himself or herself. *E.g.*, *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) ("Individuals are also protected under Title VII from discrimination because of their advocacy on behalf of protected class members."). However, none of the Plaintiffs in this case has argued that he advocated on behalf of members of a different race, national origin, color, or religion, such that he may seek protection under Title VII for discrimination based on a race, national origin, color, or religion that is not his own.

Count V (color discrimination) is brought on behalf of Plaintiffs Gomez and Wahid under Title VII and the THRA.[41] The analysis is the same under both statutes, and so the Court will conduct one analysis for the color-discrimination claims. *Brack v. Shoney's, Inc.*, 249 F. Supp. 2d 938, 947 (W.D. Tenn. 2003).

Courts are clear that a color discrimination claim is separate from a race or national origin discrimination claim. "[C]olor discrimination is distinct from race discrimination in that the former 'arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual.'" *Moore v. Food Lion*, No. 306-0712, 2007 WL 596955, at *2 (M.D. Tenn. Feb. 21, 2007) (quoting *Bryan v. Bell Atl. Md., Inc.*, 298 F.3d 124, 133 n. 5 (4th Cir. 2002)); *see also Payne v. Lucite Int'l*, No. 13-2948-STA-TMP, 2014 WL 2826343, at *3 (W.D. Tenn. June 23, 2014). As one court explained, according to the EEOC Compliance Manual:

> Title VII prohibits employment discrimination because of "color" as a basis separately listed in the statute. The statute does not define "color." The courts and the Commission read "color" to have its commonly understood meaning—pigmentation, complexion, or skin shade or tone. Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other

---

[41] The THRA provides a state remedy for race discrimination. The statute states "[i]t is a discriminatory practice for an employer to: (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin . . . " Tenn. Code Ann. § 4-21-401(a)(1). Though this is a state discrimination law, courts apply the same principles as they would to a claim brought under Title VII or 42 U.S.C. § 1981. *See e.g.*, *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)). It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case.

> color characteristic of the person. Even though race and color clearly overlap, they are not synonymous. Thus, color discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity.

*Cooper v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 950–51 (W.D. Tenn. 2010) (quoting from and discussing the EEOC's guidance). The EEOC's guidance here certainly does not have the force of law and is not binding on this Court, but the Court is satisfied that the guidance here accurately characterizes the law.

### c. Religious discrimination

Count IV (religious discrimination) is brought on behalf of Plaintiffs Wahid, Omar, and Kolshi under Title VII and the THRA. The same analysis applies under both statutes, and the Court will conduct one analysis for the religious discrimination claims. *Burdette v. Fed. Exp. Corp.*, 367 F. App'x 628, 632 (6th Cir. 2010).

A claim for religious discrimination is distinct from a claim that relates to race, national origin or color. "Religion" is defined by Title VII as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also Tepper v. Potter*, 505 F.3d 508, 513 (6th Cir. 2007). The definition of "religion" in particular is relevant to a claim of religious discrimination not least because a member (or adherent) of a "religion" is a member of a protected class. *See, e.g.*, *Tepper v. Potter*, 505 F.3d 508, 516 (6th Cir. 2007) ("[The plaintiff] has established that he is Jewish and thus a member of a protected class" for purposes of a claim of religious discrimination); *Gibson v. Finish Line, Inc. of Delaware*, 261 F. Supp. 2d 785, 791 (W.D. Ky. 2003) ("By virtue of her religion, [the plaintiff] is a member of a protected class.")

This statutory definition of religion is tautological and thus not very helpful. It is also very oddly worded in how in tries to signal that under certain circumstances, certain things that otherwise would constitute "religion" are carved out from the definition. Yet this does not concern the Court much here, since there is no question that those Plaintiffs asserting claims of religious discrimination are members of a religion; they undisputedly are Muslims, *i.e.,* members of (or adherents to) to Islam, which obviously is a "religion" even under the narrowest of definitions. Thus, the pertinent Plaintiffs are clearly members of a protected class. *See, e.g.*, *Deger v. Univ. of Cincinnati*, No. 1:14-CV-420, 2015 WL 5729324, at *8 (S.D. Ohio Sept. 30, 2015) (Noting that the plaintiff's "Muslim religion made him a member of a protected class.").

2. Legal Frameworks for Title VII claims (indirect and direct evidence)

As indicated above, Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

To survive a defendant's motion for summary judgment ruling on a Title VII claim for disparate treatment,[42] a plaintiff may seek to raise a genuine issue of material fact by offering either

---

[42] "Disparate treatment" is an umbrella term used to refer to discrimination against an employee based on the employee's membership in a protected class. The Supreme Court has explained the term as such:

> Several of our decisions have dealt with the evidentiary standards that apply when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin. In such "disparate treatment" cases, which involve "the most easily understood type of discrimination," *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S. Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977), the plaintiff is required to prove that the defendant had a discriminatory intent or motive.

direct evidence of discrimination or indirect (*i.e.*, circumstantial) evidence of discrimination in accordance with the familiar so-called *McDonnell Douglas* burden-shifting framework.

## Indirect evidence (*McDonnell Douglas*)

The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden shifting framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).
>
> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

Therefore, if only indirect (and no direct) evidence is present, the plaintiff bears the burden under *McDonnell Douglas* of first showing its *prima facie* case of race discrimination, *i.e.*, that:

> 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir.2000)). Notably, these four elements apply to all claims of discrimination of all of the various types asserted here. Although the elements are the same

---

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (distinguishing disparate treatment from disparate impact cases).

across discrimination types, their application varies across discrimination type in that the protected class (and kind of protected class) varies; for example, a female claiming sex discrimination is a member of the protected class of females, an immigrant claiming national-origin discrimination is a member of the protected class comprised of persons of the same national origin, and so forth.

If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The Supreme Court has prudently cautioned, given the confusion sometimes discernible in this context, "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). As the Sixth Circuit recently explained:

> Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

Thus, as to the existence of legitimate and non-discriminatory reasons for its action(s), the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[43] To meet that burden of mere production, "the

---

[43] As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times throughout this burden shifting. *Burdine*, 450 U.S. at 253; *Anthony*, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motion it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on this Motion. Notably, in seeking to meet its burden, the

defendant need not *persuade* the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254 (emphasis added). Rather, "[i]t is sufficient if the defendant's evidence *raises a genuine issue of fact* as to whether it discriminated against the plaintiff." *Id.* (emphasis added).[44] To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to

_____

plaintiff cannot rely purely on mere personal belief, conjecture, or speculation, because they are insufficient to support an inference of discrimination. *Garren*, 482 F. Supp. 3d at 717.

[44] Given its use of the phrase "genuine issue of fact," *Burdine*'s description of the defendant's burden at the second stage could be misunderstood to apply only at the summary judgment stage. That is, because "genuine issue of material fact" is a key term of art uniquely applicable to motions for summary judgment, one might conclude that *Burdine* here was talking only about the burden a defendant bears at the second stage on the defendant's motion for summary judgment. But it was not. *Burdine* did not involve summary judgment at all; the case went to the Supreme Court after a (bench) trial. The Court has no reason to believe, though, that the standard is any different at the summary judgment stage; whether at summary judgment or at trial, the defendant's burden is to raise a genuine issue as to whether it had a valid (legitimate and non-discriminatory) reason.

     The reasons why it is enough for the defendant, even at trial, to merely "raise a genuine issue" as to whether it had a legitimate and non-discriminatory reason becomes clear once one considers the indirect-evidence framework as a whole and the reality that the ultimate burden of proving discriminatory intent lies with the plaintiff. Specifically, the first reason is that the defendant cannot have the burden of persuasion on the issue of whether its reason was valid rather than discriminatory, because (as just noted) the plaintiff has the burden on that issue. And the second reason is that the entire function (purpose) of the second stage—whether at the trial or summary-judgment stage—is merely to determine whether *there is a genuine issue* as to whether the defendant had a valid reason for its action(s). If the defendant fails to show that there is, then there is no genuine dispute that the defendant's action(s) were unlawfully discriminatory, and the plaintiff prevails. *See Burdine*, 450 U.S. at 254 ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (noting that if the plaintiff's claim is not defeated at the first stage, then the defendant-employer's "failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it."). But if the defendant does make this showing, then the issue of whether the defendant *actually* had a valid reason is hashed out at the third step, at which the plaintiff (bearing as she does the ultimate burden to show discriminatory intent) bears the burden of showing that a discriminatory reason, rather than the defendant's proffered valid reason, was the real reason for the defendant's action(s).

present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258).[45]

If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[46] each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff

---

[45] The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* (or state) some non-discriminatory reason(s) that supposedly motivated the employment decision, and (b) to *provide some evidence* that there was/were some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. *E.g., Redlin*, 921 F.3d at 607; *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *Petway v. Textron Aerostructures*, No. 93-6114, 1994 WL 70862 (6th Cir. Mar. 3, 1994) ("[the defendant] met its burden of articulating a legitimate non-discriminatory reason for [the plaintiff's] transfer by stating that she was selected for force reduction pursuant to its SFR procedure."). But both *Burdine* and *Harris* (which, as noted, was relying on *Burdine)* make clear that the employer meets its burden of production only if it presents not merely *some statement* of what the employer now says the reason was, but rather evidence of what the reason actually was at the time in question. So although this may be indeed be a burden of articulating a reason, it is a burden of articulating a reason supported by *evidence*.

[46] The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury *could* make the required finding by a preponderance of the evidence.

must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason

was not the real reason for its action, and that the employer's real reason was unlawful."[47] *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),[48] and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).[49] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the actual reason will serve

---

[47] The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. *Burdine*, 450 U.S. at 256.

[48] One might reasonably ask whether *St. Mary's*, which as noted in *Ford Motor Co.* required the plaintiff to show both components, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine*'s statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

[49] One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the *summary judgment context* in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases under *McDonnell Douglas.* As one court put it, addressing Title VII claims of discrimination, "[a] defendant's summary judgment motion slightly modifies the order of these [*McDonnell Douglas*] showings." *Sherman v. Fountain Valley Police Dep't*, No. SACV172217JVSDFMX, 2019 WL 4238873, at *7 (C.D. Cal. Apr. 2, 2019) (internal quotation marks omitted).

The Sixth Circuit spoke very helpfully on this topic:

> [When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan,* 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that

the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009).

It is worth emphasizing some points about what the undersigned perceives as an under-analyzed topic, namely, the burdens born specifically by a defendant who moves for summary judgment as to a claim of employment discrimination based on an indirect-evidence theory in particular. As indicated above, the general idea under Rule 56 and the cases interpreting it is that the summary judgment movant bears the initial burden of showing, subject to the non-movant's opportunity to show to the contrary, that the non-movant cannot raise a genuine issue as to a material fact. *See Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) ("The moving party must demonstrate the 'basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))). In the case of a defendant-movant, the defendant-movant thus bears the initial burden of showing, subject to the plaintiff's opportunity for rebuttal, that the plaintiff cannot raise a genuine issue as to one or more elements of the plaintiff's claim(s) as to which summary judgment is sought. But because of the unique nature of the three-step *McDonnell-Douglas* framework, and the particular burdens the parties would bear at trial, a defendant-movant's burdens are not so easily understood and are worth clarifying.

As for the first step, as noted above, the Sixth Circuit has stated that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination." *Blair*, 505 F.3d at 524.

But this is actually true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. This is because, as the Sixth Circuit has made clear, the usual obligation of the summary judgment movant to make the initial showing indeed applies to defendant's motions for summary judgment directed at indirect-evidence theories. *E.g.*, *Banks v. State of Ohio*, 1995 WL 118993, * 2 (6th Cir. 1995) ("The defendants met their initial burden of showing an absence of evidence to establish a prima facie case by showing that no one was similarly situated, or treated more favorably than she was."); *Sherman*, 2019 WL 4238873, at *7 (noting that the defendants moving for summary judgment as to claims based on an indirect-evidence theory "have the initial burden to either (1) negate an essential element of [the plaintiff]'s prima facie case or (2) establish a legitimate, nondiscriminatory reason for not promoting [the plaintiff]."); *Qualls v. Regents of Univ. of California*, No. 1:13-CV-00649-LJO, 2015 WL 5604293, at *9 (E.D. Cal. Sept. 23, 2015) (noting that "under *McDonnell Douglas*, Defendants have the initial burden of demonstrating that Plaintiff cannot make a prima facie showing" of a Title VII claim"), *order vacated in part on reconsideration on other grounds sub nom. Qualls v. Regents of the Univ. of California*, No. 113CV00649LJOSMS, 2015 WL 6951757 (E.D. Cal. Nov. 10, 2015) .[50]

_____

[50] On reconsideration, the defendants specifically challenged this proposition. The court, though granting the defendants' motion in part on other grounds, specifically declined to disavow this proposition. *Qualls v. Regents of the Univ. of California*, No. 113CV00649LJOSMS, 2015 WL 6951757, at *3 (E.D. Cal. Nov. 10, 2015). And the court noted what this Court is addressing herein: the "complex issues related to the interplay of the summary judgment standard and *McDonnell Douglas*." *Id.*

As for the second step, it is worth emphasizing that upon a defendant's motion for summary judgment (just as at trial), if the burden does shift to the defendant-movant to show a legitimate and non-discriminatory reason for its action(s), then that burden is one of mere production. *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). This means that the defendant merely has to offer admissible evidence adequate to support a finding that the defendant-movant had such a reason and does not have to show that no reasonable jury could fail to find that the defendant-movant had such a reason.

As for the third step, it does not appear that the defendant-movant bears any initial burden. That is, the defendant-movant need not make an initial showing that the plaintiff cannot raise a genuine issue as to pretext.[51] The rationale for this, presumably, is that the defendant—by showing evidence of an actual (legitimate and non-discriminatory) reason—in the second step already put the onus back on the plaintiff to raise a genuine issue that the reason was pretextual; thus, the defendant need not specifically attack any claim of pretext in order for the plaintiff to be obligated to present sufficient evidence of pretext. And in the context of summary judgment, sufficient evidence means evidence sufficient for a jury to find pretext by a preponderance of the evidence. *Id.*; *see also Blair*, 505 F.3d at 532 ("[T]o survive summary judgment, a plaintiff need only produce enough evidence to ... rebut, but not disprove, the defendant's proffered rationale.").

In the Court's view, what the summary judgment analysis boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

---

[51] The cases consistently and conspicuously omit any references to any such initial burden for the defendant at the third step of *McDonnell Douglas*.

To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing[52] that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[53]

**Direct evidence**[54]

---

[52] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

[53] As indicated below, courts' references to a plaintiff's (conditional) requirement to show "pretext" is actually a (conditional) requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

[54] Defendant focuses its arguments on the indirect-evidence framework. But as noted herein, even if Defendant manages to defeat an indirect-evidence theory in support of a particular claim,

As an alternative to indirect evidence, a plaintiff may seek to establish its case via direct evidence. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Lab.*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" *Id.* "'Whatever the strength of the evidence, it is not "direct" evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.'" *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.,* 1 Fed. Appx. 305, 313 (6th Cir. 2001)). If an inference is required to draw from the evidence the conclusion that an employer was animose against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006). And to be direct evidence, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the

---

Defendant is not necessarily out of the woods, as the applicable Plaintiff conceivably still could prevail on that claim if he can show the existence of direct evidence of discrimination.

employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin,* 79 F. App'x at 896–97. "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899.

Another way to put it is to say that a plaintiff can establish a *prima facie* case of discrimination not only by establishing the defined elements of an indirect-evidence *prima facie* case, but alternatively by presenting evidence that qualifies as direct evidence of discrimination.[55] The upshot is that a plaintiff (at either the summary-judgment or trial stage) has the option of

---

[55] Often courts seemingly speak as if the only kind of *prima facie* case of discrimination is an indirect-evidence *prima facie* case. But other cases imply that the presentation of direct evidence functions to establish a (different kind of) *prima facie* case of discrimination. *See e.g.*, *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911 (6th Cir. 2009) ("As in the direct evidence context, a plaintiff relying on indirect evidence still must make a *prima facie* showing of discrimination."); *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 830 (6th Cir. 2000) ("[D]irect evidence of discrimination merely suffices to establish a *prima facie* case, which shifts the burden of production to the employer to come forward with a non-pretextual reason for its decision[.]") (Norris, J., concurring); *Thompson v. Hendrickson USA, LLC*, No. 3:20-CV-00482, 2021 WL 848694, at *19 n.20 (M.D. Tenn. Mar. 5, 2021) ("Plaintiff might meet her *prima facie* case in various ways, including via direct evidence[.]") (Richardson, J.); *Woodsmall v. Eclipse Mfg. Co.*, 249 F. Supp. 2d 918, 923 (E.D. Tenn. 2002) ("[P]laintiff has sustained his burden of demonstrating a *prima facie* case of discrimination with direct evidence. . . . . In the alternative, Woodsmall can establish a *prima facie* case of discrimination based upon circumstantial evidence."). The Court agrees with such cases; to establish a *prima facie* case means, essentially, to establish a case preliminarily, subject to the other side's opportunity (and requirement) to rebut that case. And that is exactly what a plaintiff does *either* by presenting direct evidence *or* by establishing each of the elements of an indirect *prima facie* case under *McDonnell Douglas*.

shifting a burden to the defendant by showing (to the standard required at the applicable stage) direct evidence, indirect evidence, or both kinds of evidence. *See e.g.*, *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381–82 (6th Cir. 2002) ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula." (citation omitted)); *Hicks v. U.S. Off. of Pers. Mgmt.*, No. 2:05CV100, 2006 WL 8441765, at *2 (S.D. Ohio June 20, 2006) ("In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive."); *Diaz v. City of Inkster*, No. CIVA05-CV-70423-DT, 2006 WL 2192929, at *9 (E.D. Mich. Aug. 2, 2006) ("Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect evidence) does not apply.").[56]

"Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence." *Erwin*, 79

---

[56] The quote from *Diaz* calls to mind an important distinction. If the plaintiff presents direct evidence, then (as *Diaz* states) the burden-shifting paradigm *for indirect evidence* does not apply, but a different kind of burden-shifting does apply. Specifically, "[w]hen a plaintiff establishes discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Blair*, 505 F.3d at 523. This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless. It is important to keep these differences in mind. *See Erwin v. Potter*, 79 F. App'x 893, 899 (6th Cir. 2003) ("Therefore, the district court erred when it stated that under both direct and circumstantial evidence methods of proof, [the plaintiff] must 'show that his age was a determining factor in his termination.' To the contrary, under the direct evidence approach, the [defendant] must show a legitimate reason for terminating [the plaintiff]'s employment that was not related to his age."). But this is admittedly difficult to keep in mind when no less of an authority than the Sixth Circuit has expressly (but, alas, imprecisely and confusingly) described a direct-evidence theory as distinguishable from an indirect evidence (*McDonnell Douglas*) theory on the ground that the latter (and only the latter) is a "burden-shifting theory." *See Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006).

F. App'x at 897; *see also Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 331 (6th Cir. 2003) (noting that "a variety of statements referring to the employee's protected status" would constitute direct evidence if they "require the conclusion that unlawful discrimination was at least a motivating factor" (citation omitted)); *Wexler*, 317 F.3d at 572 (evidence of repeated age-based comments showed a material dispute of fact regarding whether "stereotypical beliefs about the capabilities of older managers that influenced [the defendant's] decision to demote" the plaintiff) (discussed in *Cushman-Lagerstrom*). A decisionmaker is one who "exercised supervisory authority, imposed discipline, and influenced hiring and firing at the company . . . The management determination is not confined to labels but rather must be assessed in light of functions." *EEOC v. Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d 1119, 1124 (W.D. Tenn. 2011).

But that is not to say that comments constitute direct evidence of discrimination merely because they were made by a supervisor or decisionmaker. Indeed, in many cases a supervisor's comments have been found not to constitute direct evidence. *Worthy v. Michigan Bell Tel. Co.*, 472 F. App'x 342, 343 (6th Cir. 2012); *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 661 (6th Cir. 1999); *Preston v. Berendsen Fluid Power*, 125 F. Supp. 2d 245, 250 (W.D. Mich. 2000). "The context in which the comments are made is also critical. Discriminatory remarks made while implementing an adverse employment action are likely to reveal animus." *Erwin*, 79 F. App'x at 898. However, "occasional disparaging remarks made during the regular course of business [rather than while implementing an adverse employment action] about age or other protected characteristics are much more likely to be considered the kind of 'isolated and ambiguous' comments that do not trigger employer liability." *Id.* at 897 (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)); *see also Nasrallah v. Robert Half Int'l, Inc.*, No. 1:19-CV-00795,

2020 WL 1862657, at **5-8 (N.D. Ohio Apr. 14, 2020). As just suggested, in determining whether discriminatory acts (or animose comments) constitute direct evidence, courts often look for a "temporal proximity between the discriminatory act and the termination [or other adverse employment action]." *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (deeming comments made by the plaintiff's supervisor, suggesting animus against Italian-Americans like the plaintiff, to be direct evidence in part because they were made three weeks before the plaintiff's termination), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). And notably, in this context a remark is ambiguous if it is subject to be interpreted in a benign, non-discriminatory way. *See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 55 (1st Cir. 2021).

Importantly, although the case law is not as express on this point as it might be, it cumulatively suggests that when the plaintiff claims that a series of comments (as opposed to one comment) constitutes direct evidence, the Court should (to the benefit of the plaintiff) consider all comments together, rather than separately whereby they would be more likely to be seen as "isolated.". *See, e.g.*, *Robillard v. Opal Labs, Inc.*, 428 F. Supp. 412, 438 (D. Or. 2019) ("Thus, viewing the alleged comments and statements identified by Plaintiff individually or collectively, they are not direct evidence of age-based discriminatory animus."); *Belgrove v. N. Slope Borough Power, Light, & Pub. Works*, 982 F. Supp. 2d 1040, 1048 (D. Alaska 2013) (noting that multiple comments, "taken together," did not amount to direct evidence of discrimination), *aff'd*, 632 F. App'x 412 (9th Cir. 2016). In this case, therefore, when confronted with multiple comments allegedly constituting direct evidence, the Court will consider them cumulatively, including for purposes of assessing whether the comments are "isolated."

In such a case, therefore, the Court does not ask whether each comment, viewed entirely by itself and in a vacuum, is isolated; rather it asks something slightly different: whether the comments are all isolated even considering that multiple comments were made. The undersigned must note that this standard is rather subjective; depending largely on how they construe the word "isolated," different jurists may come to different conclusions as to whether the comments in a series of comments are properly considered "isolated"; the undersigned jurist, like any other, must simply call this like he sees it. But it is crucial that, even if there are multiple remarks, they still may properly be considered isolated and not sufficient to constitute direct evidence. *Cf. Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 956 (6th Cir. 2014) ("occasional [ ] sexist and racist comments . . . would not be enough to establish direct evidence of discriminatory intent."); *Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1283 (10th Cir. 2003) (noting the lack of challenge to the district court's finding that a decisionmaker's alleged statement the plaintiff was a "no good Indian," together with another decisionmaker's two alleged remarks about Indians, constituted direct evidence of discrimination).

Having delved somewhat into the specifics as to what does (and does not) constitute direct evidence, the Court now returns to a more general (and probably more significant) observation about direct evidence, one that seems frequently forgotten. This vital principle is that direct evidence is a very narrow concept. "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Perhaps a statement could constitute direct evidence if the employer is *slightly* less express about the fact that it is acting on discriminatory animus, but the statement needs to be rather express in this regard to constitute direct evidence; "[d]irect evidence of discrimination is the equivalent an employer stating, 'I fired you because you are [in a

protected class]." *Anthony v. Unite Tele. Co. of Ohio*, 277 F. Supp. 2d 763, 773 (N.D. Ohio 2002) (citing *Smith*, 155 F.3d at 805). Just as the concept of direct evidence is narrow, its applicability will be rare because generally words will not come "from lips of the defendant proclaiming his or her . . . animus," *Robinson v. Runyon*, 149 F.3d 507, 512–14 (6th Cir. 1998), or (even more to the point) from an employer "announc[ing] that [it is] acting on prohibited grounds." *Erwin*, 79 F. App'x at 896–97.

But in that rare case where there is direct evidence, it provides the plaintiff a great benefit. Unlike in indirect evidence cases, which as noted always involve the *McDonnell-Douglas* framework, "[i]n direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Norbuta v. Loctite Corp.*, 1 F. App'x 305, 311–12 (6th Cir. 2001) ("If a plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of [rebuttal evidence sufficient to remove any genuine issue (doubt) that the employer would have terminated the plaintiff even absent a discriminatory motive], there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court."); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). "In particular, the burden of persuasion stays with the plaintiff

throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case has the burden to show that its stated reason for acting against the plaintiff was not pretextual." *Erwin*, 79 F. App'x at 899. In the summary judgment (as opposed to trial) context, the defendant-movant's burden is to remove all doubt about pretext, *i.e.*, remove any genuine issue of material fact as to whether it would have terminated the plaintiff even had it not been motivated (in part) by discriminatory animus.

That leaves one final, and not insignificant, question: does a defendant-movant bear an initial burden to show preliminarily that there is no direct evidence of discrimination on a particular claim, failing which the plaintiff has no burden to show the existence of any direct evidence to support such claim and may take the claim to trial on the grounds that the defendant-movant failed to remove a genuine issue as to the existence of direct evidence? Or, to put the question conversely, is the burden on the plaintiff from the outset to show the existence of direct evidence (if in fact the plaintiff relies on direct evidence)? In truth, the undersigned could see this question going either way.

On the one hand, this approach arguably is consistent with the overall approach of Rule 56, *Celotex*, and its progeny. And despite superficial reasons to believe otherwise, this approach is not unfairly onerous in the sense that it asks the defendant-movant to prove a negative; under Rule 56 and case law decided thereunder, the defendant-movant need not *prove* that there is no direct evidence of discrimination, but rather need only point to some evidence preliminarily tending to indicate that this is the case.[57] On the other hand, arguably a defendant who at least meets an initial

---

[57] The undersigned declines to specify here all of the various kinds of evidence that might fit the bill, but he will note one example that potentially could do the trick in a given case: deposition testimony from the plaintiff to the effect that he or she is not aware of even a single comment from any agent or employee of the defendant-movant that he or claims is indicative of discriminatory animus.

burden with respect to an indirect-evidence theory of discrimination—which, after all, is the primary theory because (as noted above) direct evidence is rare—should be deemed to have met its initial Rule 56 burden with respect to plaintiff's claim as a whole, without having to account for a theory that statistically is unlikely to be implicated anyway. In this sense, arguably it should be the plaintiff who must raise the generally far-fetched possibility that the case involves direct evidence if in fact the plaintiff relies on this possibility at the summary-judgment stage. And despite substantial searching, the Court was unable to find any cases in which the court made it a point to ensure that the defendant-movant met an initial burden before looking to see whether the plaintiff could point to some direct evidence; instead, from what their opinions indicate, courts generally start by asking whether the plaintiff has identified anything that constitutes direct evidence. And this Court will do likewise: where Plaintiffs assert the existence of direct evidence, the Court will assess the validity of the assertion without asking first whether Defendant shifted the burden to Plaintiffs as to the existence of direct evidence.[58]

      a.  **Statute of Limitations**[59]

---

[58] The Court perhaps would do otherwise if a defendant-movant could not be credited with having met its initial Rule 56 burden as a whole by showing preliminarily an absence of evidence to support an indirect-evidence theory. If the defendant-movant has not shifted the burden to the plaintiff as to the existence of evidence to support the primary (more common) kind of theory in employment discrimination cases (the indirect-evidence theory), perhaps the defendant-movant should not be able to avoid having to shift the burden on the secondary theory. But this possible exception is inapplicable in this case because each time the Court herein addresses a theory of direct evidence, it has already found that Defendant met its initial Rule 56 burden as to the indirect-evidence theory and thus credits Defendant with having met its initial Rule 56 burden as to the claim as a whole, irrespective of whether Defendant separately did enough to shift the burden as to a direct-evidence theory in particular.

[59] The undersigned will highlight a few important points regarding the terminology used herein, by reference to something he wrote years ago:

Title VII requires an employee to file a charge of discrimination with the EEOC within either 180 days or 300 days of an "allegedly unlawful employment practice," depending on (among other things) the law of the applicable state and whether that state is a "deferral state."[60] 42 U.S.C. § 2000e-5(e)(1); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999). "The United States Supreme Court has held that these time periods operate, essentially, as a form of [limitations period]." *Whitehead v. Grand Home Furnishings, Inc.*, No. 2:19-CV-00040-DCLC, 2020 WL 1237423, at *4 (E.D. Tenn. Mar. 13, 2020) (citing *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). Tennessee is a deferral state, and so a 300-day limitations period applies if the plaintiff, contemporaneously with or before filing the charge with the EEOC, filed a charge with the Tennessee Human Rights Commission ("THRC"); otherwise, the 180-day

---

On the subject of limitations, courts often use language loosely, interchanging various terms for one another. For maximum clarity, terms must be defined so that important concepts are distinguishable from one another, then used consistently in accordance with those definitions. Herein, legal authorities will be paraphrased in terms of the following definitions to convey the concepts expressed therein, regardless of the terms used (or misused) by the authority being cited.

As used herein, a "statute of limitations" refers to a legislative enactment, or codification thereof, that sets forth a limitations period. . . . A "limitations period" refers to the length of time-the specific number of days, months, or years-in which a given claim can be commenced, as set forth in a statute of limitations. "Limitations" [refers] to the legal doctrine whereby a plaintiff is barred from bringing a claim based upon the lapse of the applicable limitations period. To say that limitations "applies" is to say that, under limitations law, a claim is time-barred. "Limitations law" refers to the entire body of rules, both statutory and judge-made, by which courts determine whether limitations applies in a given case.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017–19 (1997). When using his own words, the undersigned intends to stick generally to this terminology, with the caveat that the case law he quotes may not do so and thus may be less precise or looser in their terminology.

[60] A "deferral state" is a state that has enacted its own laws prohibiting discriminatory employment. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 406 (6th Cir. 1999).

period applies. *EEOC v. Dolgencorp, LLC*, 196 F. Supp. 3d 783, 799 (E.D. Tenn. 2016), *aff'd*, 899

F.3d 428 (6th Cir. 2018), *and aff'd*, 899 F.3d 428 (6th Cir. 2018). There is evidence to suggest that

four of the Plaintiffs did so contemporaneously with filing a claim with the EEOC. (Doc. No. 72-

1 at 437; Doc. No. 67-1 at 246; Doc. No. 681 at 387; Doc. No. 65-1 at 418). The sole exception is

Plaintiff Omar, as to whom the Court sees no such evidence. Exhibit 22 to his deposition may

reflect this, but apparently that exhibit was not filed. So the Court treats the limitations period as

180 days for Plaintiff Omar and 300 days for each of the other Plaintiffs. This means that,

generally, a complaint as to a particular discriminatory act is untimely unless filed within 180 days

thereof (for Plaintiff Omar) or 300 days thereof (as to all other Plaintiffs). Defendant does not seem

to dispute that Plaintiff Omar filed his charge of discrimination within 180 days of his termination

and that each of the other Plaintiffs filed suit within 300 days of their resignation (*i.e.*, their alleged

constructive discharge).[61]

The Sixth Circuit recognizes the "continuing violation doctrine" when determining

whether a claim for discrimination is timely filed:

> The "continuing violation" doctrine provides that when "there is an
> ongoing, continuous series of discriminatory acts, they may be challenged in their
> entirety as long as one of those discriminatory acts falls within the limitations
> period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir.1992). In other words,
> when a continuing violation is shown, "a plaintiff is entitled to have a court consider
> all relevant actions allegedly taken pursuant to the employer's discriminatory
> policy or practice, including those that would otherwise be time barred." *Alexander
> v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408 (6th Cir.1999);
> *see also Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982). This Court has
> held that continuing violations may be shown in one of two ways. The first is
> "where there is some evidence of present discriminatory activity giving rise to a
> claim of a continuing violation," and "at least one of the forbidden discriminatory

---

[61] Instead, Defendant tries to make hay on the limitations front by arguing that acts alleged by these other four Plaintiffs occurred more than 300 days prior to the filing of these four Plaintiffs' respective EEOC charges. As explained herein, this argument is irrelevant because it does not matter when the underlying acts that supposedly contributed to the constructive discharge took place; what matters is when the constructive discharge took place.

> acts [has] occurred within the relevant limitations period." <u>Haithcock</u>, 958 F.2d at 678 (citation omitted) (emphasis in original). The second type of continuing violation exists when a plaintiff has demonstrated a longstanding and over-arching policy of discrimination. *See id.* This requires a showing by a preponderance of the evidence "that some form of intentional discrimination against the class of which plaintiff was a member was the company's 'standing operating procedure.' " *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir.1988) (citation omitted).

*Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000); *Seay v. Fortune Plastics, Inc.*, No. 3:09-CV-0605, 2012 WL 610006, at *3 (M.D. Tenn. Feb. 24, 2012). Defendant pre-emptively has called the Court's attention to the continuing violations doctrine, asserting that the doctrine cannot be invoked here to help the plaintiffs in particular ways. (Doc. No. 52 at 6).

But the Sixth Circuit has held, in the aftermath of *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) (reversing Ninth Circuit's application of continuing violations doctrine to "serial violations" and holding doctrine inapplicable to claims arising out of discrete acts of discrimination), that the first of these two ways may be used *only* with respect to claims of a hostile work environment (of which, in this case, there are none, as explained more fully in a footnote herein). [62] *See Maxwell v. Postmaster Gen. of U.S.*, 986 F. Supp. 2d 881, 884 (E.D. Mich. 2013) (noting that "subsequent to *Morgan,* the Sixth Circuit has also considered the continuing violations doctrine and found, outside the context of hostile work environment cases, that it only applies where the challenged acts are part of a 'longstanding and demonstrable policy of discrimination[ ]'" and that "*Morgan* overturned prior Sixth Circuit case law allowing application

---

[62] The Sixth Circuit has stated, "In the context of a hostile work environment claim, to establish a continuing violation, a plaintiff must first produce evidence of a current violation taking place within the limitations period. Second, a plaintiff must show that the current violation is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 464 (6th Cir. 2006) (quoting *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 376 (6th Cir. 2002) (cleaned up)).

of continuing violations doctrine to serial violations" (citing *Sharpe v. Cureton,* 319 F.3d 259, 268 (6th Cir.2003))).

The Court does not see where Plaintiff has even attempted to justify the application here of the continuing-violations doctrine in this (first) way or, for that matter, in the other (second) way. Thus, the Court will not invoke the doctrine to allow consideration of alleged discriminatory acts that occurred outside of the limitations period. What the Court will do, however, is ensure that if an EEOC charge regarding an "alleged unlawful employment practice" is timely—*i.e.*, filed within the (300-day or 180-day) limitations period—evidence of an incident that allegedly is part of the alleged unlawful employment practice is not excluded merely because the incident occurred more than 300 (or 180, in the case of Omar) days prior to the filing of the EEOC charge. Such exclusion would be improper because (as discussed below), when the alleged unlawful employment practice is a constructive discharge,[63] and the EEOC charge alleging the constructive discharge is timely filed, evidence of an incident that allegedly contributed to the constructive discharge cannot independently be barred on the grounds that it occurred outside the limitations

---

[63] "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 2073, 153 L. Ed. 2d 106 (2002). A constructive discharge is an "unlawful employment practice." *Boggs v. Com. of Ky.*, No. 95-6452, 1996 WL 673492, *2 (6th Cir. 1996) ("The last event in this case that could have been an unlawful employment practice was the alleged constructive discharge . . . ."). It follows that a constructive discharge is subject to the 300-day (or 180-day) limitations period applicable to unlawful employment practices. *See id.* And (as further discussed below), the limitations period for a claim of constructive discharge runs from the date of the constructive discharge, which usually means the date the employee resigned. The limitations period should begin to run for a constructive-discharge claim only after a plaintiff resigns. *Green v. Brennan*, 578 U.S. 547, 136 S. Ct. 1769, 1777, 195 L. Ed. 2d 44 (2016). Defendant provides no support for the proposition that the limitations period runs separately as to each discriminatory act that contributed to the intolerable conditions effecting a constructive discharge.

period (meaning more than 180 days or 300 days, as the case may be, before the filing of the EEOC charge).

It appears that each Plaintiff filed his EEOC charge within the applicable number of days (300 or 180) after leaving employment with Defendant (whether via termination or by resignation alleged to be a constructive discharge).

### 3. Discussion of Plaintiffs' Title VII claims

The Court will discuss each type of claim in turn, focusing specifically therein on the evidence supporting that specific type of claim of each Plaintiff individually. The Court notes that it appears undisputed that, as to each unabandoned Title VII claim, (1) each Plaintiff bringing a particular type of claim is a member of the applicable protected class for purposes of that claim, and (2) each Plaintiff was qualified for his job(s). (Doc. No. 74 at 10). Therefore, in analyzing the survivability of an indirect-evidence theory, the Court focuses on the other elements of the indirect-evidence *prima facie* case.

#### a. Race Discrimination

Originally, all Plaintiffs asserted a claim on Count I, for race and national original discrimination under Title VII. As noted above, Plaintiffs Omar and Kolshi have since abandoned their race-discrimination claims, as they identify as white and do not bring claims indicating that they were discriminated against because they were white. The Court will therefore grant summary judgment to Defendant on Plaintiffs Omar and Kolshi's race claims under both Title VII and the THRA.

Defendant has made specific arguments for finding that summary judgment should be granted in connection with each remaining Plaintiff (Benitez, Wahid, and Gomez) which will be discussed below in connection with each Plaintiff. The remaining Plaintiffs bringing race

discrimination claims argue[64] that summary judgment should be denied because they have presented direct evidence of discrimination, and alternatively have presented indirect evidence of discrimination sufficient to survive *McDonnell Douglas*.[65] (Doc. No. 74).

As indicated above, there is no dispute as to the existence of the first two elements of an indirect-evidence *prima facie* case of race discrimination. That leaves the last two elements of such a case for each remaining Plaintiff, *i.e.*, a) that despite his qualifications and performance, he suffered an adverse employment action; and b) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *See Hughes*, 212 F. App'x at 502. Defendant challenges Plaintiff Benitez's ability to show either of these two elements. (Doc. No. 52 at 56).

### i. Plaintiff Benitez

Plaintiff Benitez's race is either Latino or Hispanic.[66] (Doc. No. 74 at 36; Doc. No. 8 at 2; Doc. No. 52 at 51). Plaintiff Benitez points to his demotion (after the incident in which metal was

---

[64] As the Court will note throughout this opinion, Plaintiffs have been unclear regarding which arguments pertain to which Plaintiffs.

[65] The Court notes that Plaintiffs' argument could be valid and yet still not entitle them to summary judgment. Specifically, even if there is a genuine issue of material fact to enable Plaintiffs to reach a jury on their *prima face* case (whether made by direct evidence or by indirect evidence), Plaintiffs theoretically could suffer summary judgment because Defendant is able to show the absence of a genuine dispute as to the latter stages (of the direct-evidence or indirect-evidence analyses) at which Defendant conceivably could prevail so as to be entitled to summary judgment.

[66] It appears undisputed that Plaintiff Benitez is in a protected class for purposes of this claim. (Doc. No. 74 at 10). Plaintiffs refer to Plaintiff Benitez and Plaintiff Gomez as "Hispanic" (Doc. No. 74 at 36; Doc. No. 8 at 7). Defendant refers to Plaintiff Benitez as "Latino." (Doc. No. 52 at 51). Though it may not be immediately apparent that "Latino" or "Hispanic" is a protected *race*, neither party seems to dispute this characterization. Additionally, many courts have found that a Latino or Hispanic individual can bring a race discrimination claim, often referring to such individuals with the words "Latino" and "Hispanic" interchangeably. *E.g.*, *Guzman v. Concavage Marine Constr. Inc.*, 176 F. Supp. 3d 330, 334 (S.D.N.Y. 2016) ("As Defendants rightly acknowledge, discrimination against Latinos may be actionable under § 1981."); *Escalera v. Bard*

found in the meat on his line and the machines were thereafter improperly cleaned) as an adverse action. (Doc. No. 74 at 10). And, not surprisingly, Plaintiff Benitez's demotion—the occurrence of which is undisputed—indeed constitutes an adverse action.[67] *O'Donnell v. City of Cleveland*, 148 F. Supp. 3d 621, 638 (N.D. Ohio 2015), *aff'd*, 838 F.3d 718 (6th Cir. 2016) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.").

Defendant argues that Plaintiff Benitez's race-discrimination claim fails because 1) he has not identified a proper comparator, and 2) he cannot prove pretext.[68] (Doc. No. 52 at 56). To

---

*Med.*, 373 F. Supp. 3d 793, 801 (W.D. Ky. 2019), *case dismissed*, No. 19-5383, 2019 WL 3226309 (6th Cir. July 2, 2019) (not raising issue of plaintiff identifying as Latino, despite no such option existing on the EEOC form for race claim); *Brown v. Oakland Cty.*, No. 14-CV-13159, 2015 WL 5215840, at *1 (E.D. Mich. Sept. 4, 2015) (not raising issue and describing plaintiff as Latino when discussing race claim).

[67] There is some confusion regarding whether Plaintiff Benitez has pointed to additional adverse actions. Defendant also believes that Plaintiff Benitez wishes to rely on the realignment of A shift Generals and his receipt of counseling on April 17, 2017. (Doc. No. 52 at 56). Plaintiff Benitez does not mention these adverse actions in his response, but he does generally reference "discipline" at some points. (Doc. No. 74 at 34). Even if Plaintiff Benitez believes these to be adverse actions in addition to his demotion, the Court will discuss later in this opinion that discipline is not typically grounds for an adverse action, and Plaintiff Benitez has not indicated why it should be considered an adverse action in this case.

Plaintiff Benitez also specifically points to an additional adverse action in his Response, claiming that he was constructively discharged. However, Plaintiff Benitez did not plead a constructive discharge. It appears that he left his employment with Defendant after the filing of the Amended Complaint. The Amended Complaint was filed on June 11, 2018, and Plaintiff Benitez resigned from his employment on June 27, 2018 (over two weeks after the Amended Complaint was filed). (Doc. No. 73 at ¶ 293). Therefore, the Court will not consider Plaintiff Benitez's alleged constructive discharge, as it was not included in the Amended Complaint and Defendant could not have had notice of this claim from the Amended Complaint. *See e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 791-92 (N.D. Ohio 2011), *clarified on denial of reconsideration*, No. 10 MD 2196 (JZ), 2011 WL 13133853 (N.D. Ohio July 27, 2011).

[68] Defendant frequently phrases its argument in terms of Plaintiffs failing to show pretext. When Defendant makes this argument, it: 1) asserts that it had a legitimate, nondiscriminatory reason for the adverse action, and 2) anticipates Plaintiffs' pretext argument with respect to such reason and

support its argument that Plaintiff Benitez cannot identify a proper comparator, Defendant points to Plaintiff Benitez's deposition testimony and explains why his testimony is insufficient, in addition to colorably asserting the absence of any other appropriate comparators to support Plaintiff Benitez's claim. Thus, the Court finds that Defendant has shifted the burden to Plaintiff Benitez to identify a proper comparator.[69]

Using a permissible alternative to effectively sidestep the issue of a proper comparator while satisfying the fourth element of an indirect-evidence *prima* facie case, Plaintiff Benitez cites his testimony that he was replaced by Derek Ausbrooks, apparently a non-Latino and non-Hispanic individual, after he was demoted.[70] (Doc. No. 74 at 27). In its reply in support of its Motion, Defendant does not dispute the accuracy of this testimony. Therefore, Plaintiff Benitez has

---

attempts to debunk it. Strangely, as discussed, though Defendant tries to anticipate Plaintiffs' arguments regarding pretext throughout the briefing, Plaintiffs make very little argument regarding pretext. Therefore, when the Court notes that Defendant has argued that Plaintiffs did not show pretext, it is referring to Defendant's aforementioned two-pronged approach, and not to efforts by Defendant to counter an actual argument by Plaintiffs concerning pretext.

[69] There is a legitimate question as to whether a defendant shifts the burden to the plaintiff as to the fourth element by showing preliminarily only that the plaintiff will be unable to show that a proper comparator was treated more favorably than the plaintiff, without also showing preliminarily that the plaintiff will be unable to show that he was replaced by someone outside of his protected class. Below, the Court explains why it answers this question in the affirmative.

[70] Plaintiff Benitez describes Ausbrooks as a "Caucasian American," (Doc. No. 74 at 27), a status that actually is not necessarily inconsistent with being Latino or Hispanic. But drawing inferences from the evidence in the non-movant's favor, as it must, the Court infers from Plaintiff Benitez's testimony that Ausbrooks is neither Latino nor Hispanic—especially since Defendant did not dispute this in its Reply.

    The parties both spend significant portions of their briefs arguing that Plaintiff Benitez is (according to Plaintiffs) or is not (according to Defendant) similarly situated to Parker, Ausbrooks, and Rainey. (Doc. No. 74). But as it appears undisputed that Plaintiff Benitez was replaced by an individual outside his protected class when demoted, thus satisfying the fourth element of a *prima facie* case as to is demotion, the Court need not consider whether he was similarly situated to these individuals as would alternatively satisfy the fourth element as to his demotion.

satisfied his *prima facie* case under *McDonnell Douglas*. As a result, the burden of production shifts to Defendant to show that it had a legitimate, nondiscriminatory reason for demoting Plaintiff Benitez.

Such reason, according to Defendant, is Plaintiff Benitez's employment history, including the incident in which metal was found in the meat product. Before that incident, Plaintiff Benitez had several issues during his employment with Defendant. Plaintiff Benitez had been previously disciplined several times, including being accused of harassment and discrimination by his Egyptian team members. (Doc. No. 52 at 52). On one occasion, Plaintiff Benitez was issued a counseling statement for producing 13,000 points of ground beef without applying a preservative spray to extend shelf life. (*Id.*).[71] But none of this resulted in Plaintiff Benitez's demotion.

Then came the incident involving metal in the meat product. As discussed in the Factual Background section, one of Plaintiff Benitez's lines "hit metal" during the process of grinding beef, meaning that metal was ground into the beef. Grant told Benitez to clean the machine in accordance with company policies (getting all of the product out, getting a hold tag on the product, washing the machine, washing the augers, washing the blenders, and tearing down the initial grinder). After Plaintiff Benitez cleaned the grinder of the machine[72] (without performing the other steps), production was ramped back up and within a few minutes, the machine "hit metal" again. Plaintiff Benitez told Grant that he had followed Grant's instructions and rinsed the equipment. Grant reviewed video footage and contended that Plaintiff Benitez had not thoroughly washed the equipment. Defendant concluded that the incident was so egregious, given that a product with

---

[71] Plaintiff Benitez does not dispute that this event occurred, but he argues that it was not his responsibility because it was a mechanical issue and that Griffin was targeting him (though the counseling was issued by Lab Kolshi). (Doc. No. 52 at 52).

[72] It is unclear whether the grinder at issue here is the aforementioned "initial grinder," but the Court does not see that it makes a difference to its analysis.

metal in it could have killed a customer had it been shipped out, that Plaintiff Benitez could have been terminated. Defendant then demoted Plaintiff Benitez.

Though Plaintiff Benitez seems to disagree with the decision to demote him, it is not the role of the Court to second-guess the business judgment of an employer. *See e.g.*, *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) ("Thus, [Plaintiff] asks us to second guess [Defendant's] employment decision, not because she offers admissible evidence that indicates [Defendant's] gender bias, but because she feels that she was treated unfairly. 'Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.'" (quoting *Risch v. Royal Oak Police Dept.,* 581 F.3d 383, 399 (6th Cir.2009) (internal citation and quotation marks omitted) (Griffin, J. dissenting))); *Lewis v. City of Detroit*, 702 F. App'x 274, 284 (6th Cir. 2017) ("[I]t was a legitimate, nondiscriminatory reason to deny [Plaintiff] a promotion. [Plaintiff's] disagreement with the 'soundness of [the] business judgment' is not proof of age-based animus. [Plaintiffs] have not demonstrated pretext, and their claims fail equally under state and federal law." (internal citation omitted)); *Peterson v. King Tree Ctr., Inc.*, 722 F. Supp. 360, 363 (S.D. Ohio 1989), *aff'd sub nom. Peterson v. King Tree Ctr.*, 896 F.2d 1369 (6th Cir. 1990) ("Pretext is not established merely upon a showing that Defendant may have exercised unsound business judgment in the employment action at issue; Plaintiff must 'show that [Defendant's] asserted business judgment was so ridden with error that Defendant could not honestly have relied upon it.' While it might well be argued that the Defendant made an erroneous business decision in terminating Plaintiff (Plaintiff having indicated that she was attempting to implement solutions to these problems in her department as quickly as practicable), such a decision is not so unreasonable

that it cannot be believed." (internal citations omitted)).[73] As has been previously discussed, Defendant bears a burden of production (not persuasion) to show that it fired Plaintiff Benitez for a legitimate, nondiscriminatory reason. Defendant has produced evidence that this was the case. Therefore, given his disciplinary history and the June 2017 metal-in-product incident, the Court finds that (i) the proffered reason is legitimate and not discriminatory; and (ii) Defendant has presented evidence sufficient to support a finding that this proffered legitimate reason was the actual reason Defendant was demoted.

Thus, the burden shifts back to Plaintiff Benitez to show that the proffered reason for his demotion actually was pretext for race discrimination. Defendant argues that Plaintiff Benitez has failed to show pretext. (Doc. No. 52 at 56). Plaintiffs' argument regarding pretext is made collectively as to all claims and all Plaintiffs,[74] without any claim-specific or Plaintiff-specific discussion. As an initial matter, Plaintiffs hardly help themselves on this issue when they write:

> Shortly after Benitez reported Griffin's discrimination to McGaugh, Benitez was demoted over an issue where a line hit metal in the ground beef

---

[73] One might reasonably ask whether this so-called "business judgment" rule, when applicable, aids defendants at the "legitimate, non-discriminatory reason" stage, at the pretext, stage, or both. The answer appears to the Court to be debatable based on the case law as a whole, but *Lewis* strongly suggests that it applies at least at the "legitimate, non-discriminatory reason" stage.

[74] In a footnote in their Memorandum in Opposition to their Motion, Plaintiffs state that "[Defendant] Tyson has declined to offer a nondiscriminatory reason for its actions since it doesn't believe the Plaintiffs have met their burden or are able to articulate an adverse employment action. Therefore, Plaintiffs are unable to fully address pretext" and "[Defendant] Tyson has stated in their brief that they will not address pretext at this time, which puts Plaintiffs at a disadvantage." (Doc. No. 74 at 9 n.4, 27). In its Memorandum in Support of its Motion, Defendant did note that it would not be addressing pretext in regards to certain Plaintiffs, as it did not believe that those Plaintiffs had alleged an adverse employment action. (Doc. No. 52 at 17 n.7; Doc. No. 52 at 40 n.16). Despite Plaintiffs' contention, Defendant did provide an analysis of a legitimate, nondiscriminatory reason for demotion and pretext as it pertains to Plaintiff Benitez. And having done so, Defendant put the onus on Plaintiff Benitez to raise a genuine issue as to pretext; Defendant was not required to address pretext in its initial brief in support of the Motion and did not, by declining to do so, "put[] Plaintiff at a disadvantage" in any cognizable sense.

> department. Benitez did wash out part of the machine, but only the final grinder. Grant Depo., p. 62. Grant intended for Benitez and his lead to wash out other parts of the grinder but didn't specifically instruct Benitez to do so, he felt like he should have known to do that. Grant Depo., p. 62-63. After this incident Grant felt like Benitez needed additional training so he could work his way back up to a general level or higher, but he wasn't sure Dyer and Griffin agreed.

(Doc. No. 74 at 34). One cannot help but wonder whether such language unwittingly betrays a (perhaps subconscious) belief that the actual reason for the demotion was just what Defendant has always said it was and that the reason was substantively justified.

But probably more to the point, Plaintiffs say very little regarding pretext, merely stating (very generally) that:

> Plaintiffs submits [sic] that there is ample evidence outlined in the above sections to show that any adverse action taken by [Defendant] Tyson was in fact motivated by discriminatory intent rather than a non-discriminatory purpose. There is no explanation sufficient enough to justify the repeated comments about the Plaintiffs and their origin or religion. The reason Griffin forced the Plaintiffs to leave [Defendant] Tyson was because that was his plan all along, to move the foreigners out and the Americans in. he was [sic] These facts, viewed in the light most favorable to these Plaintiffs, show that summary judgment should be denied.

(Doc. No. 74 at 27-28).[75] This argument is flawed in that the issue here is not whether there is an "explanation sufficient enough [sic] to justify the *repeated comments* about the Plaintiffs and their origin or religion." (*Id.* (emphasis added)). Rather, the overarching issue here is whether Defendant can justify Plaintiff Benitez's *demotion.* And as noted above, Defendant presumptively has done so—by showing with evidence that it had a legitimate and non-discriminatory reason for

---

[75] Though the language "[t]here is no explanation sufficient enough" seems at first glance to indicate that Plaintiffs are also arguing the third way to prove pretext (that "the employer's reason . . . was insufficient to warrant the action"), Plaintiffs are actually arguing that "[t]here is no reason sufficient enough to justify the repeated comments about Plaintiffs and their origin and religion." (Doc. No. 74 at 27-28). This reemphasizes that Plaintiffs' argument is based on the comments made by Griffin (*i.e.*, a different motivation for the termination), and not on the reason for demotion (here, insufficient cleaning and metal being found in the ground beef) being insufficient to warrant the adverse employment action.

the demotion—which is how we arrived at the issue of pretext in the first place. And the specific issue regarding pretext is whether Plaintiff Benitez has pointed to evidence sufficient for a jury to find by a preponderance of the evidence that Defendant's presumptively valid justification for the demotion was in fact pretextual and that the real reason was discriminatory.

Moreover, in making this argument, Plaintiffs do not even specifically mention their race discrimination claims (and instead mention only their national origin and religion claims). Additionally, Plaintiffs' argument is unclear as to whether Plaintiffs here are (i) asserting pretext in support of an indirect-evidence theory, (ii) asserting that they have direct evidence of discrimination, or both. It appears that Plaintiffs are generally arguing that Defendant's proffered reasons did not actually motivate the respective adverse employment actions against the various Plaintiffs (and that instead, discrimination did), which is the kind of argument that is made in support of an indirect-evidence theory (at the pretext stage). But in so arguing, Plaintiffs rely exclusively on the same comments (slurs against Plaintiffs) that they claim constitute direct evidence of discrimination, thus suggesting that perhaps Plaintiffs have a direct-evidence theory in mind.

To the extent that Plaintiff Benitez here means to assert that these slurs are sufficient to create a jury issue as to pretext at the third step of the indirect-evidence framework under *McDonnell Douglas*, the Court is unpersuaded. True, "discriminatory remarks may serve as evidence of pretext because they indicate the presence of animus toward a protected group." *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007). In *Vincent*, the Sixth Circuit found that the statements were "particularly probative" of pretext when they were 1) made by high-level officials who had managerial authority or played a role in decisions to make employment decisions regarding the plaintiff, 2) the comments were numerous, and 3) some of the comments specifically

indicated a desire to terminate a certain class of employees. *Id.* But the Court finds *Vincent* to be distinguishable from the present case. Here, though made by a supervisor, the comments were not numerous and did not (individually or collectively) link Plaintiff Benitez's race with a desire to terminate or take some other adverse action against him. Plaintiffs come forward with no additional evidence (*i.e.*, evidence beyond that discussed above) that shows a genuine issue of material fact as to whether Defendant's legitimate, non-discriminatory reason was pretext for race discrimination, and neither have they shown that the real reason for Defendant's action was Plaintiff Benitez's race. Therefore, Plaintiff Benitez has not shown evidence to raise a jury issue as to pretext regarding his demotion.

Plaintiff Benitez also asserts the adverse action of constructive discharge. The Court does not conclude that Plaintiff Benitez has failed to show that the reason for his constructive discharge was pretextual. To the contrary, the Court finds that the pretext stage has not even been reached, because Defendant did not advance any reason for an action (the alleged constructive discharge) that it claims never occurred in the first place. But the Court finds that Plaintiff Benitez has failed to show any evidence of the fourth element of a prima facie case as to his alleged constructive discharge, despite having the burden placed upon him to do so. He does nothing to explain why his alleged comparators (Rainey, Ausbrooks, and Parker) were in fact similarly situated to him *in all respects*; instead, he claims in the most conclusory of terms that they are comparators. Seeking to invoke the alternative for satisfying the fourth element, he cites page 140 of Griffin's deposition for the proposition that "when he was constructively discharge [sic], Benitez was replaced by Billy Parker, another Caucasian American." (Doc. No. 74 at 26). But Griffin's testimony on this page says nothing about Parker being a "Caucasian American" and, worse, states that Billy Parker replaced him "when he was demoted" as opposed to when he was (allegedly) constructively

discharged. (Doc. No. 61-1 at 140). Thus, Plaintiff Benitez has failed to show evidence of the second as well as the first alternative for the fourth element with respect to his claim of constructive discharge. Thus, without opining on whether Plaintiff Benitez has shown sufficient evidence of a constructive discharge, the Court concludes that he has failed to show sufficient evidence to go to a jury on an indirect-evidence theory of racial discrimination as to any constructive discharge.

In support of a direct-evidence theory of racial discrimination, Plaintiffs identify the following evidence related to Plaintiff Benitez's (and, for that matter, Plaintiff Gomez's) claim of race discrimination (as opposed to evidence of other kinds of discrimination, such as national-origin discrimination, that misleadingly may appear initially to relate to race discrimination) and assert that it constitutes direct evidence: (1) Griffin called Hispanic people "stupid" for protesting during what Plaintiffs call "a political border issue," (2) Griffin told Plaintiff Benitez that the primary reason he liked Hispanic women is that the sex is good, (3) Griffin told Plaintiff Benitez to "shut up" because Griffin could not understand what he was saying due to his accent, and (4) Plaintiff Omar heard Griffin make jokes about Plaintiff Benitez's height and that he is Spanish. (Doc. No. 74 at 5, 19).[76] If there is direct evidence of discrimination against Plaintiff Benitez (or Plaintiff Gomez) on the basis of being Hispanic or Latino, it must be found here.

---

[76] As noted, Plaintiff Benitez (like Plaintiff Gomez) identifies as "Hispanic" and/or "Latino." However, some of these comments (or so-called "jokes") were aimed at "Spanish" people, which in common parlance (and unsurprisingly) means people of (or from) Spain. *Spanish*, https://www.merriam-webster.com/dictionary/Spanish (last accessed on December 23, 2021). Notably, a valid Title VII claim will not exist for an individual based on allegedly being subjected to discrimination based on their *perceived membership* in a protected class of which they are not *actually* a member:

> It is true that Title VII protects only those who are actually in a protected class, and not those who are perceived to be in a protected class. Numerous district courts have rejected Title VII claims based on allegations that the plaintiff was perceived to be in a protected class. These courts have observed that, in contradistinction to

The Court does not find any of these comments[77] to be direct evidence of race discrimination against Plaintiff Benitez. Though made by a supervisor, none of the comments was

the Americans with Disabilities Act ("ADA") or the Rehabilitation Act, Title VII contains no provision for those wrongly perceived to be of a certain national origin.

*Burrage v. FedEx Freight, Inc.*, No. 4:10CV2755, 2012 WL 1068794, at *5 (N.D. Ohio Mar. 29, 2012). It is unclear whether the reference to "Spanish" was Plaintiff Omar's misunderstanding of Plaintiff Benitez's race or Griffin's misunderstanding of Plaintiff Benitez's race. Neither party raises the issue of whether a comment referring to a "Spanish" person can be taken as direct evidence of discrimination against a person (like Plaintiff Benitez and Plaintiff Gomez) who is either Hispanic or Latino. Concluding that it can and should be in this case for the reasons indicated in the following paragraph, the Court finds for the reasons discussed that this comment (even taken together with the other comments) is insufficient evidence of direct race discrimination against these Plaintiffs.

To the extent that Plaintiff Benitez would assert that the word "Spanish" allows these comments to support a national-origin claim because of its link to a specific country (Spain), the Court disagrees. It is entirely clear that Plaintiffs are portraying these comments as being exclusively about race, and not about the country of Spain or Spanish national origin. For example, one of the comments, in context, refers to some recent "political" issue that, although vaguely described in the deposition testimony (of Plaintiff Omar) in context is easily understood not to have anything to do with the country of Spain. (Doc. No. 71-1 at 56). The other comment (from the deposition testimony of Plaintiff Benitez) quite clearly is equating "Spanish" women with Hispanic women. (Doc. No. 35-1 at 28). So the Court must decline to allow Plaintiffs to dual-purpose these comments to support an argument (which is cognizable, as discussed below) that they reflect national-origin discrimination (even against persons not of Spanish origin) by showing animus against foreigners generally.

None of this is to say that persons from Spain are not properly considered Hispanic (as opposed to "Latino" or "Latina," which may refer to Latin American heritage as distinguished from Spanish (European) heritage). It is simply to say that a reference to someone being Spanish is not *per se* a reference to someone being Hispanic.

[77] One might wonder whether an issue of hearsay is implicated here. That is, at first glance, conceivably the testimony of the referenced deponents (Plaintiffs) includes hearsay in that it refers to the prior alleged statements of other persons. Hearsay evidence is an out-of-court statement (except of the kind described in Rule 801(d)) offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). And under the so-called "hearsay rule," hearsay generally is inadmissible at trial. Fed. R. Evid. 802. Likewise, generally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

With respect to the out-of-court statements mentioned here, neither party has raised the issue of hearsay in their undisputed statements of fact or in briefing. Defendant raises the issue of hearsay in a few instances, such as regarding Plaintiff Omar's recounting of what his nurse told him regarding his FMLA leave. (Doc. No. 81 at 12). Defendant does not seem to object to the

statements that Plaintiffs advance as evidence of direct discrimination as being (or containing) hearsay. "If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived . . ." *Wiley*, 20 F.3d at 226; *see e.g.*, *Moore v. City of Memphis*, 175 F. Supp. 3d 915, 929 (W.D. Tenn. 2016), *aff'd*, 853 F.3d 866 (6th Cir. 2017) (finding hearsay objection waived when no argument was provided); *Brady v. City of Westland*, 1 F. Supp. 3d 729, 732 n.3 (E.D. Mich. 2014) ("Indeed, Plaintiff not only failed to raise any hearsay concerns or other evidentiary objections with respect to the police reports, but she explicitly relied on the reports of the Westland officers as the basis for her counter-statement of facts in her responses to Defendants' motions. Accordingly, Plaintiff is in no position to complain about the Court's consideration of the police reports . . ."); *Fish Farms P'ship v. Winston-Weaver Co. Inc.*, No. 2:09-CV-163, 2012 WL 5877967, at *4 (E.D. Tenn. Nov. 20, 2012), aff'd, 531 F. App'x 711 (6th Cir. 2013) ("It is again noted that plaintiff has made no effort to address the hearsay issue, and the issue is deemed waived.").

Though the Court finds any hearsay issue to have been waived in connection with the statements supporting direct evidence, the Court briefly notes that in any event it likely would not have found the statements inadmissible under the hearsay rule, for two reasons. First, the statements made by supervisors (which, as discussed, generally are relevant when determining the existence *vel non* of direct evidence of discrimination because they are supervisors' statements) likely would fall under the opposing-party-statement exception, which provides that a statement is not hearsay when it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). *See e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003) ("Being a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment, but the 'scope of employment' criterion extends beyond direct decision-makers."); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 456 (6th Cir. 2004) ("The statement was admissible under the hearsay exception for an admission by a party-opponent.").

Second, these statements clearly are offered not for the truth of the matter asserted in the statements. Sure, Plaintiffs have no interest in asserting that it is true that Hispanic people are "stupid," or that Griffin likes Hispanic reason for prurient reasons, or that Griffin could not understand what Plaintiff Bentiez was saying due to his accent, or that Plaintiff is "Spanish." Instead, they are offered merely to show that the statements (which each include derogatory language) were made—*i.e.*, that slurs, insults, and vulgarities (which of course would not be offered by the plaintiff as "true") were made. *Blair*, 505 F.3d at 524 ("[Plaintiff] offers [the supervisor's] April 2001 statement for that fact that it was said, not to prove that [Plaintiff] was actually too old to work the Ford account. Accordingly, this statement is not hearsay because it is not being offered for the truth of the matter asserted.").

The Court notes, however, that direct evidence in its pure form is *always* offered (at least primarily) for the truth of the matter asserted. As noted above, direct evidence is the equivalent of the defendant's decisionmaker(s) saying, "I fired you because you are [a member of a protected class]." Such a statement is always offered for the truth of the matter asserted, given that of course the plaintiff's overarching goal is to prove that the defendant's decisionmaker(s) fired him or her because he or she is a member of the protected class.

tied to an adverse action involving Plaintiff Benitez (his demotion), and it is unclear when the statements were made. The statements would require the Court to make an inference to connect them to Plaintiff Benitez, his demotion, and his race, a reality that prevents them from being considered direct evidence. *Johnson*, 319 F.3d at 865. Additionally, all of the comments would qualify as isolated (even if not also *ambiguous*) comments, which are "too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (involving age-discrimination claims). The fact that the comments came from Griffin, a supervisor, does not change the Court's conclusion here (or with respect to the other Plaintiffs as discussed below), given the nature of the comments.

Therefore, the Court will grant Defendant's Motion as it pertains to Plaintiff Benitez's race discrimination claim under Title VII.

### ii. Plaintiff Gomez

Plaintiff Gomez's race is Latino or Hispanic.[78] (Doc. No. 52 at 11; Doc. No. 8 at 7). Defendant argues that Plaintiff Gomez's claim of race (and, for that matter, national-origin) discrimination fails because: (i) the claim is time-barred; (ii) Plaintiff Gomez suffered no adverse action; and (iii) no comparator was treated more favorably. (Doc. No. 52 at 16-17). The Court can and will skip the first argument and proceed to address the second and third.

Defendant takes specific aim at the notion that Plaintiff Gomez's resignation amounts to a constructive discharge, which would constitute an adverse action. Accordingly, the Court must delve into the law of constructive discharge.

---

[78] Defendant describes Plaintiff Gomez as Latino-American. (Doc. No. 52 at 11). The Amended Complaint states that Plaintiff Gomez is Hispanic. (Doc. No. 8 at 7). As with Plaintiff Benitez, Defendant does not dispute that Plaintiff Gomez is in a protected class.

The Sixth Circuit used to say that to show a constructive discharge, a plaintiff must show 1) that the employer created working conditions that are intolerable from a reasonable person's point of view, and 2) that the employer did so with the intent of forcing the employee to quit. *See, e.g., Logan*, 259 F.3d at 568.[79] But although the first of these elements still survives, the second element did not survive *Green v. Brennan*, 578 U.S. 547, 136 S. Ct. 1769 (2016):

> A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. But he must also show that he actually resigned.

*Green,* 136 S. Ct. at 1777 (citation omitted).[80] As suggested, the second element (at least currently) simply is not what cases like *Logan* claimed it was. As the Supreme Court explained:

> The whole point of allowing an employee to claim "constructive" discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him. [6] We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the

---

[79] Defendant not only invokes the now-superseded second element mentioned in cases like *Logan*, it also cites *EEOC v. Finish Line, Inc*., 915 F. Supp. 2d 904 (M.D. Tenn. 2013), for the proposition that there is a third element, *i.e.*, that the plaintiff "actually quit *because of those conditions*." (Doc. No. 52 at 5-6) (citing *Finish Line*, 915 F. Supp. 2d at 921) (emphasis added). The case cited by *Finish Line*, *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999), does stand for the proposition that the plaintiff must show that he or she actually quit, albeit without specifically breaking this out as a third element. And this is clearly the law, as noted above. But neither *Finish Line* nor *Moore* stands for the proposition that the plaintiff must show that the quitting was actually, subjectively *because of* those conditions. Instead, both *Finish Line* and the case it cites, *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982), suggest strongly that the inquiry is only an objective one into whether "a reasonable person in plaintiff's position would have felt compelled to resign" because of those conditions. *Moore*, 171 F.3d at 1080. This inquiry is already covered by the above-stated first element of a constructive discharge claim. And, as noted, the Supreme Court has made clear that the elements of constructive discharge simply do not include that the plaintiff actually quit because of the intolerable conditions. At *later* stages of the analysis, the connection between the conditions and the plaintiff's actual and subjective reason for quitting may prove to be very important in some cases. But the connection need not be made at the stage of establishing a constructive discharge as an adverse employment action.

[80] *Green* happened to involve a 45-day limitations period applicable to federal employees, rather than the more general 300-day (or 180-day) limitations period applicable in this case, but this difference is immaterial for present purposes.

discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along.

*Id.* at 1779–80 (citation omitted). Thus, the reality is, and the Sixth Circuit has acknowledged, "[a] constructive-discharge claim 'has two basic elements': (1) an employer must engage in such intolerable discriminatory conduct that a reasonable person would feel compelled to resign and (2) the employee must actually resign." *Everly*, 958 F.3d at 463 (quoting *Green*, 136 S. Ct. at 1777). Unfortunately the case law as a whole does not make this as clear as it should, as some cases simply overlook the teachings of *Green*. *See*, *e.g.*, *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 495 (6th Cir. 2017) ("To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit.") (quoting *Hurtt v. International Services, Inc.*, 627 Fed. Appx. 414, 420 (6th Cir. 2015)). And in this case, each side (and not just Defendant) has referred to the outdated, pro-defendant version of the second element. (Doc. No. 52 at 5; Doc. No. 74 at 10). But as to what the elements are for a constructive-discharge claim, the Court must and does reject that version, setting to one side cases like *Lee* and instead following *Green* (and *Everly*). Obviously, this is to the substantial advantage of any plaintiff who did resign, as it eliminates the need for such plaintiff to make the difficult showing that the employer intended to force the plaintiff to quit.

As noted in *Everly*, for a constructive discharge to have occurred, an employer must have engaged in such intolerable discriminatory conduct that a reasonable person would feel compelled to resign and (2) the employee must actually have resigned. *Everly*, 958 F.3d at 463. It follows that constructive discharge occurs only if the intolerable conduct constitutes *discriminatory conduct* in violation of Title VII. *See Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 682 (6th Cir. 2005) ("The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that

plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." (quoting *Moore v. KUKA Welding Systems & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir.1999)). This means, among other things, that harassing conduct (including comments) counts towards a showing of intolerable conditions only to the extent that the conduct is based on a discriminatory motive or animus. *See Rickard v. Swedish Match N. Am., Inc.*, No. 3:12-CV-00057 KGB, 2013 WL 12099414, at *10 (E.D. Ark. Nov. 25, 2013), aff'd, 773 F.3d 181 (8th Cir. 2014) ("To begin, the Court considers only those statements based on age and sex, as determined above, in its constructive discharge analysis. This is because an alleged constructive discharge is not illegal unless achieved through harassment based on a discriminatory animus . . ."). *Lee*, which remains good law on this point, also supports this notion. *See* 676 F. App'x at 495–96.

Seeking to refute that Plaintiff Gomez suffered any adverse employment action, Defendant extracted from Plaintiffs the admission that "Gomez voluntarily resigned his employment on May 12, 2017; accepting a promotion and higher salary with a competitor" and that his resignation letter stated that he had "accepted a position with another company that will further my growth and development in my career [. . .] [despite] hav[ing] enjoyed working at Tyson Foods[.]" (Doc. No. 73 at ¶¶ 24-25). This all tends to suggest that Plaintiff Gomez suffered no adverse employment action, including a constructive discharge.[81] Therefore, Defendant has shifted the burden on summary judgment to Plaintiff Gomez on the issue of adverse employment action.

---

[81] However, in an attempt to make this point even more strongly, Defendant regrettably, misrepresents Gomez's deposition testimony. Defendant writes, "[Plaintiff] Gomez's resignation, however, is unrelated to his discrimination claims. His testimony clarifies that he was burnt out and left for a better job opportunity. ([Gomez Dep.] at 122, Ex. 10)." The Court is at a loss as to how Defendant could characterize the testimony on page 122 in this manner, *i.e.*, as if it had nothing to do with alleged intolerable conditions or discrimination. On that page, Plaintiff Gomez testified to what he told Defendant about why he was quitting, which was primarily about "how they were treating us" and how he didn't get any days off while "many of the Americans had days off"—which he clarified, two pages later, to refer to "white Americans." (Doc. No 67-1 at 122,

To meet that burden, as expected, Plaintiff Gomez sought to establish that he had been constructively discharged. (Doc. No. 74 at 16) (claiming that "[t]he above facts created an intolerable working situation and led to the constructive discharge of four of the five Plaintiffs [including Plaintiff Gomez]"); (*id.* at 16-20) (identifying additional evidence allegedly reflecting intolerable conditions that would support a claim of constructive discharge).

The Sixth Circuit considers a number of factors in deciding whether this first requirement is satisfied: [82]

> Whether a reasonable person would have feel [sic] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Plaintiff Gomez has argued almost none of the applicable factors from *Logan*,[83] but he does argue the sixth factor, which appears to be the most significant one: "badgering, harassment, or

---

124). The Court is concerned that Defendant portrayed this testimony as indicating that Plaintiff Gomez's resignation was unrelated to alleged "intolerable working conditions" underlying Plaintiff Gomez's claims of constructive discharge and to any concerns about being discriminated against via-a-vis "white Americans," by which Plaintiff Gomez certainly could have meant non-Latino and non-Hispanic persons.

[82] The undersigned believes that the Sixth Circuit would have conveyed its meaning more precisely if, in place of the word "factors," it had written "events encountered by the plaintiff, to the extent that they in fact occurred." But the Court will follow the Sixth Circuit's lead and refer to them as "factors."

[83] The Court does not see where Plaintiffs assert that Plaintiff Gomez in particular was driven to resign by any circumstances beyond badgering, harassment, and intimidation. To the extent that he does, it appears that any assertions would fall into the category of "dissatisfaction with work

humiliation by the employer calculated to encourage the employee's resignation." *Logan*, 259 F.3d at 569. Courts have suggested that constructive discharge can be found by the presence of this factor alone. *See e.g.*, *Logan*, 259 F.3d at 569 (noting that the factors are "relevant[] singly or in combination"); *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 640 (6th Cir. 2010) (discussing only the "badgering, harassment, or humiliation" factor); *Bender v. Gen. Dynamics Land Sys., Inc.*, No. 2:19-CV-13177, 2020 WL 4366049, at *5 (E.D. Mich. July 30, 2020) ("[T]here is precedent for finding constructive discharge where an employee is subjected to 'badgering, harassment, or humiliation' by a coworker so intolerable that it moves the employee to resign.").

The Sixth Circuit has previously explained in a factually similar case that:

> When analyzing the prong of intolerable working conditions, this court has held that "whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider several factors, including but not limited to, reduction in salary and badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Id.* Drawing all inferences in favor of Plaintiff, the record reflects that [Defendant's] employees subjected Plaintiff to humiliation through derogatory racial slurs, and pertinently, that these slurs generally went uninvestigated by [Defendant] despite Plaintiff's complaints. Further, the record demonstrates that Meyer questioned Plaintiff about her retirement on various occasions, which a jury could conclude was harassment. The district court found that none of these events would amount to evidence of an intolerable working environment. However, in *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001), a case with similar facts, we determined that a genuine issue of material fact remained as to whether the plaintiff was subject to intolerable working conditions. In *Logan*, management and co-workers made comments to an employee such as "We don't serve 'grits' here," "You're probably used to that 'first of the month rush,' " and "These must have been some of your people," when referring to people who did not want to pay for their food. *Id.* at 572. This court reasoned that the comments carried "an inference of invidious discrimination" in that they were made because of the employee's race, "sufficient enough to create a

---

assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions," but these kinds of things, at least by themselves, are "are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994), quoted in *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004). In any event whatever contribution these things could make towards a showing of intolerable (as opposed to merely unpleasant) working conditions, Plaintiff Gomez does not clearly assert them.

question of fact as to whether the comment[s were] harassing and created an intolerable atmosphere." *Id.* While this court in *Logan* acknowledged other adverse employment actions that were enough to satisfy the constructive discharge inquiry, including demotion and salary and responsibility reduction, it went on to analyze the racially motivated comments in isolation and concluded that they were enough to create a fact question of whether the plaintiff was subject to an intolerable work environment. *Id.* Similarly, in this case, the comments made to Plaintiff by her coworker, on their own, carried an inference of invidious discrimination as they were even more explicit than those made in *Logan*. They were overt comments that clearly concern Plaintiff's race and national origin. While management did not make those comments, viewing the evidence in a light most favorable to Plaintiff requires the finding that management failed to investigate the comments when Plaintiff informed them of such, thus unreasonably failing to respond to the coworker harassment. *Cf. Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) (concluding that summary judgment was improper when the evidence showed that employer failed to investigate harassment complaints). Further, the record shows that *Meyer* questioned Plaintiff regarding her retirement on several occasions. Unlike our case of *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 770–71 (6th Cir. 2008), where the plaintiff was subjected to similarly discriminatory comments but her employer promptly investigated and addressed the comments, [Defendant] generally failed to investigate Plaintiff's complaints. Accordingly, a genuine issue of material fact remains as to whether these comments constituted harassment and humiliation strong enough to compel resignation and whether any failure to investigate contributed to a constructive discharge.

*Lee*, 676 F. App'x at 495–96 (footnote omitted); *see also Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735, 751 (M.D. Tenn. 2010). So the Court concludes that badgering, harassment, and humiliation can by itself effect constructive discharge. On the other hand, it has been said, not without reason, that "[t]he occurrence of one of these factors in isolation, however, generally is insufficient to support a finding of 'intolerable working conditions.'" *See Gosbin v. Jefferson Cty. Commissioners*, No. 2:14-CV-2640, 2017 WL 5653503, at *10 (S.D. Ohio Mar. 29, 2017), *aff'd*, 725 F. App'x 377 (6th Cir. 2018). And the Sixth Circuit has rejected a claim of constructive discharge at the summary judgment stage where the "[p]laintiff's evidence of harassment and disparaging comments were isolated to only a few incidents and by a few individuals and were not pervasive enough to significantly alter [the plaintiff's] working conditions." *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012).

Many of the incidents (and comments) cited by Plaintiffs do not implicate Gomez's membership in a protected class or indeed any members of a protected class of which Gomez is a member. Even some of the alleged comments that superficially seem to relate to one of his protected classes actually do not, and others were not shown to have even been made known to Gomez (as opposed to other Plaintiffs); for example, when Plaintiffs claim that "Benitez . . . heard Griffin make comments about Gomez's English language skills," (Doc. No. 74 at 13 (citing page 389 of Plaintiff Benitez's deposition)), the reference to the comments is so barebones that the Court lacks any context to say that these comments were heard by Plaintiff Gomez[84] or amounted in any way to a swipe at any persons in one of Plaintiff Gomez's protected classes. Even more concerning here is that Plaintiffs characterize this testimony falsely. Page 389 does *not* include testimony from Plaintiff Benitez that he heard Griffin make comments about Gomez's language skills; the closest he gets is when he says something certainly different (and not shown at all to be based on personal knowledge), *i.e.*, that "[t]he reason why [Griffin] doesn't see Mr. Gomez [sic] capable or compatible is because he struggles to express himself or the way he express [sic] himself." (Doc. No. 72-1 at 389).

Other certain alleged circumstances seem more in the nature of mere personal perceptions or beliefs of Plaintiff Gomez or other Plaintiffs. And the Court does not see how a reasonable jury could find that a reasonable person in Gomez's shoes would feel not just justifiably upset about some things at work, but rather *compelled* to resign. In this regard, Plaintiff Gomez is hindered by Plaintiffs' approach, which was merely to string together on behalf of all Plaintiffs myriad

---

[84] As another example, Plaintiffs assert that "Griffin made comments about Hispanic women being good at sex," (Doc. No. 74 at 13 (citing page 219 of Plaintiff Benitez's deposition)), but one searches the cited page in vain for a reference to *Griffin* (as opposed to Plaintiff Benitez) using the term Hispanic (as opposed to Spanish) or to any indication that Plaintiff Gomez would have heard whatever referenced comments Griffin did make. (Doc. No. 72-1 at 219).

sentences that paraphrase what cited depositions supposedly say, then make the conclusory assertion that "intolerable conditions existed at the Goodlettsville plant." (Doc. No. 74 at 21). What Plaintiff Gomez needed to do instead, to meet his burden, was to explain cogently what someone in *his* shoes would have *objectively* perceived (rather than *personally* felt) in terms of intolerable conditions or events (excluding ones not reflective of discriminatory animus) and why those conditions or events would have been so intolerable—considering their timing and frequency— that a reasonable person in Plaintiff Gomez's position in particular would have felt compelled to resign. This is a far cry from the approach of lumping all Plaintiffs together and leaving unclear why certain incidents or conditions are reflective of discriminatory animus towards Gomez in particular and why a reasonable person in Gomez's particular position would have felt compelled to resign considering the nature and timing (frequency) of all incidents and conditions that are properly considered in this context.

On balance, construing the evidence cited by Plaintiff Gomez in the light most favorable to him as required (while also discounting the cited testimony to the extent it is inadmissible due to, for example, lack of personal knowledge), the Court cannot say that it is sufficient to reach a jury on the issue of constructive discharge.

The Court undertook diligently to see whether admissible evidence suggested that someone in Plaintiff Gomez's shoes would have found working conditions intolerable based on comments or actions made with a discriminatory animus. The Court sifted through Plaintiffs' cascade of paraphrasing of particular testimony, looked to see whether the cited testimony supported the paraphrasing, excluded testimony not shown to be admissible (based on, for example, whether personal knowledge was should or could reasonably be inferred), and determined what comments would have been known to Plaintiff Gomez and implicate one of his protected classes. Ultimately,

the Court could not find that those portions of the cited evidence that were admissible and relevant were sufficient to establish the first element of a constructive-discharge claim. In reaching its conclusion here, that Court notes that many Sixth Circuit cases that held that the plaintiff did not present sufficient evidence of constructive discharge did so not because of insufficient evidence of objectively intolerable working conditions (animated by discriminatory animus), the first element of constructive discharge, but rather because of insufficient evidence of a second element of constructive discharge that (as discussed in detail below) is no longer an element of constructive discharge. The Court does not likewise base its conclusion on the second element. The Court cannot conclude that a jury could find that an objectively reasonably employee would have felt compelled by such conditions to resign. Accordingly, Plaintiff Gomez fails to show a genuine issue as to an adverse employment action.[85]

Alternatively, the Court addresses the fourth element of an indirect-evidence prima facie case of discrimination. This element is that the plaintiff was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class (known as a "comparator" or "comparable"). Plaintiff Gomez has admitted that following his resignation, he was replaced by a Latino individual. (Doc. No. 73 at ¶¶ 28-29). So

---

[85] As noted herein, insufficient evidence of a constructive discharge is only one of two alternative bases for granting summary judgment on Plaintiff Gomez's claims. The Court found it worth considering this alternative basis in conjunction with Plaintiff Gomez's claims, believing that so doing would be edifying. The Court declines to consider whether insufficient evidence of the constructive discharge claimed by Plaintiff Wahid likewise provides an alternative basis for summary judgment on any of their claims as to which the Court will grant summary judgment.

Unlike Plaintiff Gomez and Plaintiff Wahid, Plaintiff Benitez and Plaintiff Kolshi claim one or more other adverse actions besides just constructive discharge, so finding a lack of evidence of a constructive discharge would not justify summary judgment as to any of their claims in its entirety. Nevertheless, the Court opted to explain why, as to Plaintiff Kolshi but not Plaintiff Benitez, the lack of sufficient evidence of constructive discharge provided an alternative basis for granting summary judgment on a claim to the extent based on constructive discharge in particular.

Plaintiff Gomez must show that he was treated less favorably than a proper comparator, *i.e.*, someone truly "similarly situated" to him. This means that he "must show that the 'comparables' are similarly situated *in all respects.*" *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Hughes*, 212 F. App'x at 503 (finding *prima facie* case for disparate pay not be met when plaintiff did not show other employees were similarly situated); *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (same). The reference here is actually to all *material* respects; a plaintiff is "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the [comparator's]." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998).

"Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. The reality is that to show a valid comparator, the plaintiff must show a specific and close match between the plaintiff's situation and the comparator's situation; this bar is not a low one, even granting that for the most part the bar for establishing a *prima facie* case is not considered especially high.

Defendant meets its preliminary burden of showing that Plaintiff Gomez cannot do so, by discussing in considerable detail who the apparent purported comparators are and then explaining why each is not similarly situated. (Doc. No. 52 at 13-15). In response, Plaintiff Gomez does little to meet his resulting burden. To the extent that Plaintiffs' Memorandum in Opposition to the Motion suggests at all that there are valid comparators as to Plaintiff Gomez in particular, the suggestion is unsupported because comparison is made only to "Plaintiffs" generally or to other

Plaintiffs, or to persons Plaintiffs do not specifically identify to the Court as being outside of Gomez's racial class. This fails to satisfy Plaintiffs Gomez's burden of showing at least one particular better-treated person outside his racial class who was similarly situated to *him* in all material respects. Thus, not having presented evidence with nearly the required specificity on this point Plaintiff Gomez cannot prevail on an indirect-evidence theory.

In support of a direct-evidence theory of race discrimination, Plaintiff Gomez can rely only on the comments of Griffin discussed above in connection with Plaintiff Benitez. But as with Plaintiff Benitez, these comments are insufficient to show discrimination against Plaintiff Gomez based on his being Hispanic or Latino. Moreover, a direct-evidence theory, like an indirect-evidence theory, requires an adverse employment action. *Johnson*, 319 F.3d at 865 (noting that a valid direct-evidence theory exists where there is evidence from which no inference need be drawn to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group). As noted above, however, Plaintiff Gomez has failed to raise a genuine issue as to the existence of an adverse employment action.

Thus, as Plaintiff Gomez lacks evidence to reach a jury under either a direct-evidence or indirect-evidence theory, summary judgment is appropriate as to Plaintiff Gomez's claim of race discrimination.

### iii. Plaintiff Wahid

Plaintiff Wahid's race is Arabic.[86] (Doc. No. 52 at 22). Plaintiff Wahid's race discrimination claim appears to be based on several incidents, each of which Plaintiff Wahid

---

[86] Though "Arabic" may not initially seem to refer to a race (as opposed to a language or cultures or languages that use such language), courts have allowed race discrimination claims brought on behalf of "Arabic" individuals, and neither party raises this as a potential issue. *E.g.*, *Ali v. BC Architects Engineers, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020), *as amended* (Oct. 16, 2020) (not raising issue when Arab-American employee sued on various theories of race discrimination);

apparently claims reflects either discriminatory motive or an adverse employment action (though Plaintiffs in their briefing do not clearly distinguish between the two): denials of promotions in 2016, the machete incident in 2016, some comments made in 2011, and underpayment in 2003. (*Id.* at 25). Defendant claims that Plaintiff Wahid's race-discrimination claim fails because (1) the alleged discrimination is time barred; (2) he is unable to identify a proper comparator; or (3) he is unable to establish pretext. (Doc. No. 52 at 25).

Setting aside the first and third arguments, that Court finds that the second argument has merit and that accordingly Plaintiff Wahid fails to reach a jury on an indirect-evidence theory of race discrimination. To meet its initial burden on this issue as the summary-judgment movant, Defendant cites testimony from page 193 of Wahid's deposition (Doc. No. 68-1) for the proposition that "Wahid admits that he cannot identify any other Supervisor who was treated better than him." (Doc. No. 52 at 25). But the testimony on this page does not support this proposition. In this testimony, Wahid admits nothing so broad; indeed, it is unclear that he "admits" anything. What he does do is state (depending on how one parses the testimony) either that he does not think there were, or that he does not remember there being, any *white* production supervisors (Wahid's position) treated better than he was. Because someone who is "Arabic" is not necessarily non-white, this testimony goes only so far in showing that there was no one outside of his protected race class (Arabic) who was treated better than he was. But the testimony here as a whole tends to indicate that Wahid is unlikely to be able to point to a non-Arabic person (whether white or non-

*Agha v. Rational Software Corp.*, 97 F. App'x 748, 749 (9th Cir. 2004) (not raising issue when Arab-American employee sued for race discrimination and reversing district court's granting summary judgment on disparate treatment claim). The Court believes that it is a safe assumption to say that in this context, "Arabic" persons is synonymous with "Arabs," and in places herein the Court proceeds accordingly.

white) who was treated better than he was. And so the burden shifts to Plaintiff Wahid to identify a valid comparator.[87]

Like Plaintiff Gomez, Plaintiff Wahid does little to meet his resulting burden. To the extent that Plaintiffs' Memorandum in Opposition to the Motion at all suggests that there are valid comparators as to Plaintiff Wahid in particular, the suggestion is unsupported because comparison is made only to "Plaintiffs" generally or to other Plaintiffs, or to persons Plaintiffs do not specifically identify to the Court as being outside of Wahid's racial class. This fails to satisfy Plaintiffs Wahid's burden of showing at least one particular better-treated person outside his racial class who was similarly situated to *him* in all material respects. In Plaintiffs' Response in Opposition to Defendant's Statement of Undisputed Material Facts, Plaintiffs do note that a little bit later in his deposition, that Plaintiff Wahid did identify a production supervisor who was treated better than he was, namely, Mena Khalil. (Doc. No. 73 at ¶ 119). But this gets Plaintiff Wahid nowhere, because he identifies Khalil as an Egyptian. (Doc. No. 68-1 at 199). It is far from clear than someone who is an Egyptian is necessarily or even presumptively not "Arabic." *See, e.g.*, *Are Egyptians Africans or Arabs?*, https://dailynewsegypt.com/2012/09/06/are-egyptians-africans-or-arabs (last accessed December 23, 2021); *Egyptians: Are we Arabs?*, https://elkonafa.com/article/egyptians-are-we-arabs (last accessed September 23, 2021). Plaintiffs make no effort to show that Khalil is in fact not "Arabic" and thus outside of Plaintiff Wahid's protected class; conceivably such an effort could have succeeded, but Plaintiff Wahid simply did

---

[87] Plaintiff Wahid alternatively could show that he was replaced by a non-Arabic person, but the Court does not see where he claims, or the record indicates, that this was the case. As far as the Court has been able to glean, the record is silent as to who (if anybody in particular) replaced Wahid after he resigned.

not make it.[88] Thus, not having presented evidence with nearly the required specificity on this point, Plaintiff Wahid cannot prevail on an indirect-evidence theory.

As for direct evidence, none of what Plaintiffs identify (with excessive generality) as "direct evidence of discriminatory motive" has anything to do with discrimination on the basis of being a member of the *Arabic race*. (Doc. No. 74 at 8-9). Instead, it has to do with being "Spanish," or "Iraqi," or foreign, or Muslim; none of these categories is co-terminous with being a member of the "Arabic" race. So none of this evidence is direct evidence of discrimination against Plaintiff Wahid (or anyone else) on the basis of belong to the racial class of Arabs. Thus, as Plaintiff Gomez lacks evidence to reach a jury under either a direct-evidence or indirect-evidence theory, summary judgment is appropriate as to Plaintiff Gomez's claim of race discrimination.

In summary, for the reasons discussed in this section, [89] the Court will grant Defendant's Motion as to all race discrimination claims brought by any Plaintiff who brought a race discrimination claim (namely, Benitez, Wahid, and Gomez).

### b. National-Origin Discrimination[90]

---

[88] Indeed, Plaintiffs make no effort to explain the contours of their alleged racial class of "Arabic" persons, even though it seems clear that the contours of any such class are entirely debatable. In particular, Plaintiffs make no effort to carve out Egyptians as a whole from the class of "Arabic" persons, even though such an effort conceivably could have gained traction. Khalil is identified as a "white" Egyptian, but this fact is immaterial; to be a valid comparator, he needs to be non-Arabic, and an Egyptian (whether or not "white") may or may not be Arabic.

[89] The Court does not reach Defendant's additional arguments in support of summary judgment on these claims. (Doc. No. 52 at 16, 25).

[90] Plaintiffs argue it is direct evidence of discrimination that "Griffin bragged about getting rid of foreign-born employees and wanted the foreign managers out so he could hire new staff of his choice." (Doc. No. 74 at 9). Defendant argues that this characterization of Griffin's statements, rather than being direct evidence, is "nothing more than an unsupported argument based on speculation and conjecture." (Doc. No. 81 at 5 n.3).
   Plaintiffs cite the testimony of four of the Plaintiffs for the proposition that Griffin bragged as claimed. The pages cited to by Plaintiffs in their depositions do not reflect testimony by any of

As indicated above, for some reason, Count I (confusingly enough) included claims not only of race discrimination under Title VII, but also of national-origin discrimination (also under Title VII). Having just addressed the former claims, the Court now proceeds to the latter claims, which remain pending on behalf of all five Plaintiffs. The Court will address the national-origin discrimination claims of each Plaintiff in turn.

### i. Plaintiff Benitez

Plaintiff Benitez's national origin is Cuban. (Doc. No. 52 at 51). Defendant argues that Plaintiff Benitez has failed to show an indirect-evidence *prima facie* case of national-origin discrimination because he 1) has not identified a proper comparator, and 2) cannot prove pretext. (Doc. No. 52 at 56).

To support its argument that Plaintiff Benitez has not pointed to a proper comparator, Defendant cites Plaintiff Benitez's deposition testimony and explains why his testimony is insufficient and why there appears to be no other evidence to support the existence of a proper comparator to support Plaintiff Benitez's claim. Thus, in connection with Plaintiff Benitez's

---

the Plaintiffs directly supporting this proposition. Instead, they include examples of Griffin expressing interest in hiring Ausbrooks (a Caucasian, American-born individual, with no reference to other individuals) (Doc. No. 65-1 at 223), rumors that Plaintiff Omar might be replaced by Ausbrooks, (Doc. No. 69-1 at 126; Doc. No. 70-1 at 296), perceptions of Griffin's beliefs (Doc. No. 37-2 at 157-58), and questions by counsel merely restating the identical paragraph in the Amended Complaint alleging that Griffin bragged about getting rid of foreign born employees (without any subsequent relevant examples or statements from the Plaintiff being deposed) (Doc. No. 67-1 at 198; Doc. No. 70-1 at 296); *see also Johnson v. City of Flint*, No. 09-11805, 2010 WL 1957208, at *7 (E.D. Mich. May 13, 2010) ("Under Rule 56, the party opposing a motion for summary judgment 'may not rely merely on allegations . . . in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.'").

Therefore, the Court rejects Plaintiffs' proposition that there is evidence that Griffin bragged about getting rid of foreign managers, and so this (alleged but non-existent) evidence does not constitute direct evidence of discrimination.

indirect-evidence theory of national-origin discrimination, the Court finds that Defendant has shifted the burden to Plaintiff Benitez to identify a proper comparator.

As noted above, though, a plaintiff can establish the fourth element alternatively by showing that he was replaced by someone outside of the protected class. As further noted above, Plaintiff Benitez when demoted was replaced by Ausbrooks, who is American (as opposed to Cuban), according to Benitez's deposition testimony. (Doc. No. 73 at ¶ 4). Defendant does not dispute the accuracy of this testimony, and so Plaintiff Benitez has raised a genuine issue as to the fourth element of his indirect-evidence *prima facie* case.

The Court has also found above that Defendant has shown a legitimate, nondiscriminatory reason for demoting Plaintiff Benitez. These findings also apply to the national-origin discrimination claim. So Plaintiff Benitez must show evidence sufficient for a jury to find that the reason for his demotion was not the real reason and instead was pretext for national-origin discrimination.

The Court concludes that Plaintiff Benitez cannot raise a genuine dispute that Defendant's proffered reason was pretextual and that the real reason was animus against Plaintiff Benitez's national origin. The Court has found above that that Plaintiff Benitez has not shown evidence sufficient for a jury to find that the proffered reason was not the true reason and instead was a pretext for *racial* discrimination. That discussion is entirely applicable to Plaintiff Benitez's claim of national-origin discrimination as well, and thus is incorporated by reference into the Court's reasoning here, except insofar as Plaintiff Benitez: (i) is more express about what he is basing his claim of pretext on with respect to this claim, namely, "the repeated comments [of Griffin] about the Plaintiffs and their origin[,]" which reflect that "[t]he reason Griffin forced the Plaintiffs to leave Tyson" was that his plan "all along [was] to move the foreigners out and the Americans in";

and (ii) relies on different comments—naturally, comments relating to "[national] origin" rather than race. (Doc. No. 74 at 27-28; 8-9).

Plaintiffs do cite one alleged comment, mentioned by Benitez during his deposition, concerning Plaintiff's particular national origin. (*Id.* at 14 ("Griffin talked about not wanting a Cuban in his family when a relative started dating a Cuban."). Otherwise, the alleged comments of Griffin upon which Plaintiffs rely are inapplicable to Benitez except insofar as they are related foreigners generally as opposed to persons of some particular foreign national origin other than Cuban. The cited alleged comments of Griffin related to foreigners generally are the following:[91]

> Griffin complained to Gomez that people born outside the United States, "They come to this country, they don't speak English, they want to do whatever they want." Gomez Depo., p. 83.

---

[91]As indicated, none of these comments are directed at the particular national origin of any Plaintiff. But the Court is inclined to agree with those courts that have recognized that national-origin discrimination includes not just disfavoring a single national group relative to all others but also favoring one national group (such as Americans) over all others, and moreover includes discrimination on the basis of disfavored treatment of foreigners generally. *See* 42 U.S.C. § 2000d; *Unal v. Los Alamos Pub. Sch.*, 638 F. App'x 729, 13-14 (10th Cir. 2016) (evidence of animus or hostility towards foreigners generally or various non-American nationalities supported the plaintiff's national-origin discrimination claim); *Mallare v. St. Luke's Hosp. of Bethlehem*, 699 F. Supp. 1127, 1132-33 (E.D. Pa. 1988) (evidence that a program favored American applicants over non-American applicants supported the plaintiff's national-origin discrimination claim); *Prokopiou v. Long Island R.R. Co.*, No. 06-cv-2558, 2007 WL 1098696, at *4 (S.D.N.Y. Apr. 9, 2007) (finding a claim of national-origin discrimination adequately stated based on allegations that the defendant did not provide the foreign-born plaintiff with opportunities provided to employees who were not foreign-born). On the other hand, the Court keeps in mind that the probativeness, whether as to pretext or other issues, of any animus against foreigners generally depends on the particular nature of that animus and the extent to which it can be linked to a particular action against a plaintiff of a particular national origin considering all of the circumstances.

Also, although evidence of animus against foreigners as a whole can constitute evidence of animus against someone of a particular national origin, that does not mean (and the Court declines to conclude) that evidence of animus against persons of one particular national origin constitutes evidence of animus against a person of another particular foreign national origin. So the Court herein will not consider proffered evidence of animus against one Plaintiff's particular national origin as evidence against another Plaintiff's particular national origin.

Griffin said, "If you are not from here you must pay the price." He added that "You must learn English." Gomez Depo., p. 82-83.

. . .

Griffin bragged about getting rid of foreign-born employees and wanted the foreign managers out so he could hire new staff of his choice. Gomez depo., p. 198; Benitez Depo., pp. 314-315; Omar Depo., p. 126, 296-297; Lab Kolshi Depo., p. 223.

(Doc. No. 74 at 8-9).

With respect to the last of the alleged comments, the Court is constrained to note that the cited pages from Plaintiff Benitez's deposition (Doc. No. 37-2 at 157-58), the cited page (223) from Kolshi's deposition, and the cited page (126) from Omar's deposition, absolutely do *not* support the proposition (initially advanced in paragraph 118 of the original complaint and paragraph 122 of the Amended Complaint) that "Griffin bragged about getting rid of foreign-born employees and wanted the foreign managers out[.]" The Court is concerned that these pages were cited by counsel (conspicuously without quotes disclosing what the testimony actually was) in support of this potentially very important proposition.

As for the cited page of Plaintiff Gomez's deposition (Doc. No. 39-1 at 198), it reflects that Gomez declined to confirm (when specifically asked) that he personally witnessed this bragging. And he did not clearly indicate that he had *heard* the bragging, either. [92] As for what he does claim,

---

[92] The applicable testimony went as follows:

on that page, to have heard personally from Griffin, Gomez testified only that Griffin "said that he was going to try to bring different people." (*Id.*). This (alleged) statement of Griffin is a far cry from bragging about *ousting foreign workers and managers*. Gomez here also testified that he understood (perhaps, but not necessarily, from discussions with Griffin) that Griffin was trying "not [to] bring in people from somewhere else." *Id.* Having such an understanding likewise is a far cry from claiming that Griffin was bragging about ousting foreign workers and managers and provides little (if any) support for the notion that Griffin would have demoted an existing employee based on the employee's national origin.

As for Plaintiff Omar's testimony from pages 296-297 (Doc. No. 41-2 at 87-88), it is quite vague and cursory.[93]  It arguably supports the quoted proposition to some extent, but it indicates

---

```
Q          "Griffin often bragged about getting rid of
non-Caucasian, foreign-born employees."
           Did you personally hear this?
A          Could you repeat that, please?
Q          It states, "Griffin often bragged about
getting rid of non-Caucasian, foreign-born
employees."
A          Yes.
```

(Doc. No. 39-1 at 198). It is far from clear that in stating "yes," Plaintiff Gomez was affirming that he personally heard such bragging, rather than simply acknowledging the quoted statement that was to be the subject of the question that previously had been asked.

[93] The applicable testimony went as follows:

absolutely no basis for his alleged knowledge of such bragging; he does not, for example, claim to have heard it personally. Thus, even if this testimony is admissible because Defendant did not specifically object to its admission, it is of very limited probative value inasmuch as Plaintiff Omar provided no context at all regarding the bragging or how it might be connected to any adverse actions temporally or otherwise. And its probative value in showing national-origin discrimination is diminished further still, and indeed virtually eviscerated, because it refers only to bragging about "getting rid of non-Caucasian, foreign-born employees." So it does not suggest animus not against foreigners *generally*, but only against *non-Caucasian* foreigners—and because many Cubans

---

```
Q.      Okay.  In Paragraph 122 you also claim that
Griffin bragged about getting rid of non-Caucasian,
foreign-born employees and was openly hostile and
impatient toward the employees who did not have
English as their primary language?
A.      Yes, ma'am.
Q.      Have you told me what you know about him
bragging about getting rid of non-Caucasian,
foreign-born employees?
A.      One of them is Arnobio Gomez.
Q.      Right.  We've talked about that.
A.      Yes, ma'am.
Q.      Okay.  Have you told me everything about
that?
A.      This is what I know.
```

(Doc. No. 41-2 at 87-88). In this part of his testimony, Plaintiff Omar seems to cross-reference some earlier testimony from his deposition, but it is not the Court's job to root through his deposition to figure out what he meant by the cross-reference, where the cross-referenced testimony can be found, whether the cross-referenced testimony was based on personal knowledge, and how the cross-referenced testimony might support the quoted proposition.

undeniably are Caucasian (or white),[94] this comment cannot be taken as evidence of animus against Cubans as Cubans (as opposed to evidence of animus against particular Cubans who happen to be non-Caucasian Cubans).[95] Moreover, as is relevant to the analysis below, this testimony does not support the notion that Griffin would *demote* people (as opposed to terminate them) because they were Cuban (or otherwise foreigners); Griffin's alleged statement indicated a plan to "get rid" of foreign employees, but demoting foreigners would not seem to be part of that plan because one does not "get rid" of employees by demoting them.[96]

So Griffin's alleged comments about foreigners generally is of virtually no value in showing pretext—*i.e.*, showing that animus against Plaintiff Benitez's national origin, and not Defendant's proffered reason, was the real reason for his. That leaves just one comment from Griffin to the effect that he did not want a Cuban in his family. This isolated comment, even though coming from a supervisor, is insufficient to create a jury issue as to pretext. This is especially true

---

[94] *E.g.*, *Cubans in the United States*, https://www.pewresearch.org/hispanic/2006/08/25/cubans-in-the-united-states ("Cubans are far more likely than other Hispanics to identify themselves as white when asked about their race. In the 2004 Census data, about 86% of Cubans said they were white . . .") (last accessed December 23, 2021).

[95] Plaintiffs could have asserted this particular testimony alternatively as evidence of discrimination against non-Caucasians (racial discrimination), even though it suggests animus against only certain kinds of non-Caucasians, and not categorical animus against all Caucasians. But Plaintiffs cited this testimony only as evidence of discrimination against foreigners, *i.e.*, national origin discrimination, and so the Court receives it the same way, while repeating that it would be entitled to little weight for any purpose because Plaintiff Omar indicated no basis of knowledge for such testimony.

[96] The notion of "getting rid" of someone tends, in the Court's view, to be a sweeping one that suggests the person being completely gone from an environment. In the employment context, this would mean entirely gone from employment. It is true that one could refer to "getting rid" of employees in a more limited sense, *i.e.*, get rid of them from the supervisory ranks by demoting them. But nothing in relevant allegations of the Amended Complaint (or original complaint), or in the cited testimony of Amended Complaint, or in the cited testimony of Plaintiff Omar, indicates that Griffin's alleged bragging about "getting rid" of foreigners referred to "getting rid" of employees only in this limited sense.

because the comment has not been shown to be connected temporally or otherwise to Plaintiff Benitez's demotion in any way; indeed, Plaintiff Benitez provided no information at all as to when this comment might have been made. (Doc. No. 72-1 at 171). Moreover, the undersigned believes that history shows that it is undisputable that (for better or for worse) the kind of prejudice that causes some people to want to keep certain kinds of persons out of their families does not at all necessarily cause them to want to prevent such kinds of persons from working for them (even in important positions). So Plaintiff Benitez's national-origin discrimination claim does not survive on an indirect-evidence theory.

The only purported direct evidence pertaining to Plaintiff Benitez's claim for national-origin discrimination is the above-referenced array of alleged comments of Griffin, one dealing with Cubans specifically and several related to foreigners generally. The Court, keeping in mind the extent to which Plaintiffs' cited "evidence" actually fails to establish that Griffin made the comments as Plaintiff alleges he made them, finds that none of this is direct evidence of national origin-discrimination against Plaintiff Benitez. Slurs can constitute direct evidence of discrimination, but as just noted, most of such evidence is of very little (if any) probative value as to whether Plaintiff Benitez was demoted based on his national origin. The comments are isolated and ambiguous and do not appear to be connected temporally or otherwise to Plaintiff Benitez's demotion. And with the exception of the alleged comment regarding Cubans, none of the comments appear to be directed at Plaintiff Benitez in particular;[97] according to some courts, this alone prevents those comments from constituting direct evidence of discrimination against Plaintiff Benitez. *See, e.g.*, <u>Steinhauer v. DeGolier</u>, 359 F.3d 481, 487 (7th Cir. 2004)

---

[97] Comments can *implicate* a particular person's national origin (including the general category of "foreign" national origin) without being *directed at* such person.

("inappropriate remarks not directed at employee are not direct evidence of discrimination" (citing *Curry v. Menard, Inc.,* 270 F.3d 473, 477 (7th Cir.2001)); <u>Cox v. Logicore Corp.</u>, No. 5:13-CV-02132-MHH, 2016 WL 2894095, at *4 (N.D. Ala. May 18, 2016) ("[The plaintiff] seeks to rely on [the defendant's supervisor's] racial slurs as direct evidence of discrimination, but the alleged statements were not aimed at [the plaintiff]. Therefore, these statements do not constitute direct evidence with respect to [the plaintiff's] termination.").

Ultimately, none of these comments can be connected to Plaintiff Benitez's demotion without drawing an inference.[98] Distasteful though the alleged comments may be, and whatever their potential value to Plaintiffs in other aspects of the analysis of alleged national-origin discrimination, they are not sufficient to make Plaintiff Benitez's case one of the "rare" ones involving direct evidence, because they are not even close to an announcement (or even a more subtle revelation) by Griffin that he was "acting on prohibited grounds," *i.e.*, demoted Plaintiff Benitez due to his national origin.

---

[98] The Court does not deny that such comments, at least if considered collectively, could help support an inference that Griffin had an animus against foreigners generally that manifested itself in the form of Griffin's termination of Plaintiff Benitez for having a foreign national origin.

But that is just the point: one would have to draw an inference from those comments in order to conclude from them that Plaintiff Benitez's demotion resulted from national-origin discrimination. And where an inference is required to connect comments to an adverse employment action that the plaintiff attributes to discrimination, the comments by definition are not direct evidence of discrimination—even if the inference could be drawn relatively easily and would be a relatively strong inference.

The Court recognizes that some courts have held that repeated slurs against members of a protected class can constitute direct evidence of discrimination. Perhaps in some cases, the nature and timing of the slurs are such that one could conclude that the comments, at least collectively, essentially show by themselves that the employer's attitude is such that it manifestly takes adverse employment actions against employees based on their protected status; if so, the comments are properly viewed as direct evidence as specifically defined by the Supreme Court and the Sixth Circuit. But this is not such a case; Griffin's alleged slurs based on national origin do not constitute "direct evidence" under the applicable definition; whatever it is the alleged comments manifestly show by themselves, it is *not* that Griffin (or Defendant) takes adverse employment actions against employees based on their foreign national origin.

Thus, the Court finds that none of these comments is sufficient to constitute direct evidence of discrimination on the basis of national origin. Each one is not direct evidence, because "it does not prove the fact of discrimination without any inference or presumption" *Belian v. Texas A & M Univ. Corpus Christi*, 987 F. Supp. 517, 523 (S.D. Tex.), *aff'd sub nom. Belian v. Texas A & M*, 132 F.3d 1453 (5th Cir. 1997).

Therefore, the Court will grant summary judgment to Defendant on Plaintiff Benitez's claim for national origin discrimination under Title VII and the THRA.

### ii. Plaintiff Omar

Plaintiff Omar's national origin is Iraqi. (Doc. No. 52 at 34). Defendant argues that Plaintiff Omar's national origin discrimination claim fails because he 1) did not suffer an adverse employment action, 2) cannot identify a proper comparator, and 3) cannot establish pretext. (Doc. No. 52 at 37).

To support its proposition that Plaintiff Omar has not suffered an adverse action, Defendant cites to several documents in the record, including exhibits regarding his leave and depositions of various involved individuals. (*Id.* at 33-34). Because (as noted below in a footnote) it is unclear what events exactly Plaintiff Omar is claiming constituted an adverse action, Defendant also cited case law indicating that various events could not constitute an adverse action. (*Id.* at 37-38). As noted below in that same footnote, Plaintiff Omar has not adequately asserted any cognizable adverse action other than his termination.[99] So the initial question is whether Defendant has shifted

---

[99] Plaintiff Omar asserts his termination as an adverse action. (Doc. No. 74 at 10). It appears that Plaintiff Omar intended his negative performance evaluation to also serve as an adverse action. However, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). There is no evidence that there was an adverse impact on Plaintiff Omar's wages or salary resulting from the negative performance evaluation. In fact, Plaintiff Omar received a raise after his negative performance evaluation. (Doc.

the burden to Plaintiff Omar on summary judgment with respect to whether he suffered an adverse action, the third element of an indirect-evidence *prima facie* case, by showing that Plaintiff Omar's termination is not a cognizable adverse action.

Termination is a quintessential example of an adverse employment action. *E.g.*, *Eberhardt v. First Centrum, LLC*, No. 05-71518, 2007 WL 518896, at *6 (E.D. Mich. Feb. 15, 2007) ("Examples of adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." (internal quotation marks omitted)). Thus, Plaintiff Omar satisfies the third of the four elements of an indirect-evidence *prima facie* case of employment discrimination. *See Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (noting that to show an indirect-evidence *prima* facie case, a plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class (or was treated less favorably than a similarly situated individual outside his protected class) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000)).[100]

---

No. 73 at ¶¶ 149, 150). Therefore, the Court does not find that the negative performance evaluation constitutes an adverse employment action. Additionally, Plaintiff Omar seems to indicate that he applied for two positions in the Material Handling department that he did not receive. Plaintiff Omar does not reference this as an adverse action in his Response, and Defendant notes that there is no evidence of when Plaintiff Omar applied for these positions, what positions they were, or who the other candidates were. (Doc. No. 52 at 37-38). Therefore, the Court considers Plaintiff Omar's termination to be the only adverse action he has presented to the Court.

[100] These elements are sometimes listed in a different order with a correspondingly different numeration. *See, e.g.*, *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004). The Court here is referring to the numeration used by *Hughes*.

Nevertheless, Defendant disputes that *Plaintiff Omar's termination* suffices to satisfy this element. Defendant claims that Plaintiff Omar's termination is not relevant to his national origin discrimination claim, stating that "[h]e was terminated because he failed to return FMLA paperwork or contact [Defendant] Tyson about his medical leave. There is no evidence that these facts are linked to Omar's national origin, therefore his termination is not an adverse action in support of his discrimination claim." (Doc. No. 52 at 38). But Defendant misunderstands the element here. The question as to this element is simply whether Plaintiff Omar has suffered an "adverse action"—which clearly he has—and not whether he has suffered an adverse action "linked to [his] national origin." (*Id.*). The existence (or non-existence) of *any relationship between* that adverse action and his national origin—*i.e.*, the issue of causation—is simply not implicated in this element, and instead is implicated (if at all) only later in the *McDonnell-Douglas* framework. Notably, the issue is implicated in a *subsequent* (rather than the first) element of an indirect-evidence of the prima facie case for *retaliation* under Title VII.[101] See *Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 888-89 (W.D. Mich. 2007) ("Defendant unquestionably terminated Plaintiff's employment, and termination satisfies the adverse-employment-action element of the prima facie case. The pivotal issue on the prima facie case analysis is whether Plaintiff has produced evidence sufficient to permit a finding of cause. Plaintiff must produce evidence sufficient to raise the inference that his protected conduct was the likely reason for his termination."). But for a *general* claim of discrimination, the concept of causation is nowhere to be found in the elements of an indirect-evidence *prima facie* case and instead is implicated only if and when the court assesses whether the defendant appeared to have had a legitimate non-

---

[101] Specifically, as set forth below, causation is the fourth and final element of an indirect-evidence *prima facie* case of retaliation.

discriminatory reason and, if so, whether such reason in fact was pretextual. So the Court rejects

the notion that a plaintiff who (supposedly) has not *causally connected* his termination to

discriminatory animus has not shown the third element of an indirect-evidence *prima facie* case of

general discrimination; if the plaintiff was terminated, the plaintiff has shown that element,

period.[102]

Regarding the fourth and final element of an indirect-evidence *prima facie* claim of

discrimination, the plaintiff must show that the purported comparators are similarly situated *in all*

*material respects*. Defendant cites to parts of Plaintiff Omar's deposition that indicate that the

purported similarly situated employees actually were not similarly situated to Plaintiff Omar. (Doc.

No. 52 at 35-36). For example, Defendant argues that Rainey and Brinkley cannot serve as

comparators because they worked in a different department than Plaintiff Omar's, Plaintiff Omar's

beliefs about their job performances were subjective, and there was no evidence of either of them

being subjected to discipline for similar behavior (namely, the allegedly improper taking of leave

resulting in his termination) as Plaintiff Omar. (Doc. No. 52 at 35). Defendant thus has shifted the

burden to Plaintiff Omar on this element because it has made a showing that tends to suggest that

Plaintiff Omar lacks a valid comparator.[103]

---

[102] To an extent, the apparent law regarding constructive discharge is somewhat (though not directly) in tension with this. As noted herein, it appears that events do not count towards a finding of intolerable conditions (required for a constructive discharge) unless they are the result of a discriminatory animus. To this extent, the specific adverse action of constructive discharge *does* need to be connected to discriminatory animus. The Court declines to opine (or speculate) as to why constructive discharge is treated differently in this respect, except to say that constructive discharge is a unique kind of adverse action. But in any event, once a finding is made that there was a constructive discharge, then this element of an indirect-evidence *prima facie* case is satisfied, and—just as in the case of termination—the defendant may not negate that element by showing that the constructive discharge is somehow not sufficiently causally connected to a discriminatory motive.

[103] As discussed below in some detail, by making this showing, Defendant shifted the burden to Plaintiff Omar to show evidence either that he had a valid comparator *or* that he was replaced by

In the Response, Plaintiff Omar posits three Generals as being similarly situated to himself: Rainey, Parker, and Ausbrooks.[104] (Doc. No. 74 at 22). Besides claiming cursorily that they constitute valid comparators, Plaintiff Omar has not argued or presented evidence that any of these three individuals were similarly situated to him. Each of these three individuals appear to have held the same job positions as Plaintiff Omar at some point (although the timelines are unclear): Parker was also a General in the ground beef department (Doc. No. 74 at 22); Rainey was a General, but it is unclear what department he was in (Doc. No. 73 at ¶ 190); and Ausbrooks was at one time a ground beef General. (Doc. No. 74 at 22). There is no indication of whether these individuals were on the A or the B shift. Thus, Plaintiff Omar does not point to any evidence that these individuals worked under the same supervisor, as apparently Generals on the A shift reported to a different supervisor than did Generals on the B shift; it appears undisputed that the General on the A and the General on the B shift reported to the Operations Manager or the Assistant Operations Manager, respectively. (Doc. No. 52 at 7). The Sixth Circuit has not been uniform when indicating whether individuals can be similarly situated if they do not report to the same

someone outside his protected class. Plaintiff Omar makes no effort to show evidence of the latter, so he must show evidence of the former, which he fails to do as discussed herein.

[104] As noted, Defendant posited that Plaintiff Omar was also claiming that an individual named Brinkley was a comparator. This does not appear to be the case, in light of Plaintiff's Response. Plaintiff Omar did testify, when asked about Brinkley, that he thought she was treated better than he was, but that does not mean that he was then (or is now) relying on her as a comparator. Defendant argues that Plaintiff Omar makes no response to Defendant's Motion on the issue of comparators. (Doc. No. 81 at 8). The Court does not fault Defendant for this conclusion, as Plaintiffs briefly mention that Omar claims these three individuals as comparators, and then proceed to analyze these three comparators solely in the context of Plaintiff Benitez's claims and how they relate to Plaintiff Benitez. The Court does not find the issue abandoned, as Plaintiffs did state whom it was they believed were proper comparators for Plaintiff Omar, but the Court finds that these three are not proper comparators, for the reasons discussed, and notes that Plaintiffs did not provide the Court with fulsome briefing on this issue.

supervisor. *Compare Mitchell*, 964 F.2d at 583 ("Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor[.]"), *with Seay v. TVA,* 339 F3d 454, 479-80 (6th Cir. 2003) ("[W]e have never read 'the same supervisor criterium' as an 'inflexible requirement.'"). While having different supervisors would not necessarily preclude a finding that any of these three individuals is similarly situated to Plaintiff Omar, it would not help Plaintiff Omar's position. What *would* help him to meet his burden is to show the opposite—that he and the purported comparators reported to the same supervisor at least at some relevant time(s). He has failed to do this, however, because Plaintiff Omar has not shown that he and all (or even any) of the purported comparators ever worked on the same shift at the same time.

Moreover, Plaintiff Omar was disciplined for two different kinds of alleged misconduct; namely, he was warned and counseled for his poor treatment of his team members, and he was terminated for taking allegedly unauthorized leave instead of returning to work. By contrast, Plaintiff Omar claims only that each of his three alleged comparators was a "weak performer" or had (unspecified) "performance issues." (Doc. No. 74 at 22). To claim "performance" issues or weaknesses (which may imply mere laziness or incompetence) is not the same as claiming that they were disciplined for the same kind of specific (and more affirmative) alleged misconduct for which Plaintiff Omar was disciplined. *"*The vague statements proffered by Plaintiff [Omar as to the allegedly comparable conduct of the alleged comparators] fall short of providing the Court with sufficient evidence to permit a finding that [the alleged comparators] were similarly situated." *Simns v. Maxim Healthcare Servs., Inc.*, No. 11-1052, 2013 WL 435293, at *7 (W.D. Tenn. Feb. 4, 2013). Again, Plaintiffs merely cite (and in some instances, miscite) deposition testimony in an

attempt to substantiate their claim.[105] These citations to various portions of deposition testimony fail to specifically address Defendant's arguments and fail to establish personal knowledge supporting their contentions. It is not enough for Plaintiff to cite to deposition testimony containing only "personal belief and speculation," as mere citations to such testimony "do not create genuine issues of material fact that may be used to defeat a motion for summary judgment." *Holleman v. BellSouth Telecommunications, Inc.*, No. 3:09-CV-311, 2011 WL 3876590, at *11 (E.D. Tenn. Sept. 1, 2011) (citing *Mitchell*, 964 F.2d at 585 ("noting that a plaintiff's affidavit consisted of 'nothing more than rumors, conclusory allegations, and subjective beliefs which are wholly insufficient to establish a claim of discrimination as a matter of law'")). In order to sufficiently respond to Defendant's Motion, Plaintiffs needed to submit declarations which more specifically and thoroughly respond to Defendant's arguments and/or show that the testimony being cited to was in fact based on personal knowledge. Plaintiff Omar's bald (and self-interested) assertions that his alleged comparators were weak performers fails to provide adequate factual support for his claim that their performance was such they deserved the same (or worse) treatment that he received (but did not receive it because they were outside of Plaintiff Omar's protected class). *Cf. Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) (stating that affidavits indicating that the plaintiff did a better job than another individual were "bald assertions and conclusory statements [that] fail to provide any factual support for [Plaintiff's] claim of sexist, ageist, or politically retaliatory animus."). Plaintiff Omar has thus failed to show that the individuals he claims are similarly situated "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

---

[105] *See* Doc. No. 74 at 22.

In short, Plaintiff Omar has not shown a similarly-situated employee who was treated better than he was.[106] The Court finds alternatively, for the reasons discussed below in connection with Plaintiff Omar's ADA discrimination claim, that Defendant has shown with evidence a legitimate, non-discriminatory reason for his termination and that Plaintiff Omar has not raised a genuine issue as to pretext. For these alternative reasons, Plaintiff Omar has failed to show his *prima facie* case under the indirect-evidence framework.

Plaintiff Omar also cannot succeed on his national-origin discrimination claim under a direct-evidence theory. Plaintiff Omar relies on evidence of the comments identified above (in connection with Plaintiff Benitez) related to foreigners generally, claiming that it is direct evidence of national-origin discrimination. But essentially for the same reasons as with Plaintiff Benitez, it is not direct evidence of national-origin discrimination against Plaintiff Omar; notably, the comments about foreigners generally were not directed at Plaintiff Omar. Plaintiff Omar also points to a variety of other comments that ostensibly might seem to be directed at Plaintiff Omar's national origin but cannot actually be tied to specifically to his being an Iraqi (or even a foreigner generally) without the drawing of some inferences.[107] From the list of Griffin's comments provided by Plaintiffs, only one directly implicates Plaintiff Omar's national origin: Griffin's

---

[106] Alternatively, Plaintiff Omar could satisfy this element via evidence that he was replaced by someone outside of the protected class. But the Court does not see where Plaintiff Omar has even attempted to show that that his replacement was someone outside of the applicable protected class (persons of Iraqi national origin).

[107] For example, Plaintiffs claim that Griffin took a picture of Plaintiff Omar and showed it to other team members, commenting that the picture reflects what a terrorist looks like. (Doc. No. 74 at 8). Since there are terrorists who are not Iraqi, and terrorists who are American, one would have to infer that Plaintiff was referring to Plaintiff Omar looking like, or being, a foreigner or an Iraqi. The inference may not be *hard* to draw, but it does *need* to be drawn to connect the comment to Plaintiff Omar's national origin.

statement, when showing a picture of Plaintiff Omar to Plaintiff Kolshi, "[l]ook at this Muslim Iraqi terrorist." (Doc. No. 74 at 8). The Court does not find this comment, though made by a supervisor, to be direct evidence of discrimination. The statement appears to be isolated, as well as ambiguous in that it was not topically or temporally connected to any adverse employment action. Moreover, it would require the Court to make an inference to link discriminatory intent with the adverse action (termination) against Plaintiff Omar. In short, evidence of these statements is not direct evidence because it "admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak*, 400 F.3d at 470 (quoting *Norbuta,* 1 Fed. Appx. at 313).

Therefore, the Court will grant summary judgment to Defendant on Plaintiff Omar's Title VII and THRA claims for discrimination based on national origin.

### iii. Plaintiff Kolshi

Plaintiff Kolshi's national origin is Albanian. (Doc. No. 52 at 15). Defendant argues that Plaintiff Kolshi's national-origin discrimination claim fails because 1) he has not identified a proper comparator, 2) he has not suffered an adverse employment action in the form of a constructive discharge as he claims,[108] 3) he cannot show pretext, and 4) he was not constructively discharged. (*Id.* at 48-50). To support the proposition that Plaintiff Kolshi has not pointed to a proper comparator, Defendant cites to evidence (including Plaintiff Kolshi and other employee's depositions), to show that the comparators Plaintiff Kolshi identifies do not qualify as proper

---

[108] Defendant includes the constructive-discharge analysis in a separate section at the end of its analysis of Plaintiff Kolshi's claims. However, although it was physically separated from Defendant's discussion of Plaintiff Kolshi's national-origin claim and seemingly is directed at a separate "claim" of constructive discharge, (Doc. No. 52 at 50), this analysis apparently was meant to refute the existence of an adverse action needed for a national origin-discrimination claim.

comparators. (*Id.* at 42-44). Thus, the Court finds that Defendant has shifted the burden to Plaintiff Kolshi as to whether there is a proper comparator.

As an adverse employment action is required for both direct-evidence and indirect-evidence claims, the Court will next address whether Defendant has shown the absence of a genuine issue as to the occurrence of an adverse employment action. Defendant argues that Plaintiff Kolshi cannot show that he was constructively discharged (and thus that he cannot show that he suffered an adverse action). (Doc. No. 52 at 50). Plaintiff Kolshi maintains that he was constructively discharged, and he also points to his suspension without pay (prior to his alleged constructive discharge) as an adverse employment action. (Doc. No. 74 at 11).

Suspension without pay constitutes an adverse employment action, and Defendant does not seem to argue otherwise. *See White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 802 (6th Cir. 2004) (finding suspension without pay to constitute an adverse employment action), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *McKethan-Jones v. Ohio Dep't of Health*, 7 F. App'x 475, 479 (6th Cir. 2001) (finding week-long suspension without pay to constitute adverse employment action). Therefore, the Court finds that this suspension without pay constitutes an adverse employment action.

Constructive discharge is a potential *additional* adverse action for Plaintiff Kolshi. As noted above, a constructive-discharge claim has two elements: (1) the employer must have engaged in such intolerable discriminatory conduct that a reasonable person would have felt compelled to resign, and (2) the employee must have actually resigned. *See Everly*, 958 F.3d at 463.

There is no question that Kolshi satisfies the second element because he resigned. As for the first element, as indicated above, "[i]n order to maintain an action for constructive discharge,

[a plaintiff] must show that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). To support the proposition that Plaintiff Kolshi has not shown a constructive discharge as an *additional* adverse employment action, Defendant argues (citing facts for which it includes citations elsewhere in its brief):

> [Plaintiff] Kolshi cannot prove that [Defendant] Tyson deliberately created intolerable conditions that were so objectively severe that a reasonable person in his position would have been compelled to resign. [Plaintiff] Kolshi was promoted to the second-highest member of management. He cannot recall receiving any negative performance evaluations or disciplinary actions. The only event that occurred affecting his employment was his brief suspension caused by a failed quality audit that he admits was serious. When [Plaintiff] Kolshi returned to work, upper management complemented [sic] his character and prior job performance. Nonetheless, [Plaintiff] Kolshi's pride was injured and he had already decided to resign. [Plaintiff] Kolshi cannot show that his three-day suspension was so objectively severe that a reasonable person in his position would have been compelled to resign.

(Doc. No. 52 at 50).

The Court is satisfied that Defendant has pointed to circumstances tending to indicate that Plaintiff Kolshi will be unable to show that his working conditions were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign.

Again, in deciding whether this first requirement is satisfied, the Sixth Circuit considers a number of factors, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *See Logan*, 259 F.3d at 569.

In response, Plaintiff Kolshi argues that he did, in fact, suffer a constructive discharge. Like Plaintiff Gomez, Plaintiff Kolshi has argued almost none of the applicable factors from *Logan*, but he does assert the existence of "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Logan*, 259 F.3d at 569. As with Plaintiff Gomez, to the extent that Plaintiff Kolshi argues circumstances beyond badgering, harassment, and humiliation based on discriminatory animus, they would fall into the category of "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions," but these kinds of circumstances are "are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994), quoted in *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004). At best, such circumstances could make some contribution towards a showing of intolerable working conditions, so the Court remarks on the evidence relating to such things.

As for the incidents (and comments) cited by Plaintiffs that colorably could be asserted as badgering, harassment, or humiliation, they do not implicate Plaintiff Kolshi's membership in a protected class or indeed any members of a protected class of which Kolshi is a member. As for those that do, Plaintiff Kolshi often provides no context to help the Court assess the extent to which a comment actually reflects discriminatory animus and actually would have contributed to a reasonable person's finding of intolerable working conditions. Plaintiffs refer to Griffin making "comments to [Plaintiff Kolshi] about being Albanian and making so much money." (Doc No. 74 at 13). Of course, such a comment could have been stated in a derogatory fashion, but it also could have been said in an admiring or amazed fashion, expressing how impressive it is for someone

immigrating from a country widely acknowledged as very poor[109] to have achieved financial success. The Court does not know how it was said and does not believe that it should take such pithy references to comments and construe them in the worst manner based on mere conjecture. The Court construes the evidence here in a light most favorable to Plaintiff Kolshi as the non-movant, but it does not draw speculative inferences from the evidence or conjure up evidence that is not there.

A great many of the alleged comments and actions on which Plaintiffs rely were not shown to have even been made known to Plaintiff Kolshi (as opposed to other Plaintiffs); for example, when Plaintiffs claim that "Benitez . . . heard Griffin make comments about Gomez's English language skills," (Doc. No. 74 at 13 (citing page 389 of Plaintiff Benitez's deposition)), their reference to the comments is so barebones that the Court lacks any context to say that these comments were heard by Plaintiff Gomez[110] or amounted in any way to a swipe at anyone in one of Plaintiff Gomez's protected class. Even more concerning here is that Plaintiffs characterize this testimony falsely. Page 389 does *not* include testimony from Plaintiff Benitez that he heard Griffin make comments about Gomez's language skills; the closest he gets is when he says something certainly different (and not shown at all to be based on personal knowledge), *i.e.*, that "[t]he reason why [Griffin] doesn't see Mr. Gomez capable or compatible is because he struggles to express himself or the way he express [sic] himself." (Doc. No. 72-1 at 389).

---

[109] *See, e.g.*, *Albania remains one of the poorest countries in Europe, suggests a report of the World Bank*, https://balkaneu.com/albania-remains-poorest-countries-europe-suggests-report-world-bank (last accessed October 6, 2021).

[110] As another example, Plaintiffs assert that "Griffin made comments about Hispanic women being good at sex," (Doc. No. 74 at 13 (citing page 219 of Plaintiff Benitez's deposition)), but one searches the cited page in vain for a reference to *Griffin* (as opposed to Plaintiff Benitez) using the term Hispanic (as opposed to Spanish) or to any indication that Plaintiff Gomez would have heard whatever referenced comments Griffin did make. (Doc. No. 72-1 at 219).

Other certain alleged circumstances seem more in the nature of mere personal perceptions or beliefs of Gomez or other Plaintiffs. As with Plaintiff Gomez, the Court does not see how a reasonable jury could find that a reasonable person in Plaintiff Kolshi's shoes would feel not just justifiably upset about some things at work, but rather *compelled* to resign. Like Plaintiff Gomez, Plaintiff Kolshi is hindered by Plaintiffs' approach of merely stringing together on behalf of all Plaintiffs numerous sentences that pithily paraphrase what cited depositions supposedly say, then conclusorily asserting that "intolerable conditions existed at the Goodlettsville plant." (Doc. No. 74 at 21). To meet his burden, Plaintiff Kolshi needed to explain cogently what someone in his shoes would have *objectively* perceived (rather than *personally* felt) in terms of intolerable conditions or events (excluding ones not reflective of discriminatory animus) and why those conditions or events would have been so intolerable that a reasonable person in his position in particular would have felt compelled to resign. Like Plaintiff Gomez, Plaintiff Kolshi simply did not do so.

Moreover, much of the specific evidentiary citations that ostensibly would support Plaintiff Kolshi's claim of constructive discharge fail to do so on closer inspection. Plaintiffs cite only page 236 of Plaintiff Kolshi's deposition for the proposition that in terms of feeling compelled to resign, "[f]or Kolshi, the breaking point was when Griffin told Kolshi that the second shift (B shift) operations manager, [Roger] Delepierre, did not report to him, but then Kolshi was held responsible and suspended without pay for a bad audit on B shift." (Doc. No. 74 at 12). But page 236 does not in any way indicate that this was the breaking point or indeed say anything about how Kolshi felt about this (a topic of limited significance in the required objective analysis anyway); at most, the testimony on this page suggests that Kolshi did not think this should have happened to him. Plaintiffs cite only Exhibit 21 to the deposition of Crystal Dyer (Doc. No. 64-1

at 228) for the proposition that "Delepierre, the assistant operations manager who oversaw B shift, was a Caucasian American and was not suspended." But neither Exhibit 21 to the deposition, nor indeed any testimony from that deposition, establishes that Delepierre was a Caucasian American.

Plaintiffs cite pages 121-122 of Plaintiff Kolshi's deposition (Doc. No. 65-1 at 121-122) for the proposition that "areas of criticism [conveyed by Dyer and Griffin] were frequently Plaintiffs' accents, English speaking skills, and religion." (Doc. No. 74 at 12). But these pages by no means support the notion that Plaintiffs were criticized for their accents and *English-speaking skills*. These pages of Kolshi's deposition would support this proposition only if one were to fill in all sorts of gaps in the testimony to bring meaning to the curt, non-specific language (such as "blasting," which may or may not refer to "criticism of English language skills or religion")[111] used by the deponent. And while these pages do support the notion that there was skepticism about at least one aspect of Plaintiff's religion (Islam), the only criticism referenced was some sort of disagreement regarding prayer times for Muslims.

Additionally, Plaintiff relies on testimony at page 112 of Plaintiff Kolshi's deposition (Doc. No. 65-1 at 112) for the proposition that Griffin frequently was "going after" him, Omar, and Benitez and "just nit-picking, just making our job just miserable." (Doc. No. 74 at 12-13). But Plaintiff Kolshi's testimony actually was that Griffin was going after "my [Plaintiff Kolshi's] generals" and not that Griffin was also going after Plaintiff Kolshi. And the testimony on that page

---

[111] The deposing attorney (counsel for Defendant) put it aptly in asking the key question "what was being said?" by Dyer about Islam, noting she did not know what "blasting" means. (Doc. No. 65-1 at 123). Plaintiff Kolshi's answer referred to "blasting" as a "disagreement" about prayer times; because "disagreement" may or may not involve criticism, this answer serves to illustrate that the "blasting" does not necessarily entail criticism of the kind that could contribute to the intolerability of working conditions. What the Court needs regarding such instances is more detail and more context as to what actually was said (and, ideally, also how it was said); otherwise, even construing the testimony in Plaintiff Kolshi's favor as required, the Court has difficulty finding that these instances contribute meaningfully to a finding of intolerable working conditions.

provides no detail about the nitpicking (and why such "nitpicking" was not perfectly appropriate considering the kind of carefulness that naturally is required in this kind of work to ensure food safety), except to indicate that it related to "mechanical" and "operation[al]" issues. This testimony makes no contribution to a showing that Plaintiff Kolshi was subjected to inappropriate (as opposed to entirely appropriate and even prudent) "nitpicking," let along to badgering based on a discriminatory animus.

Plaintiffs cite pages 205-206 of Plaintiff Kolshi's deposition for the proposition that comments of Griffin "persisted," but which they clearly mean to suggest "persisted [even] *after* Dyer verbally coached Griffin and reported it to her supervisor." (Doc. No. 74 at 13). But pages 205-206 in no way suggest to the Court this sequencing, *i.e.,* Griffin's continuation of comments even after being coached and reported up the chain. Once again, Plaintiffs have provided narrative content based on a citation to a rather pithy description of Griffin's comments largely devoid of content, and the Court cannot credit the narrative based on Plaintiffs' citation to the record.

Plaintiffs also cite five pages of Plaintiff Kolshi's deposition for the proposition that "American employees were treated more favorably than non-American born employees." (Doc No. 74 at 16). But none of the five pages contains testimony that actually support this proposition. In relevant part: (i) page 121 includes only Plaintiff Kolshi's *conclusory assertion* that Dyer discriminated against "non-Caucasian Americans"; (ii) page 129 includes only Plaintiff Kolshi's *conclusory assertion* that Griffin would nitpick non-Caucasians (without, Plaintiff Kolshi implies, nit-picking Caucasians); (iii) page 216 includes only Plaintiff Kolshi's conclusory assertion that he had seven comparators and personal perception that one of them in particular was treated better than he was; (iv) page 252 includes only Plaintiff Kolshi's testimony recounting in conclusory fashion that he had complained to Gordon and Sorensen about Griffin's mistreatment of non-

Caucasians; and (v) page 276 includes only Plaintiff Kolshi's personal perception that Dyer had "blast[ed]" Plaintiff Omar unfairly for some reason, perhaps having something to do with his religion. The cited testimony, however, either has not shown to be admissible (as based on personal knowledge), or establishes only Plaintiff Kolshi's personal view or personal perception. Thus, it fails to advance his showing that a reasonable person in his shoes, based on actual circumstances, *objectively* would have found conditions so intolerable that resignation was effectively compelled.

Still other deposition testimony of Plaintiff Kolshi is cited for propositions that do not contribute to a finding intolerable circumstances for *Plaintiff Kolshi* in particular, even if they could so contribute for someone else. This includes his testimony that he heard Dyer discourage Plaintiff Wahid and Plaintiff Gomez from moving to more advantageous shifts. (Doc. No. 74 at 17). It also includes his testimony that for some reason Griffin dumped trash out on Plaintiff Omar's desk; such action is not reflective of discriminatory animus towards Plaintiff Kolshi, and Plaintiff Kolshi did not contend so in the cited pages of his deposition (Doc. No. 65-1 at 194 and 196-197) or explain what if anything made him think that this action was discriminatory. Plaintiffs rely here on the claim that Griffin did not likewise throw trash on the desk(s) of any Caucasian Americans, but Plaintiff Kolshi's testimony does not reflect that Plaintiff Kolshi perceived this disparate treatment even if other Plaintiffs supposed did. Plaintiffs also cite, exclusively, page 195 of Plaintiff Kolshi's deposition for the proposition that "Griffin also threw dirty [fr]ocks on [Plaintiff Kolshi's] workspace as well but not on the desks of Caucasian Americans." (*Id.*). But page 195 does not indicate in any way whatsoever that Griffin did not throw dirty frocks on the desks of Caucasian Americans.

Plaintiffs also rely on Plaintiff's Kolshi's testimony that Griffin took a close picture of Omar and said to Kolshi, "Look at this Muslim Iraqi terrorist," and that Griffin referenced Muslim

employees and said "skinny bastards sticking their asses out. We should just go kick them in their ass while they're doing their praying." (Doc. No. 74 at 8-9). It is hard not to conclude that such comments are objectively offensive. But the question here is not whether these comments are dreadfully ignorant and absurd. The question is how far these comments go towards showing that a reasonable person in Plaintiff Kolshi's shoes would feel compelled to resign. For once, Plaintiffs here provide some context for the comments, and they show that these comments, however offensive they are, would have done little to make Plaintiff Kolshi's position objectively intolerable. Plaintiff Kolshi's testimony makes clear that neither of these comments was about him. He is not Iraqi and he did not pray, and Griffin's comments were about "them" rather than him (Plaintiff Kolshi). (Doc. No. 65-1 at 205). And although Plaintiff Kolshi is Muslim, "when it came to Muslims, [Griffin] didn't do it directly to me, but he would make comments in general." (*Id.*). Moreover, it is clear that Plaintiff Kolshi could and did talk to Griffin about these comments and that when he did, he spoke not as someone feeling like a target of the comments, but rather as coming to the defense of other persons who were targets. (*Id.*). In short, with respect to these comments, Plaintiff Kolshi was not a victim but rather (to his credit) the metaphorical adult in the room. Accordingly, whatever else can be said about the offensiveness of these comments (and any discriminatory animus they reflect that could be used in support of some aspect of some Plaintiffs' claims), these comments would not have done much to make a reasonable person in *Plaintiff Kolshi's* shoes find conditions so intolerable that such person would have felt compelled to resign.

On balance, construing the evidence cited by Plaintiff Kolshi in the light most favorable to him as required (while also discounting the cited testimony to the extent it is inadmissible due to, for example, lack of personal knowledge), the Court cannot say that it is sufficient to reach a jury on the issue of constructive discharge. The Court cannot conclude that a jury could find that an

objectively reasonably employee would have felt compelled by such conditions to resign. Accordingly, Plaintiff Gomez fails to show a genuine issue as to an adverse employment action.

As with Plaintiff Gomez, the Court undertook diligently to see whether admissible evidence suggested that someone in Plaintiff Kolshi's shoes would have found working conditions intolerable based on comments or actions made with a discriminatory animus. And as with Plaintiff Gomez, the Court sifted through Plaintiffs' cascade of paraphrasing of particular testimony, looked to see whether the cited testimony supported the paraphrasing, excluded testimony not shown to be admissible (based on, for example, whether personal knowledge was should or could reasonably be inferred), and determined what comments and actions would have been known to Plaintiff Kolshi and implicate one of his protected classes.

Ultimately, the Court could not find that those portions of the cited evidence that were admissible and relevant were sufficient to establish the first element of a constructive-discharge claim for Plaintiff Kolshi. The bar for establishing constructive discharge is not a low one. To clear the bar, Plaintiff Kolshi (and Plaintiff Gomez) needed a presentation of evidence that was more detailed, organized in a more plaintiff-specific way, comprised of citations to testimony that was not inadmissible based on speculativeness or lack of personal knowledge, and comprised of citations to testimony that consistently supported the propositions for which the respective citations were made.[112] Having failed to do so, Plaintiff Kolshi (like Plaintiff Gomez) fails in his

---

[112] In fairness to Plaintiffs, Defendant was not immune to citing testimony that does not support the proposition for which it was cited. For example, Defendant cited Plaintiff Gomez's deposition at pages 14 and 152-53 for the (undisputed, as it turns out) proposition that the person who replaced him when he resigned was Latino. (Doc. No. 73 at ¶ 29). Those pages actually do not support that proposition at all. No one is perfect, of course, but counsel are reminded to double check every citation to ensure that busy courts do not waste time looking for information that in fact does not exist.

claim of constructive discharge. Construing the evidence in the light most favorable to Plaintiff Kolshi on summary judgment, as it must, the Court finds that Plaintiff Kolshi has not shown a genuine dispute of material fact regarding whether he suffered a constructive discharge.

However, as noted, he has shown an adverse action in the form of his suspension without pay. Thus, the Court continues its analysis under the indirect-evidence framework based on this particular adverse action.[113] Regarding the fourth element of an indirect-evidence *prima facie* case,

---

[113] The Court realizes that Plaintiff Kolshi may have been in a much stronger position on the latter stages of the indirect-evidence framework had he been able to rely also on constructive discharge. In particular, the Court would have been very skeptical of any assertion that Defendant had a legitimate, non-discriminatory reason for doing something (constructively discharging Plaintiff Kolshi) Defendant denies even having done. And indeed it is not clear that Defendant has made such an assertion. If Defendant had made such an assertion, it would have been cognizable but likely unpersuasive.

It may seem strange that a court would even countenance a defendant denying that a constructive discharge took place and yet simultaneously asserting that there was a legitimate reason for doing so. One might ask how a defendant can have a good reason for taking an action the defendant insists never even took place. A defendant taking these alternative, and ostensibly inconsistent, positions is reminiscent of the proverbial defendant in a murder case who insists that he had nothing to do with the murder but that if he did, he was insane at the time. And yet a review of the case law suggests that courts allow a Title VII defendant to assert these two positions alternatively. *See*, *e.g.*, *Idom v. Natchez-Adams Sch. Dist.*, 115 F. Supp. 3d 792, 799–800 (S.D. Miss. 2015). For example, in *Embrico v. U.S. Steel Corp.*, 404 F. Supp. 2d 802 (E.D. Pa. 2005), *aff'd*, 245 F. App'x 184 (3d Cir. 2007), the defendant, U.S. Steel, moved for summary judgment on the plaintiff's age discrimination claim:

> Here, U.S. Steel makes two defenses. First, U.S. Steel presents its own evidence to contest Thomas's claim of constructive discharge, arguing that it should not have to provide a legitimate reason for Thomas's constructive discharge because Thomas was never constructively discharged in the first place. . . .

> U.S. Steel's second defense is that if Thomas were constructively discharged, it was because he lacked a technical background, not because of his age.

*Id.* at 823-24. The court rejected U.S. Steel's first argument, finding a genuine issue as to the existence of a constructive discharge. But it went on the consider U.S. Steel's alternative argument, finding that U.S. Steel had presented adequate evidence of a legitimate, non-discriminatory reason for the constructive discharge—and, what's more, found that the plaintiff failed to present adequate evidence that that the proffered reason in fact was pretextual.

Defendant argues that Plaintiff Kolshi has failed to point to a proper comparator. In its memorandum in support of its motion, understandably not being sure who Plaintiff Kolshi might assert as a comparator, it assumes that Delepierre and Griffin must be the alleged comparators and explains (albeit not as clearly as would be ideal) why they do not meet the standard for being a comparator of Kolshi. (Doc. No. 52 at 44-45, 48). This was minimally adequate to shift the burden to Plaintiff Kolshi to show a proper comparator.

In their Response Plaintiffs apparently assert that Delepierre, Steve Grant, and Yvettee Stone are proper comparators. (Doc. No. 74 at 25-27). But Ms. Stone is not a proper comparator

---

These cases suggest that there is nothing improper about a defendant disputing that whatever it did to the plaintiff amounted to constructively discharging him (meaning, creating conditions that would have compelled an objectively reasonable employee to resign) while also asserting that there was a legitimate reason for discharging him. The various cases are unclear as to whether a defendant properly may do that because (in the view of these courts) there is nothing especially inconsistent about the two alternative arguments or because a party can assert these alternative arguments even if they are very inconsistent. Notably, these courts seem to not look at whether there was a legitimate, non-discriminatory reason for *treating the plaintiff the way it treated him or her*, but rather whether there was a legitimate reason for *terminating the plaintiff*. The undersigned will follow the lead of such courts, allowing Defendant here to posit alternatively that what it did do did not amount to a constructive discharge and alternatively that the discharge (if any) was for a legitimate, non-discriminatory reason.

But in so doing, the Court must recognize that any defendant making the alternative second argument starts behind the metaphorical eight-ball. As noted above, although this is not always fully understood or clear, the defendant must show with evidence what the legitimate, non-discriminatory reason *actually was at the time of termination*—and not merely what, *in retrospect, could or would have been* a legitimate, non-discriminatory reason. If the defendant claims that there was no *constructive* termination (in order to refute that there was any adverse employment action), the defendant surely would be incentivized to take (and would take) the position that it did not *actually* terminate the plaintiff—in which case it would seem disingenuous for it to take the position that there was at the time in question *any* actual reason for termination (whether legitimate and non-discriminatory or otherwise). That is to say, if the defendant claims it did not *constructively* terminate the plaintiff , it very likely will also claim that it did not *actually* terminate the plaintiff, in which case it could hardly have evidence that at the time in question it had a valid reason for actually terminating the plaintiff.

All of which is to say that if the defendant comes up short on the question of constructive discharge, it may be out of luck from the get-go on the second stage of *McDonnell Douglas*.

because her situation—being suspended with rather than without pay—was in connection with an entirely different failed audit, and Plaintiff Kolshi has failed to show that whatever Yvette Stone wrongfully did or failed to do as revealed in the audit in her case was of comparable seriousness to what Defendant concluded Plaintiff Kolshi did as revealed in the audit in his case. *See Mitchell*, 964 F.2d at 583-84 (explaining that an employee is a proper comparator for the plaintiff only if the employee engaged in conduct of "comparable seriousness"). The same is true for Delepierre and Grant; Plaintiff simply does not explain how they did, or failed to do, something of a seriousness comparable to what the failed audit revealed that Plaintiff Kolshi did. And Plaintiffs badly overstate Grant's testimony when they cite it for the proposition that the fact that Griffin decided to keep Kolshi's suspension without pay is significant because *at the management level, suspensions have always been with pay*." (Doc. No. 74 at 26) (emphasis added). In fact, Grant's cited testimony does not stand for anything nearly so definitive as the italicized statement; what Grant actually said was substantially more (and doubly) qualified: "To the best of my knowledge, on the managers, most everything is with pay," referring only to suspensions "that I've been involved in." (Doc. No. 62-1 at 32). Therefore, Plaintiff Kolshi's indirect-evidence *prima facie* case fails due to insufficient evidence to satisfy its fourth element.

Alternatively the Court finds that it fails because Defendant has shown there was a legitimate, nondiscriminatory reason for Plaintiff Kolshi's suspension without pay, and Plaintiff Kolshi lacks sufficient evidence that this reason was pretextual. Defendant's asserted reason for suspending Plaintiff Kolshi was a failed audit by one of Defendant's largest customers in March 2017, which found multiple defects across a spectrum of products[114] and put Defendant's contract

---

[114] Plaintiff' Kolshi's response to Defendant's assertion that the March 2017 audit found multiple defects across a spectrum of products, (Doc. No. 73 at ¶ 211), seems wholly inappropriate. The response was, "Denied. The bad product was produced by B shift." (*Id.*). In context, it strikes the

with the customer in jeopardy. (Doc. No. 52 at 43-44; Doc. No. 73 at ¶¶ 210-12). Plaintiff Kolshi admitted in a meeting with Griffin and Gordon that the product was defective, but he attempted to shift the blame during the meeting by indicating that B shift (instead of his shift, A shift) was responsible for the defect. (Doc. No. 53 at 44). Gordon was angered by this response, told Plaintiff Kolshi that he was responsible because he was the Operations Manager, and suspended Plaintiff Kolshi for three days without pay. (*Id.*). Plaintiff Kolshi does not appear to dispute any of these facts, but he continues to maintain that he was not responsible (or at least not as responsible as certain other employees) for the defective product.[115] (Doc. No. 73 at 45-48). As has been previously noted in connection with Plaintiff Benitez's race-discrimination claim, it is not the role of the Court to second-guess the business judgment of an employer. *See e.g.*, *Lewis*, 702 F. App'x at 284. The Court finds that: (i) the proffered reason is legitimate and not discriminatory; and (ii) Defendant has presented evidence sufficient to support a finding that this proffered legitimate reason was the actual reason Defendant was suspending without pay and constructively

---

Court as rather clear that Plaintiff Kolshi was admitting this fact as stated, and that his purported denial was not a denial of this fact at all, but rather an attempt at providing additional context for the fact. A response is a place to admit or deny the fact as stated, not to provide context for the fact. Plaintiffs elsewhere have had opportunities to provide, and have provided, copious context to all kind of circumstances at issue in this case, and should not have rendered a confusing response in order to provide context right here.

[115] Plaintiff Kolshi does not dispute the facts in the Undisputed Statement of Facts. Then, in Plaintiffs' Response, he asserts that "the breaking point for him was when Griffin told Kolshi that the second shift (B shift) operations manager, Delepierre, did not report to him, but then Kolshi was held responsible and suspended without pay for a bad audit on B shift. Kolshi Depo., p. 236." (Doc. No. 74 at 120). But page 236 of Kolshi's deposition actually does not support this proposition; instead, it merely reflects Plaintiff Kolshi complaining about being held responsible (via a suspension) for what he maintains was not his responsibility. (Doc. No. 65-1 at 236). Another statement relevant to this assertion, "Griffin had changed the reporting hierarchy to have the assistant operations manager reporting directly to him instead of Kolshi months before this incident," contains no citation to the record at all. (Doc. No. 74 at 12). This same paragraph of the Response also contains a citation to Doc. No. 64-1 at 228, which shows that Delepierre was also disciplined for the incident. (*Id.*). The Court cannot credit this unsupported assertion by Plaintiff Kolshi regarding the reason (allegedly, his national origin) behind his suspension.

discharged. Thus, the Court finds that Defendant has presented a legitimate, nondiscriminatory reason for suspending Plaintiff Kolshi without pay for three days.

Thus, the burden shifts back to Plaintiff Kolshi to show that this reason was a pretext for discrimination based on his national origin. As previously discussed in connection with Plaintiff Benitez's race discrimination claim, Plaintiffs have made no specific arguments regarding pretext for each respective Plaintiff. There appears to be no support in the record that the reason for firing Plaintiff Kolshi was pretext, and Plaintiff has pointed the Court to none. Additionally, to the extent that Plaintiff Kolshi asks this Court to infer pretext based on his insistence that another employee alternatively or additionally been held responsible, the Court notes that Plaintiff's mere disagreement with Defendant's agreement to hold him responsible via suspension (which led to his resulting constructive discharge) is not sufficient to establish pretext.

Additionally, the Court finds that Plaintiff Kolshi's claim does not survive alternatively under a direct-evidence framework. Plaintiff Kolshi points to two examples of Griffin's comments as direct evidence of discrimination regarding his national origin: 1) a comment about Plaintiff Kolshi being Albanian and making a certain amount of money, and then dumping dirty clothing in front of Plaintiff Kolshi, and 2) Griffin talking about Plaintiff Kolshi being Albanian and "demean[ing] him in meetings". (Doc. No. 74 at 5, 13). The Court does not find these statements sufficient to constitute direct evidence of national origin discrimination. These incidents are isolated. Moreover, the comment in the first instance is ambiguous, in the sense that making a comment about someone being Albanian in connection with how much money that person makes is "subject to [being] interpreted in a benign, non-discriminatory way." *Zampierollo-Rheinfeldt*, 999 F.3d at 55. As for the alleged "demeaning," Plaintiffs cite only to page 315 of Plaintiff Benitez's deposition transcript (Doc. No. 72-1 at 315), and the transcript here reflects only that

Benitez recalled two occasions of this and that the demeaning comments were to the effect that Plaintiff Kolshi was an Albanian and in an operations manager position. (*Id.* at 315-16). While such comments might be better left unsaid, they do not suggest any desire to take adverse action against someone because they are Albanian. Furthermore, these comments do not appear to be connected (temporally, topically or otherwise) to Plaintiff Kolshi's alleged adverse employment action (suspension without pay). Additionally, they would require the Court to make an inference to link discriminatory intent with the adverse actions against Plaintiff Kolshi. Evidence of these statements is not direct evidence, because it "admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak*, 400 F.3d at 470 (quoting *Norbuta,* 1 Fed. Appx. at 313).

Therefore, the Court will grant summary judgment in favor of Defendant on Plaintiff Kolshi's national origin discrimination claim under Title VII and the THRA.

### iv. Plaintiff Gomez

Plaintiff Gomez's national origin is Colombian. (Doc. No. 52 at 11). Defendant argues that Plaintiffs Gomez's (and, for that matter, Plaintiff Wahid's) national origin discrimination claim is time-barred. To support each of these arguments, Defendant cites various documents in the record indicating the timeframe of the events that could potentially support Plaintiff Gomez's (and Plaintiff Wahid's) national-origin discrimination claim. (*Id.* at 16, 25).

But the Court finds this argument inapposite in light of *Green*, which makes clear that when a Title VII claim is based on a claim of constructive discharge, the limitations period begins running only as of the time of the constructive discharge (meaning, typically, the time of the employee's resignation). *Green*, 136 S. Ct. at 1777, 1780-81, 1782. Moreover, *Green* strongly suggests that if a claim is filed within the limitations period (counted from the time of the

constructive discharge), evidence of an event that contributed to the claim of constructive discharge is not time-barred from supporting such claim even if the event occurred outside the limitations period (meaning, in the case of Plaintiff Gomez and Plaintiff Wahid, that the event occurred more than 300 days prior to the filing of the EEOC charge). *See id.* at 1781-82. Defendant does nothing to indicate that the rule is other than what *Green* suggests it is. And this rule makes perfect sense; generally, a limitations period runs as to a claim, not as to discrete events that support the claim; likewise, the expiration of a limitations period time-bars a claim, not events that support the claim. *Id.* at 1782. A claim of constructive discharge is a claim that the plaintiff effectively suffered a discharge in violation of anti-discrimination laws (such as Title VII), so the limitations period runs only as to the claim of constructive discharge, not the discrete events that contributed to the alleged constructive discharge. As one district court put it, "a constructive discharge claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice,' for purposes of the charge filing requirement of Title VII." *Chavera v. Victoria Indep. Sch. Dist.*, 221 F. Supp. 2d 741, 749 (S.D. Tex. 2002). The constructive discharge *is* the unlawful employment practice, and the limitations period begins running from the time of the constructive discharge. Thus, the Court rejects Defendant's limitations argument as to Plaintiff Gomez (and Plaintiff Wahid).[116]

---

[116] The Court understands that it may seem unfair (or even absurd) to allow a plaintiff to attempt to prove that his or her resignation (on a particular date) within the limitations period was based on acts of discriminatory animus long preceding that date. After all, if the last such act long precedes the plaintiff's resignation, it may strain credulity to suggest that the plaintiff was driven to resign by those acts. But even if such a large time gap does not aid a defendant in asserting a *limitations* argument, it does help the defendant argue the *merits* of the claim of constructive discharge, which requires the plaintiff to show that a reasonable person in his or her shoes would have felt compelled to resign; to the extent that the acts of discriminatory animus cease long before the plaintiff resigns, it is less appropriate to conclude that the plaintiff would have felt compelled to resign *when the plaintiff resigned*, which is the time that matters. *See Thompson v. Kanabec Cty.*, 958 F.3d 698, 707 (8th Cir. 2020) (upholding summary judgment to the defendant on FMLA

Defendant is on firmer footing in challenging the third and fourth elements of Plaintiff Gomez's indirect-evidence *prima facie* case. Regarding the third element, as explained above, Plaintiff Gomez has failed to raise a genuine issue of material fact as to the existence of an adverse employment action (including a constructive discharge). That alone dooms his indirect-evidence theory.

Regarding the fourth element, the Court has found above (in connection with his claim of racial discrimination) that Plaintiff Gomez has not pointed to any valid comparators who were similarly situated to him, as Defendant placed upon him the burden to do, because he did not sufficiently show that his purported comparators actually were similarly situated to him. Plaintiff Gomez's purported comparators likewise fail to support his national-origin discrimination claim (which relies on the same comparators). That is not the end of the story here, however, because the fourth element alternatively can be satisfied by a showing that the plaintiff was replaced by someone outside his protected class, and Defendant does absolutely nothing to refute this alternative. In connection with his racial discrimination claim, Plaintiff could not possibly show that he was replaced by someone outside of his protected class; it is undisputed that he was replaced by someone of the same race (Latino). But for purposes of his national-origin discrimination claim, Plaintiff Gomez does have a shot of showing that he was replaced by someone outside his protected class (*i.e.*, someone who is not Colombian).

The first question is whether he even has any burden to do so. If the defendant preliminarily shows a lack of evidence of a valid comparator but not a lack of evidence of plaintiff's replacement

---

claim, due to lack of constructive discharge, on grounds that the plaintiff "was not working in intolerable conditions *at the time she resigned* [because at that time] had been on leave for over two months") (emphasis added).

by someone outside the protected class, has the defendant shifted the burden to the plaintiff on the fourth element? Not to its surprise, the Court was unable to find any authority on this issue even though it is a consequential one in many cases if the analysis is done thoroughly and properly. The Court can see arguments both ways. But ultimately, it must conclude that Sixth Circuit case law in no way suggests that a defendant's attack on the fourth element of an indirect-evidence *prima facie* case fails if the defendant does not successfully attack both alternatives for establishing the fourth element. Truth be told, the Sixth Circuit often speaks as if there is no initial burden on the defendant-movant to show preliminarily the absence of evidence to support an element. The Court concludes from this not that the Sixth Circuit recognizes no such burden (which clearly does exist) but rather that it is more inclined to ask whether the plaintiff has met his or her burden rather than whether the defendant-movant met its (preceding) burden. This may be why, even in the summary judgment (and not just trial) context, the Sixth Circuit often gives primacy the observation that "[i]t is well-established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination." *Mitchell*, 964 F.2d at 582.

    *Mitchell* is telling. There, while noting that the plaintiff has two options for satisfying the fourth element, and asking whether the plaintiff had met its burden of showing one of the two alternatives, the Sixth Circuit made no reference to whether the defendant had met its preliminary burden as to one, two, or neither of the alternatives. *Id.* at 583. Of course, there are several possible explanations for this, including conceivably that it was undisputed that the burden had shifted to the plaintiff to establish the fourth element or just that the Sixth Circuit simply thought this topic for some reason was not worth mentioning. But the Court is inclined to think that it strongly suggests that the plaintiff does not avoid shouldering the burden on the fourth element unless the defendant shows preliminarily a lack of evidence of either of the two alternatives. It seems more

likely to the Court that the Sixth Circuit's attitude would be that if the defendant-movant squarely makes an issue out of the fourth element, and then knocks out one of the two options for satisfying that element, it is incumbent on the plaintiff to show why he or she can raise a genuine issue as to the fourth element—especially when, as here, the plaintiff did not even make the argument that the burden had not shifted to it.

So the Court perceives that Plaintiff Gomez in fact had the burden of showing that the person who replaced him was not Colombian. It seems mathematically quite likely that this is the case, even though Plaintiff Gomez's replacement undisputedly was Latino, since Colombia is obviously only one of numerous countries in Latin America. But Plaintiff did nothing to show that this was the case. This is yet another example of both sides not getting down into the weeds enough in litigating the Motion. This may be understandable, given the huge number of claims, and even huger number of theories, involved in this case. But understandable or not, there was a failure here, and it results in an alternative reason for rejecting an indirect-evidence theory in support of Plaintiff Gomez's national-origin discrimination claim.

Plaintiffs assert that evidence in the record of discrimination constitutes direct evidence of discrimination against all Plaintiffs because of their national origin. Plaintiffs point to no evidence of comments relating to Colombia or Colombians in particular, so Plaintiff Gomez can rely upon only to the above-referenced comments by Griffin complaining about foreigners generally. (Doc. No. 74 at 9). But just as these comments were not direct evidence of national-origin discrimination against Plaintiff Omar and Plaintiff Benitez, they are not direct evidence of national-origin discrimination against Plaintiff Gomez; it is unclear that they pertain to Plaintiff Gomez in any way, let alone to an adverse employment action against him. To link these comments to an adverse action, the Court would have to draw an inference.

Because Plaintiff Gomez's indirect-evidence and direct-evidence theories of national-origin discrimination lack evidence required to reach a jury, the Court will grant summary judgment as to his claim of national-origin discrimination.

### v. Plaintiff Wahid

Plaintiff Wahid's national origin is Moroccan. (Doc. No. 52 at 22).

Defendant challenges the third and fourth elements of Plaintiff Gomez's indirect-evidence *prima facie* case of national origin discrimination.

Regarding the fourth element, the Court has found above (in connection with his claim of racial discrimination) that Plaintiff Wahid has not pointed to any valid comparators, as Defendant placed upon him the burden to do, because he did not sufficiently show that his purported comparators actually were similarly situated to him. Plaintiff Wahid's purported comparators likewise fail to support his national-origin discrimination claim (which relies on the same comparators). But Plaintiff Wahid still could prevail on this element by showing that he was replaced by someone outside his protected class (*i.e.*, by someone who was not Moroccan).[117] As the Court found above, the burden is on him to adduce evidence that this is the case. But Plaintiff has not even attempted to do so. Thus, he fails to raise a genuine issue as to the existence of the fourth element of his *prima facie* case of national-origin discrimination.

That alone dooms his indirect-evidence theory. The Court declines to address alternatively the third element of his *prima facie* case, *i.e.*, the existence of an adverse employment action (a constructive discharge).[118]

---

[117] It seems mathematically very likely that this was the case, if in fact Plaintiff Wahid was replaced by a particular person. But Plaintiff Wahid did not even try to make this showing.

[118] Relatedly, the Court notes that it rejects Defendant's statute-of-limitations argument related to Wahid's national-origin discrimination claim; as discussed herein, if Wahid's claim of

That leaves only the possibility of direct evidence of national-origin discrimination. Plaintiff Wahid points to two of Griffin's comments related to Morocco that he apparently asserts as, among other things, direct evidence of discrimination: 1) Griffin told Plaintiff Wahid that Plaintiff Wahid makes twice as much money in the United States as he would in Morocco, and 2) Griffin told Plaintiff Wahid, after another employee threatened Plaintiff Wahid with a machete, that Plaintiff Wahid did not need medical care because he is Moroccan. (Doc. No. 73 at ¶ 101). It is unclear from the record when the first statement was made; as for the second, as previously discussed, the machete incident took place sometime in 2016. While perhaps imprudent, these comments are not necessarily reflective of any particular animus towards Moroccans. Moreover, the comments were isolated and cannot be connected to any adverse action against Plaintiff Wahid.

Plaintiff Wahid is thus relegated to relying on Griffin's comments about foreigners generally. But as with his co-Plaintiffs, these comments are not direct evidence of discrimination against Plaintiff Wahid based on his national origin. None can be tied to Wahid, let alone to any adverse action against him. Moreover, Wahid did not testify to hearing any of them himself; this does not prove that the comments were not directed at him in some way, but the lack of evidence that he was on the receiving end of any of these comments serves further to illustrate the lack of connection between these comments and any adverse action against him based on a discriminatory animus.

Therefore, the Court will grant summary judgment on Plaintiff Wahid's national-origin discrimination claims under Title VII and the THRA.

---

constructive discharge is timely (which Defendant does not dispute), there is simply no issue as to whether some or all the underlying discriminatory acts were outside the limitations period.

In summary, for the reasons set forth in this section, the Court will grant summary judgment to Defendant on each Plaintiff's national-origin discrimination claim.

### c. Color Discrimination

Count V asserts claims of color discrimination under Title VII and the THRA on behalf of Plaintiff Wahid and Plaintiff Gomez. Defendant argues that Plaintiffs Gomez and Wahid's color discrimination claims are time-barred based on the timing of the discriminatory acts that underly their claims of constructive discharge. But as discussed above this argument is without merit in light of *Green* because the limitations period on a claim of constructive discharge runs only from the time of the constructive discharge.

Defendant fares better when it argues that, as with their claims of racial and national-origin discrimination, Plaintiff Wahid and Plaintiff Gomez have failed to point to a valid comparator in connection with their claims of color discrimination. (Doc. No. 52 at 17, 25). As noted above, Plaintiff Wahid and Plaintiff Gomez have indeed failed to point to a valid comparator in connection with those other claims because they have not pointed to any similarly-situated individuals outside of their protected classes. And they do not even attempt to explain how those same alleged comparators (or any other alleged comparators, for that matter) somehow are valid comparators for purposes of a claim of color discrimination.

Moreover, the Court can see no evidence in the record that would allow the Court to determine that they fit into the alleged protected class of darker-skinned persons, such that their situation could be compared with persons outside of that protected class. Although the Amended Complaint alleges that Plaintiff Gomez is a "dark-skinned" individual (Doc. No. 8 at ¶ 48), the Court is not aware of any evidence of this alleged fact in the record. And there appears to be no allegation in the Amended Complaint, or any evidence in the record, regarding the color of Plaintiff

Wahid's skin.[119] So the evidence is insufficient even to show that lighter-skinned persons belong to a different class than the color class to which Plaintiff Wahid and Plaintiff Gomez belong. So these Plaintiffs completely fail to show the fourth element of an indirect-evidence *prima facie* case of color discrimination. And Plaintiffs do not come close to even hinting at anything that might constitute direct evidence of color discrimination. So the claim of color discrimination fails at the summary-judgment stage on the merits.

In fact, these Plaintiffs do not address their color discrimination claim *at all* in their Response other than to note, when describing the claims brought in the Amended Complaint, that "[t]wo Plaintiffs, Gomez and Wahid, have also asserted color claims." (Doc. No. 74 at 2). Therefore, the Court finds alternatively that this claim has been abandoned by Plaintiffs Gomez and Wahid. *See Brown*, 545 F. App'x at 372.

Therefore, the Court will grant summary judgment to Defendant on both Plaintiff Wahid and Plaintiff Gomez's color discrimination claims under both Title VII and the THRA.

### d. Religious Discrimination[120]

---

[119] It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record).

[120] There appears to be some confusion regarding what kind of religious-discrimination claim Plaintiffs bring in the Amended Complaint. Defendant cites the Court to standards applicable to religious harassment and hostile work environment claims. It is unclear whether Defendant was citing the Court to this standard because Defendant believes Plaintiffs to have brought a claim for a religious hostile work environment claim or whether Defendant cited to this standard as support for its arguments disputing that certain Plaintiffs were subject to a constructive discharge.

In order to prevail on a hostile work environment claim based on religion: "a plaintiff must show 1) he or she was a member of a protected class, 2) he or she was subjected to unwanted religious harassment, 3) the harassment was based on the plaintiff's religion, 4) the harassment resulted in a hostile work environment and 5) the employer is liable." *Garcimonde-Fisher v.*

*Area203 Mktg., LLC*, 105 F. Supp. 3d 825, 837 (E.D. Tenn. 2015) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). Plaintiffs did not plead this claim in their Amended Complaint. Plaintiffs also did not address this claim in their Response. Therefore, the Court does not find that Plaintiffs have brought a claim for a hostile work environment based on religion, and if they did intend to bring such a claim, it has since been abandoned.

Additionally, it is unclear from the Amended Complaint whether Plaintiffs' religious-discrimination claim is grounded on the theory that they were terminated based on the religion or on a failure-to-accommodate theory. "Courts . . . have recognized, as a variant of a religious discrimination claim, a cause of action for an employer's failure to reasonably accommodate an employee's religious beliefs." *Mohamed v. 1st Class Staffing, LLC*, 286 F. Supp. 3d 884, 900 (S.D. Ohio 2017). The Sixth Circuit has explained that:

> The analysis of any religious accommodation case begins with the question of whether the employee has established a *prima facie* case of religious discrimination. Such a case is established when an employee shows that: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Turpen v. Missouri-Kansas-Texas R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir.1984). Once the employee has established a prima facie case, the burden shifts to the employer to prove that it cannot reasonably accommodate the employee without incurring undue hardship. *See, e.g.*, *id.*; *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 401 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S. Ct. 2848, 61 L.Ed.2d 290 (1979).

*Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987); *see also Tepper*, 505 F.3d at 513. Plaintiffs have not addressed the claim in the Response, and they have advanced no evidence that they hold a sincere religious belief that conflicts with an employment requirement, that they told Defendant about a conflict, or that they were discharged for this conduct. In fact, Plaintiff Omar admitted that Defendant never denied any of his requests to practice his Muslim faith at work (Doc. No. 52 at 39). Therefore, the Court concludes that this claim was never asserted in the first place and that even if it was, it has been abandoned.

Count IV asserted a claim of religious discrimination on behalf of Plaintiffs Wahid, Omar, and Kolshi. All three of these Plaintiffs identify as Muslim.[121] (Doc. No. 8 at ¶¶ 29, 65, 80).[122] The claims in Count IV are brought under Title VII and the THRA, and the same analysis applies under both statutes. *Burdette v. Fed. Exp. Corp.*, 367 F. App'x 628, 632 (6th Cir. 2010). Plaintiffs claim that they have presented direct evidence of religious discrimination. (Doc. No. 74 at 30). Plaintiffs alternatively claim that they have shown their *prima facie* cases under the *McDonnell-Douglas* framework. (*Id.*).

The three Plaintiffs bringing religious-discrimination claims contend that some remarks of Griffin pertain to all of them, without differentiation in their respective applicability to particular Plaintiffs:

---

[121] The Court has previously noted that throughout their Response, Plaintiffs seem to confuse their various discrimination claims and the evidence that can be used to support each claim. For example, in asserting particular Plaintiffs' claims of national-origin discrimination and race discrimination, Plaintiffs repeatedly points to evidence of comments derogatory to members of these Plaintiffs' religion (Islam). The Court has considered this evidence in discussing Plaintiffs' religious discrimination claims, but the Court does not consider such evidence when looking at race, national origin, and color discrimination claims, except for where it clearly overlaps with one of these types of discrimination (*i.e.*, evidence of Plaintiff Omar being called an "Iraqi Muslim," which appears to relate to both his national-origin and religious-discrimination claims).

[122] The fact that Plaintiffs Wahid and Omar identify as Muslim does not seem to be in dispute, although the fact was not included in the Statement of Undisputed Facts. Plaintiffs deny in the Statement of Undisputed Facts the statement "Plaintiff Kolshi admits that he is not a practicing Muslim," explaining: "Kolshi doesn't participate in prayer but he does participate in fasting. Kolshi Depo., p. 212." (Doc. No. 73 at 50). On page 212 of Plaintiff Kolshi's deposition, Plaintiff Kolshi responds to the question "Are you a practicing Muslim?" with an unequivocal "No." but goes on to provide context regarding the distinction between participating in Islamic prayer and practicing fasting during the Islamic holiday of Ramadan. (Doc. No. 65-1 at 212-213). The Court interprets this dispute to be more one of semantics than of underlying facts; it is a dispute only about what it means to be a "practicing" Muslim, *i.e.*, to "practice" Islam. Despite not participating in Islamic prayer, the record clearly indicates that Plaintiff Kolshi participates in at least one aspect of the Muslim faith (fasting) and clearly identifies himself as being Muslim: "I am a Muslim; so whether I practice or not, it's still my religion." (*Id.* at 214).

- Griffin said (in reference to Muslim employees) "skinny bastards sticking their asses out. We should just go kick them in their ass while they're doing their praying";

- Griffin made jokes about the way Muslim people wore their scarves, prayed, and washed themselves;

- Griffin said that Muslims were not serious about prayer and were working the system to pray;

- Griffin made jokes about a Somalian woman

(Doc. No. 74 at 8-9). The Court finds these remarks (referred to below as the "undifferentiated remarks") do not constitute direct evidence of religious discrimination against any of these Plaintiffs. While the statements are not ambiguous, because they are not subject to a benign interpretation, *Zampierollo-Rheinfeldt*, 999 F.3d at 55, the comments appear to be isolated, and would require the Court to draw an inference in order to link them with adverse actions against any of the three Plaintiffs bringing religious-discrimination claims. *Kocak*, 400 F.3d at 470 (quoting *Norbuta*, 1 Fed. Appx. at 313). Thus, success on Count IV will require each of the applicable Plaintiffs either to establish that something besides the undifferentiated remarks constitutes direct evidence of discrimination against him, or avoid summary judgment under an indirect-evidence theory.

### i. Plaintiff Wahid

Defendant argues that Plaintiff Wahid cannot show that he was constructively discharged on the basis of his religion, because (according to Defendant)[123] the only relevant events that even

---

[123] As with Plaintiff Kolshi, Defendant includes the constructive-discharge analysis as to Plaintiff Wahid in a separate section at the end of its analysis of Plaintiff Wahid's claims. However, it appears that although this analysis was physically separated from Defendant's discussion of Plaintiff Wahid's religious-discrimination claim and seemingly is directed at a separate "claim" of constructive discharge, it apparently was meant to refute the existence of an adverse action needed for a religious-discrimination claim.

arguably occurred within applicable limitations period were (i) comments of Griffin that either had nothing to do with Plaintiff Wahid (let alone Plaintiff Wahid's religion) and (ii) questions about Wahid's religion that (according to Defendant) were not objectively severe or intolerable enough to amount to constructive discharge. (Doc. No. 52 at 26, 29). But as noted above, if the constructive discharge itself occurred within the limitations period, the Court will not exclude, on limitations grounds, evidence of discrete acts that allegedly contributed to the alleged intolerable conditions resulting in the constructive discharge. In any event, the Court declines to consider whether Plaintiff Wahid suffered a constructive discharge, finding the resolution of such issue unnecessary because the Court determines herein that all of Plaintiff Wahid's claims are subject to summary judgment even assuming arguendo that he did suffer a constructive discharge.

In addition to the undifferentiated remarks, Plaintiff Wahid relies on Griffin's above-referenced posing of questions about Plaintiff Wahid's religion.[124] But as far as the current record shows, the referenced questioning was isolated, was ambiguous, and would require the Court to make an inference of discrimination. Asking questions about a particular religion is not necessarily the same as making a slur or speaking derogatorily about a religion—and indeed can be a sign of mere curiosity—and the fact that Griffin asked questions about Islam does not by itself mean that Griffin necessarily held animosity toward Muslim individuals. One would have to draw an inference to attribute such questioning to anti-Muslim animus, and one would have to draw a more major inference to conclude from such questioning that Griffin took any adverse employment action against Plaintiff Wahid based on any anti-Muslim animus. Therefore, the Court does not find such evidence to be direct evidence of discrimination.

---

[124] Defendant argues that the instances regarding the timing of prayer breaks occurred prior to the period at issue and should be time-barred. (Doc. No. 53 at 26). Because the Court does not find this to be direct evidence of discrimination, the Court need not address this argument.

Plaintiff Wahid points to some evidence, which he asserts constitutes direct evidence of discrimination, beyond evidence of Griffin's questions and the above-referenced undifferentiated remarks. Specifically, he points to evidence that: 1) prayer breaks at one point were timed, and 2) on two occasions he was not allowed to pray at the same time as other employees. But from these incidents, again, one would have to draw an inference (a shaky one at best) to attribute them to anti-Muslim animus. Therefore, the Court does not find such evidence to be direct evidence of discrimination.

Plaintiff Wahid's indirect-evidence *prima facie* case likewise fails. As explained above in connection with Plaintiff Wahid's claims of racial discrimination and national-origin discrimination, Plaintiff Wahid failed to show a proper comparator. That same is true with respect to his claim of religious discrimination. Therefore, the Court will grant summary judgment to Defendant on this Plaintiff Wahid's religious-discrimination claim under the THRA and Title VII.

ii.     Plaintiff Omar

Plaintiff Omar purports to have direct evidence of religious discrimination beyond the undifferentiated remarks, namely, evidence of Griffin's remarks (when showing a picture of Plaintiff Omar) about Plaintiff Omar looking like a terrorist or being a "Muslim Iraqi terrorist." (Doc. No. 74 at 8). Any such comments, of course, may be quite offensive and unwarranted, and would be properly characterized as "unambiguous" in that they are not "subject to be interpreted in a benign, non-discriminatory way." *Zampierollo-Rheinfeldt*, 999 F.3d at 55.

But as discussed above, the Court finds that these statements are isolated and unrelated to any adverse employment action, and so evidence of its making does not constitute direct evidence of religious discrimination. *Kocak*, 400 F.3d at 470 (quoting *Norbuta,* 1 Fed. Appx. at 313).

Plaintiffs' Response indicates from its location of its discussion of comparators, (Doc. No. 74 at 21), that Plaintiff Omar is relying on the same comparators for each of his Title VII claims, and Plaintiff Omar does not appear to point to any additional comparators beyond those (Rainey, Parker and Ausbrooks) discussed above in connection with his national-origin discrimination claim. The Court previously discussed why it found those comparators to be improper—namely, they were not similarly situated to Plaintiff Omar. And this finding goes for a claim of religious discrimination just as it did for a claim of national-origin discrimination. Moreover, the Court does not discern from the record that any of these three individuals are *necessarily* (rather than merely mathematically *likely* or *presumably*) outside of Plaintiff Omar's religious class. As a result, Plaintiff Omar has failed to show his indirect-evidence *prima facie* case for religious discrimination. And, even if he had done so, his indirect-evidence theory would fail because, as discussed below in connection with Plaintiff Omar's ADA discrimination claim, Defendant has shown with evidence a legitimate, non-discriminatory reason for his termination and Plaintiff Omar has not raised a genuine issue as to pretext. For these alternative reasons, Plaintiff Omar has failed to show his *prima facie* case under the indirect-evidence framework.

Therefore, the Court will grant summary judgment to Defendant on Plaintiff Omar's religious discrimination claim under the THRA and Title VII.

### iii.    Plaintiff Kolshi

Defendant argues that "[Plaintiff] Kolshi also purports to bring a claim for religious discrimination. However, when deposed [Plaintiff] Kolshi offered no evidence to support this claim as explained above." (Doc. No. 52 at 48). In the Response, Plaintiffs argue that Plaintiff Kolshi has shown direct evidence of religious discrimination and that he has shown his *prima facie* case under the indirect evidence framework. (Doc. No. 74 at 30-31).

To support his direct-evidence theory, Plaintiff Kolshi appears to point to one comment beyond the undifferentiated remarks, namely, that Griffin told Plaintiff Kolshi that it did not matter how much a Muslim prayed, because he would still go to hell. (Doc. No. 74 at 28). The Court finds that this additional isolated comment—inappropriate and ill-advised though it may be in the workplace—is not sufficient to constitute direct evidence of religious discrimination. One would have to draw an inference to connect this comment to an adverse employment action against Plaintiff Kolshi (particularly when considering that Griffin was referring to *other* Muslim employees, not Plaintiff Kolshi, who were praying); unquestionably, a manager can have a dire forecast for an employee's prospects for the afterlife and yet have no problem keeping them around as an employee in the present life.

Regarding the indirect-evidence framework, the Court found above in connection with his national-origin discrimination claim that Plaintiff Kolshi had failed to show a valid comparator because he has not shown that any alleged comparator engaged in comparably serious behavior. The Court there further found that Plaintiff Kolshi has not sufficiently raised a genuine issue as to (i) the existence of one alleged adverse employment action against him (his alleged constructive discharge); and (ii) pretext as to the adverse employment action against him, *i.e.,* as to whether the legitimate, non-discriminatory reason proffered (with evidence) by Defendant for his suspension without pay was not the actual reason. Plaintiff Kolshi did not, in the part of the Response addressing his religious-discrimination claim, somehow show the Court otherwise.[125] This is fatal to such claim.

_____

[125] Plaintiffs do note briefly that "[a]ll three [of the applicable Plaintiffs] have shown that any action Griffin took that might be presented as non-discriminatory such as policing the beef line because it is profitable is merely pretextual as others were not scrutinized or harassed in the manner Plaintiffs were, as was outlined more fully in the above Title VII analysis section." (Doc. No. 74 at 30). It is unclear how this argument relates specifically to Plaintiff Kolshi, and, as has been

Therefore, the Court will grant summary judgment to Defendant on Plaintiff Kolshi's religious discrimination claim under the THRA and Title VII.

## B. **Count II—Retaliation**

Count II asserts claims, on behalf of all Plaintiffs, under Title VII, the THRA, the Tennessee Public Protection Act, and Tennessee common law. Plaintiffs have abandoned their claims to the extent they were brought under the Tennessee Public Protection Act and Tennessee common law, (Doc. No. 58 at 2 n.1), and for that reason the Court will grant summary judgment for Defendant on these claims. *Brown*, 545 F. App'x at 372. For the remaining retaliation claims, the Court need conduct only one analysis because courts use the same analysis for retaliation claims under Title VII and the THRA. *Frazier v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at *6 (M.D. Tenn. May 11, 2010); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at **3, 8, 10 (M.D. Tenn. May 19, 2016).

Title VII makes it unlawful to retaliate against employees for engaging in protected conduct. *See* 42 U.S.C. § 2000e-3(a). "In order to establish a[n indirect-evidence] prima facie case of retaliation under Title VII, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008); *Accord Taylor*, 703 F.3d at 336 ("[Plaintiff] does not present direct evidence of retaliation, and, therefore, she must demonstrate by a preponderance of the evidence four elements: (1) she engaged in a protected activity under Title VII, (2) the exercise

---

discussed, the Title VII section of the Response did not contain a fulsome analysis of the pretext issue.

of protected rights was known by [her supervisor], (3) [her supervisor] took [an] adverse employment action against [Plaintiff], and (4) there was a causal connection between the adverse employment action and the protected activity."). The Sixth Circuit has noted that "the burden of establishing a *prima facie* case of retaliation is not onerous[.]" *Hatchett*, 186 F. App'x at 550 (internal quotation marks and citation omitted). Contributing to such lack of onerousness is the relatively broad notion of "adverse employment action" in the context of retaliation claims in particular. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) ("In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citation and internal quotation marks omitted).

Protected conduct includes opposing any practice made unlawful by Title VII, or making a charge or testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII. 28 U.S.C. § 2000e-3(a). Reporting or complaining of racist conduct to management also constitutes protected conduct. *Fite*, 686 F. Supp. 2d at 75; *Pendleton*, 2016 WL 2927983, at *8. Both retaliation and discriminatory termination (discussed above) are subject to the *McDonell-Douglas* framework if there is no direct evidence of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Thus, a plaintiff "'may prove [subject to the defendant's rebuttal as to why it took the adverse employment action(s)] unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework.'" *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)).

The Sixth Circuit has previously explained what is required to establish causation for purposes of an indirect-evidence *prima facie* case:

> To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a "but for" cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360, 133 S. Ct. 2517, 186 L.Ed.2d 503 (2013). In other words, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action" or otherwise engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). At the prima facie stage, this burden "is not onerous," and can be met through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.*

*George v. Youngstown State Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020). "[T]he plaintiffs must, among other things, show 'a causal link' between a protected activity and the adverse employment action. That is, the evidence 'must be sufficient to raise an inference that the protected activity,' such as complaining to management about racial harassment, 'was the likely reason for the adverse action.'" *Fite*, 686 F. Supp. 2d at 753 (quoting *Wade v. Knoxville Utils, Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). Or, to put it only slightly differently, "[t]o establish a causal connection between the protected activity and the adverse employment action, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected activity." *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 550 (6th Cir. 2006). Or to put it yet another way,

> In order to establish such a causal connection, a plaintiff must show some type of retaliatory intent. [The plaintiff] therefore had to establish that the true motivation for [the adverse employment action(s)] were not for the reasons given, but were instead based on the fact that he [engaged in protected conduct].

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).

The Sixth Circuit has held that the causal link can be inferred at the summary judgment

stage when the adverse employment action and the protected conduct occur close in time:

> With regard to the last element, establishment of a "causal connection" between the protected activity and the adverse employment action, "[a]lthough no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen*, 229 F.3d at 563. In fact, this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise. *See, e.g.*, *Brown v. ASD Computing Ctr.*, 519 F.Supp. 1096, 1116 (S.D. Ohio 1981) ("where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise"), *aff'd sub nom. Brown v. Mark*, 709 F.2d 1499 (6th Cir.1983); *see also Nguyen*, 229 F.3d at 567 (noting that there are instances in which "evidence of temporal proximity alone would be sufficient to support" an inference of a causal link); *Parnell v. West*, No. 95–2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997) (noting that although "[a] time lag of seven months does not necessarily support an inference of a causal link[,] previous cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months").

> Various of our sister circuits have also accepted this concept. *See, e.g.*, *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir.1988) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir.1986) ("[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge"); *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir.1982) ("causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980) ("proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment").

*DiCarlo*, 358 F.3d at 421. In *DiCarlo*, the Sixth Circuit found that granting summary judgment on

a retaliation claim was inappropriate when 21 days elapsed between the filing of an EEOC

complaint and the plaintiff's termination, finding that "the temporal proximity between the two

events is significant enough to constitute indirect evidence of a causal connection so as to create

an inference of retaliatory motive." *Id.* at 421-422. The Sixth Circuit later clarified its holding in *DiCarlo* after confusion arose as to the circumstances under which plaintiffs must present evidence of causation beyond mere temporal proximity:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

> The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (internal citation omitted). Therefore, in the Sixth Circuit, if an adverse employment action is "very close in time" after—*i.e.*, occurs "immediately" upon—protected conduct, the temporal proximity by itself can suffice to raise a genuine dispute as to causal connection in order to enable the retaliation claim to survive summary judgment, but if "some time" elapses the plaintiff must produce evidence of additional discriminatory conduct. Naturally, the devil may be in the details as to what does or does not fall within the quoted terms, which are rather subjective in nature.

"The burden of proof at the [indirect-evidence] *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). What this means is that the real battle regarding causation often will occur not at the *prima facie* case (first) stage, but rather at the latter two stages.

Regarding a direct-evidence theory of retaliation, the Court previously has noted:

> For a plaintiff to prevail under a theory of direct evidence of retaliation, he would have to show both "blatant remarks" revealing the defendant's retaliatory intent and that the retaliatory intent was a motivating factor in the defendant's adverse employment action toward him. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235–36 (6th Cir. 2017). As indicated above, direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination (or, here, retaliation) was at least a motivating factor in the employer's actions. *McGee*, 2017 WL 587856, at \*2. Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate (or retaliate) on the basis of some impermissible factor. *Publix*, 481 F. Supp. 3d at 697. Direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by discrimination or retaliation. *Id.* at 697-98. Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate (retaliate), but also that the employer acted on that predisposition. *Id.* at 698.

*Kostic v. United Parcel Serv., Inc.*, No. 3:18-CV-00556, 2021 WL 1213409, at \*15 (M.D. Tenn. Mar. 31, 2021). The Court does not perceive that Plaintiffs have pointed to anything they claim to be direct evidence of retaliation, and so it examines only whether Plaintiffs' retaliation claims survive under an indirect-evidence theory.

a. <u>Plaintiff Benitez</u>

Plaintiff Benitez took several protected actions: 1) he reported Dyer's treatment of foreigners to Sorenson, 2) he complained to McGaugh (at a meeting Griffin walked in on), 3) he filed a claim of discrimination with the EEOC, and 4) he filed this lawsuit and served Defendant. (Doc. No. 74 at 32, 34). Plaintiff Benitez argues that several events were retaliatory: 1) after his meeting with McGaugh, he was demoted; 2) after the filing of his claim with the EEOC, (a) Grant disciplined him due to an alleged unauthorized absence from the plant (though Plaintiff Benitez claims he gave notice to his supervisor, Plaintiff Kolshi), and (b) he was constructively discharged; and 3) after he served Defendant with process in this lawsuit, he was put on a PIP. (*Id.*).

As an initial matter, the Court agrees with Defendant's assertion, (Doc. No. 52 at 58 n.24), that the issuance of a PIP was not an adverse employment action against Plaintiff Benitez for purposes of his retaliation claim. True, as noted above, in this context the term is construed broadly. Nevertheless, "[i]n retaliation cases, performance improvement plans and non-satisfactory work reviews 'do not rise to the level of a materially adverse action' if they have a 'legitimate' motivation." *Lively v. Kroger Co. of Michigan*, No. 19-12961, 2021 WL 791024, at *7 (E.D. Mich. Mar. 2, 2021) (quoting *Choulagh v. Holder*, 528 F. App'x 432, 438 (6th Cir. 2013) ("None of the alleged retaliatory acts alleged resulted in a decrease in salary, a less distinguished title, or a loss of benefits. The placement on the performance improvement plan and the non-satisfactory work reviews had legitimate, non-retaliatory motivations and do not rise to the level of a materially adverse action.")); *Coleman v. Cardinal Health 200, LLC*, No. 12-11154, 2013 WL 5954428, at *13 (E.D. Mich. Nov. 7, 2013), *aff'd* (Aug. 7, 2014) (finding performance improvement plan not an adverse action for purposes of retaliation claim); *see also Thompson v. Ohio C.R. Comm'n*, No. C-1-06-479, 2009 WL 10679436, at *12 (S.D. Ohio July 7, 2009) (finding that a performance improvement plan could constitute adverse employment action in retaliation case when it forms part of the basis for a plaintiff's termination or is excessive in length). Defendant has pointed to evidence indicating a legitimate motivation for the PIP, (Doc. No. 72-1 at 220-21, 431-35), and Plaintiffs have done nothing to counter such indication, so Plaintiff Benitez's PIP does not constitute an adverse employment action.

Moreover, as noted above, the Court declines to consider Plaintiff Benitez's belated claim of constructive discharge, and he has not specifically explained why Grant's more general acts of discipline (or harassment) amount to adverse employment action(s).

Therefore, Plaintiff Benitez's retaliation claim can prevail based solely on the same adverse action as his race discrimination claim: his demotion. In other words, although such demotion suffices to establish the third element of Plaintiff Benitez's *prima facie* case of retaliation, the fourth element can be established only via a causal connection between his protected activity and *his demotion* in particular.

Defendant argues essentially that Plaintiff Benitez's retaliation claim should fail because he cannot 1) establish a causal connection between his complaints and the alleged retaliatory adverse employment action(s) (meaning, in light of the Court's conclusions above, only his demotion), and 2) show pretext. (Doc. No. 52 at 58). To support these propositions, Defendant cites to relevant case law and to the record to explain the lack of causal connection. (*Id.* at 54-55, 58). Thus, the Court finds that the burden has shifted to Plaintiffs regarding whether there is a causal connection.

Plaintiff Benitez claims that he has raised a genuine issue as to whether the decision to demote him came before or after he complained to McGaugh about Griffin's conduct. (Doc. No. 74 at 33-34). This alleged complaining by McGaugh supposedly occurred during a visit of McGaugh to the plant, and the Court finds that Plaintiff Benitez has raised a genuine issue that he did in fact so complain.[126] As to whether this complaint occurred before or after Plaintiff Benitez's demotion, the Court likewise finds that Plaintiff Benitez has raised a genuine issue. Citing page 32

---

[126] The Court finds sufficient evidence to support, for present purposes, Plaintiff Benitez's claim that he complained to McGaugh about Griffin's conduct. Plaintiff concedes that "McGaugh testified he didn't meet with [Plaintiff] Benitez in 2017." (Doc. No. 74 at 34). As Plaintiff correctly notes, (*id.* at 34), Plaintiff Benitez and Grant both testified to the effect that Plaintiff Benitez complained to McGaugh and that Plaintiff Benitez was demoted after so complaining (even though only Plaintiff Benitez testified that he complained to McGaugh a*bout Griffin*). (Doc. No. 37-2 at 12-13; Doc. No. 62-1 at 59-62). Therefore, construing the evidence in the light most favorable to Plaintiff Benitez for purposes of summary judgment, the Court finds that there is a genuine dispute as to whether Plaintiff Benitez met with McGaugh to complain about Griffin's conduct.

of McGaugh's deposition transcript, Defendant claims that "McGaugh visited the Goodlettsville plant on June 20 through June 22, 2017, which was after [Defendant] demoted Benitez." (McGaugh Dep. at 32). "McGaugh's visit to the plant occurred *after* Benitez was demoted." (Doc. No. 52 at 54). But citing pages 169-170 of Plaintiff Benitez's deposition (Doc. No. 37-2 at 12-13), Plaintiffs claim that McGaugh's relevant visit was "around May or June of 2017" and that he (Plaintiff Benitez) was demoted "[s]hortly after," on June 19, 2017. (Doc. No. 74 at 33-34). This is problematic for two reasons. First, the cited testimony says nothing about what month the visit took place, be it May or June of 2017 or otherwise. Second, Plaintiffs' claim leaves open the possibility that as many as seven weeks passed between the visit and the demotion on June 19, 2017.[127] Yet Plaintiffs ignore the fact, which actually inures to Plaintiff Benitez's benefit, that Plaintiff Benitez's cited testimony in fact suggests McGaugh's visit occurred the week prior to "the day of his demotion," a date he does not identify here but does not need to in order to suggest a close temporal connection between his demotion and his alleged complaint to McGaugh about Griffin. Based on this testimony, as well as Grant's testimony that the demotion came after Plaintiff Benitez's complaining to McGaugh, the Court agrees that Plaintiff Benitez has raised a genuine issue as to whether his complaint came before his demotion. To this point in the analysis, Plaintiff Benitez has kept alive the possibility of a causal connection between his complaining to McGaugh and his being demoted.

Even so, it turns out that Plaintiff Benitez nevertheless cannot meet even the relatively slight burden to show the causal connection for purposes of an indirect-evidence *prima facie* case. "An employment decision cannot be caused by protected activity if the decision-maker did not

---

[127] Specifically, it leaves open the possibility that McGaugh's visit was on May 1, 2017, which is seven weeks before June 19.

know about the protected activity." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 526 (6th Cir. 2015) (citing *Mulhall v. Ashcroft,* 287 F.3d 543, 551 (6th Cir. 2002)). Plaintiff simply has not pointed to evidence sufficient to support a finding that the alleged protected activity (the complaining to McGaugh) was known to the person (or any person) who made the decision to demote him. Indeed, Plaintiff fails even to identify such decision-maker(s). In arguing that Plaintiff Benitez's retaliation claim fails for lack of causal connection, Defendant implies that it was Griffin. (Doc. No. 52 at 58) ("Further, Griffin was unaware of this complaint to McGaugh."). The Court is not so sure this is the case, although Plaintiff Benitez appeared to suggest this in one place in his deposition testimony. (Doc. No. 72-1 at 174). But in any event, having reviewed Plaintiff's briefing, and all of the evidence (the testimony of Griffin, Dyer, and Plaintiff Benitez, and one deposition exhibit) cited by Plaintiffs regarding the demotion,[128] the Court still cannot determine who Plaintiff Benitez claims made the decision to demote him, much less determine whether such person(s) actually made the decision, let alone determine that such person was aware of Plaintiff Benitez's complaining to McGaugh. In actuality, the Court was not even required to undertake such efforts to see whether it could make such determinations; it was incumbent upon Plaintiff Benitez make all of this clear to the Court, and he failed to do so.

Even if the Court were to accept this as sufficient evidence of causation, such that Plaintiff Benitez is deemed to have established this final piece of his indirect-evidence *prima facie* case of retaliation, his indirect evidence theory still would fail. As the Court has found (in its discussion of Plaintiff Benitez's race discrimination claims) Defendant has shown a legitimate, nondiscriminatory (and non-retaliatory) reason for demoting Plaintiff Benitez, and Plaintiff Benitez again has made no argument that this reason was pretextual and that the real reason was

---

[128] Most of Plaintiffs' citations to such evidence are found at Docket No. 74 at 14, 34,

his protected activity. The Court would add that it perceives that in his briefing regarding his retaliation claim in particular, Plaintiff Benitez actually cites no evidence to the effect that he complained to McGaugh specifically about conduct of Griffin *that would be in violation of anti-discrimination laws* (as opposed to complaining more generally about Griffin). This certainly does not help the Court find as required that the real reason for the demotion was Plaintiff Benitez engaging *protected conduct*—meaning, under Plaintiff Benitez's theory here, his complaining about Griffin's *acts of discrimination*.

So for multiple reasons, his retaliation claim does not survive the Motion on an indirect-evidence theory. And it appears that Plaintiff Benitez does not assert the existence of any direct evidence of retaliation. Therefore, the Court will grant summary judgment to Defendant on Plaintiff Benitez's retaliation claim.

### b. Plaintiff Omar

According to Defendant, Plaintiff Omar identifies three instances of protected conduct: 1) a complaint to Dyer about Griffin, 2) a complaint to Sorensen about Dyer, and 3) a complaint to Kolshi about Griffin.[129] (Doc. No. 52 at 39; Doc. No. 74 at 31). Defendant does not dispute that these instances qualify as protected conduct.[130] Instead, Defendant argues that it is entitled to

---

[129] It is unclear to the Court whether Plaintiff Omar argues that his reporting Griffin's comments about Albanians and/or poor treatment of Omar and Benitez constitutes an instance of protected activity, or that Plaintiff's reporting Griffin's retaliation thereafter to Kolshi is protected activity, or that both are protected activity. Either instance would fall under Title VII's opposition clause, in which "[protected activity] . . . covers conduct such as complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices [. . .]" *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 578 (6th Cir. 2000) (internal citations omitted)).

[130] In its summary judgment motion Defendant does not address (or even identify) Omar's third instance of alleged protected conduct.

summary judgment because 1) Defendant did not take an adverse action against him, 2) there is no causal connection between his complaints and any adverse action, and 3) Plaintiff Omar cannot establish pretext. (Doc. No. 52 at 39).

There are several instances noted in both parties' briefing that conceivably could serve as Plaintiff Omar's adverse action for purposes of his retaliation claim:[131] 1) his termination, 2) Griffin visiting his department frequently and admonishing him as to certain issues, and 3) Dyer embarrassing/talking down to him in meetings. (Doc. No. 74 at 31-32).

Defendant does not address the first of these, and in any event, as previously discussed, a termination is an adverse action. *E.g.*, *Eberhardt*, 2007 WL 518896, at *6. However, Plaintiff Omar has made no attempt to causally link his termination with any of his protected activities. Therefore, the Court finds that Plaintiff Omar has failed to raise a genuine dispute of material fact as to whether a protected activity caused his termination; this is fatal to his indirect-evidence *prima facie* case of retaliation based on his termination in particular.

As for the second and third of these possible adverse actions, Defendant sufficiently explains why it contends that the facts in the record are insufficient to support a finding that they are adverse actions, and it cites relevant case law. (Doc. No. 52 at 39-40).[132] Thus, the Court finds that the burden has shifted to Plaintiff Omar to show that these are adverse actions.

---

[131] In connection with his national origin-discrimination claim, Plaintiff Omar did not assert any adverse actions beyond termination. It appears likely that he asserts additional adverse actions in connection with his retaliation claim to increase his chances of establishing a causal connection between an adverse action and his protected conduct as required for his *prima facie* case of retaliation; an indirect-evidence *prima facie* case of general discrimination requires no such similar causal connection, and so this same concern was inapplicable in connection with his national original-discrimination claim, which did not involve alleged retaliation.

[132] In the last line on page 39 of its memorandum in support of its Motion, Defendant clearly omitted (inadvertently) the word "not" before the words "adverse actions". (Doc. No. 52 at 39)

The Court notes that embarrassing a plaintiff is not typically an adverse action. As one court explained:

> "Normally, petty slights, minor irritations, or the simple lack of civility will not deter a complainant." *Heintz v. Fayette County Area Vocational Tech. Sch.*, No. 07–1174, 2009 WL 1362044, at *10 (W.D. Pa. May 14, 2009) (citing *DiCampli v. Korman Communities*, 257 Fed. App. 497, 501 (3d Cir. 2007)). *See also Scott v. Dismas Charities, Inc.*, Civil Action No. l:05–CV–3267–TWT, 2007 WL 2746697, at *1 (N.D. Ga. Sept.17, 2007) (citation omitted). Indeed, "[a] supervisor's 'upbraiding' or 'criticizing' an employee for pursuing a discrimination claim generally does not amount to actionable retaliation as a matter of law." *Slater v. Town of Exeter*, Civil No. 07–cv–407–JL, 2009 WL 737112, at *9 (D.N.H. Mar.20, 2009) (quoting *Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) ("ruling that defendant supervisor did not retaliate as a matter of law by calling plaintiff into his office and accusing her of trying to embarrass him before his superiors")). *See also Bussell v. Motorola, Inc.*, 228 Fed. App. 832 (11th Cir. 2006) (finding that occasional yelling by a supervisor is not actionable harassment under [*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)]). In fact, " '[t]he Supreme Court . . . has emphasized that sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims." *Slater*, 2009 WL 737112, at *9 (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("ruling that a boss's 'profanity-laden yelling'-including threats to have plaintiff removed from the workplace in handcuffs—did not show actionable retaliation") (citations omitted)).
>
> "To be sure, few employees, particularly those new to the job or career, would look forward to a showdown with a supervisor . . . , but '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.' " *Id.* at *10 (quoting *Burlington N.*, 548 U.S. at 68). "And the fact is that a boss's yelling at an employee, subjecting the employee to unjustifiable criticism, and calling into question his or her future on the job is a common employee experience." *Id.* (footnote omitted). *See also Pierri v. Cingular Wireless, LLC*, 397 F. Supp. 2d 1364, 1380 (N.D. Ga. 2005) ("Job performance criticism from a supervisor or manager is a common vicissitude of life in the working world, even if harsh or unjustified."). Thus, the Court finds that the confrontation with Clem was not an adverse action.

*Carrio v. Apollo Grp.*, No. CIVA 1:07-CV-1814BBM, 2009 WL 2460983, at *14 (N.D. Ga. Aug. 7, 2009).[133] The Court agrees with this case. Therefore, Dyer's embarrassing Plaintiff Omar does

---

[133] Although *Carrio* does not make this clear, *Baloch* (quoted in *Slater*) was citing *Burlington N.*, 548 U.S. at 68.

not constitute an adverse action, even under the more lenient standard applicable to retaliation as opposed to general discrimination claims.[134]

Citing primarily *Williams v. City of Burns*, 465 S.W.3d 96, 122 (Tenn. 2015), and then five other cases, Plaintiffs argue that "[w]hen an employee is subjected to heightened scrutiny soon after engaging in protected conduct, this is evidence." (Doc. No. 74 at 31). Plaintiffs do not even say—and the parentheticals provided with their case cites do not clearly indicate, and certainly do not indicate with any consistency—what this heightened scrutiny supposedly is evidence *of*.[135] Certainly, heightened scrutiny evidences *something*, but Plaintiffs are unclear what it evidences or what the legal significance is of whatever is thus evidenced. To the extent that Plaintiffs argue that heightened scrutiny is a type of adverse action, Plaintiffs have oversimplified the case law. None of the cases cited by Plaintiff Omar indicates that intensified scrutiny by itself can constitute an

---

[134] The Second Circuit has stated that "[a]cts that humiliate or undermine an employee's authority with subordinates can constitute adverse action supporting a claim for retaliation whether or not accompanied by any pecuniary injury." *Kirkweg v. New York City Dep't of Educ.*, 633 F. App'x 40, 41 (2d Cir. 2016) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154-55 (2d Cir. 2000)). *Kirkweg* did not explain the basis for *Howley*'s rule, or its implication that *Howley*'s rule survived the Supreme Court's decision in *Burlington N.*, which post-dated *Howley* by six years. But in any event, it does not appear that Plaintiff Omar claims any effect on his authority with his subordinates, as opposed to mere embarrassment, and so *Howley*'s rule would be inapplicable here even assuming it should be followed at this juncture by courts in the Sixth Circuit.

[135] Plaintiffs do not include a parenthetical along with their citation to *Williams* (although they do with the other five cases). But clearly they are invoking *Williams*'s statement that "[w]hen an employee is subjected to heightened scrutiny soon after engaging in protected conduct, this is evidence of pretext." *Williams*, 465 S.W.3d at 122. In paraphrasing this part of Williams, Plaintiffs unhelpfully has omitted "of pretext." At most, *Williams* stands for the proposition that heightened scrutiny can be evidence of pretext—not that it is evidence of an adverse action, let alone that it *constitutes* an adverse action by itself. The same can be said for another case cited here by Plaintiffs, *Lee v. N.M. State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265 (D.N.M. 2000). *See id.* at 1280 ("Additional evidence of pretext is demonstrated by the heightened scrutiny and differential treatment to which Plaintiff was subjected.").

adverse action—and this is true even if one assumes what Plaintiff has not even asserted, *i.e.*, that heightened scrutiny is evidence of an adverse action.

The undersigned previously has held that increased supervision of an employee does not constitute an adverse action for purposes of a general discrimination claim:

> Generally speaking, neither increased surveillance nor discipline, whether warranted or not, constitutes a material adverse change in the terms of employment in the discrimination context because those actions do not constitute a significant change in employment status as do things such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Rim v. Lab. Mgmt. Consultants, Inc.*, No. 3:18-cv-00911, 2019 WL 5898633, at *10 (M.D. Tenn. Nov. 12, 2019). The Sixth Circuit has never held that temporarily increasing an employee's workload is a materially adverse employment action. *Courts v. Correct Care Sols., LLC*, No. 3:17-cv-00944, 2019 WL 3425892, at *5 (M.D. Tenn. July 30, 2019). Conduct that does not amount to a materially adverse employment action includes close supervision and written warnings. *Andrews v. Lockheed Martin Energy Sys., Inc.*, No. 3:06-CV-42, 2006 WL 2711818, at *11 (E.D. Tenn. Sept. 21, 2006); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 451 (6th Cir. 2004) (close supervision); *Williams v. AP Parts, Inc.*, 252 F. Supp. 2d 495, 498 (N.D. Ohio 2003) (written warnings) . . . The Court agrees that the alleged over-supervision and difficult workloads are not adverse employment actions for purposes of Plaintiff's discrimination claims.

*Kostic*, 2021 WL 1213409, at *12. As discussed above, it is true that in the retaliation context, "adverse employment action" is construed more broadly and includes anything that would have dissuaded a reasonable worker from exercising his rights under federal anti-discrimination laws. But the Court finds that even under the broader construction, mere heightened scrutiny does suffice. Heightened scrutiny may be rather unwelcome for typical—although not necessarily all[136]—workers, but in some cases, increased scrutiny undeniably is neither inappropriate not unexpected. Ultimately, the Court cannot say that by itself increased scrutiny is necessarily so

---

[136] Some workers may welcome increased scrutiny at least under certain circumstances, as it might better enable them to prove themselves worthy or dispel any potential questions regarding their ability to perform adequately on the job.

harassing, disconcerting, or otherwise unpleasant or menacing that a worker would choose to forego exercising their federal rights rather than be subjected to it.

Plaintiffs generally argue that "[t]here was a clear causal connection between the escalating intensity of events and the Plaintiff's attempts to oppose and report this illegal behavior all of which culminated in Plaintiffs no longer being employed by [Defendant] Tyson." (Doc. No. 74 at 36). However, even if this is true, it is irrelevant because Plaintiffs' task is not to establish a causal connection between an "escalating intensity of events" and protected conduct; instead, Plaintiffs must establish a causal connection between protected conduct and something cognizable as *an adverse action* for purposes of a retaliation claim. And Plaintiffs offer the Court no analysis for how the particular adverse action Plaintiff Omar did suffer —his termination—was causally linked with Plaintiff Omar's protected activities. Ultimately, he has not raised a genuine issue regarding the existence of a causal connection between his termination and his protected conduct.

Moreover, as discussed below in connection with Plaintiff Omar's disability discrimination claim, Defendant has proffered evidence that Plaintiff Omar was terminated for a repeated failure to return documentation required to excuse his continued absence from work, and Plaintiff Omar has done nothing to show that this legitimate, non-retaliatory reason was pretextual and that the real reason was any of his protected conduct.

Therefore, the Court finds that Plaintiff Omar has not established that he was subject to an adverse employment action other than termination, and he has not established the required causation between his protected conduct and his termination. The Court will grant summary judgment to Defendant on this Count as it relates to Plaintiff Omar.

c.  <u>Plaintiff Kolshi</u>

Plaintiff Kolshi contends that he was retaliated against by Griffin for confronting Griffin about Griffin's treatment of the other Plaintiffs and Griffin's comments about Albanians. (Doc. No. 74 at 31). Regarding the nature of the retaliation (the various adverse employment actions), Plaintiff Kolshi seems to assert that he suffered 1) increased scrutiny and comments (Griffin walking the production floor, giving him dirty looks, and yelling at the Generals), and 2) suspension without pay and constructive discharge. (Doc. No. 74 at 31-36). The Court has already discussed at length (in connection with Plaintiff Omar's retaliation claim) that increased scrutiny alone is not an adverse action. The Court has also explained (in connection with Plaintiff Kolshi's national origin-discrimination claim) that Plaintiff Kolshi has failed to raise a genuine issue that he was constructively discharged but has shown that he was suspended without pay. But his suspension must have a causal connection with the protected conduct or else the indirect-evidence *prima facie* case of retaliation fails.

Defendant asserts that this claim fails because 1) Plaintiff Kolshi did not suffer an adverse employment action, 2) there is no causal connection, and 3) he cannot show pretext. (Doc. No. 52 at 49). But Defendant actually fails to marshal a separate argument that Plaintiff Kolshi suffered *no* adverse employment action *at all*, and any such argument would have been unsuccessful because Plaintiff Kolshi undeniably suffered suspension without pay.

Instead, what Defendant actually does here is argue that Plaintiff Kolshi lacks evidence that any adverse employment action (meaning, now, only his suspension without pay) was causally linked to his protected conduct (his confrontation with Griffin). (*Id.* at 47-49). Thus, the Court finds that Defendant has shifted the burden to Plaintiff on the element (of an indirect-evidence *prima facie* case) of causal connection.

Finally, as noted above in connection with Plaintiff Omar, Plaintiffs argue that "[t]here was a clear causal connection between the escalating intensity of events and the Plaintiff's [sic] attempts to oppose and report this illegal behavior all of which culminated in Plaintiffs no longer being employed by [Defendant] Tyson." (Doc. No. 74 at 36). But again, as noted above, Plaintiffs need to show a genuine issue as to a link between protected conduct and *an adverse employment action* (as opposed to an "*escalating intensity of events*," whatever that means).

Plaintiff Kolshi does not even attempt to do so. He makes no attempt to link his protected activity with his suspension without pay. And even if he had successfully done so, and thus raised a genuine issue as to his *prima facie* case, Plaintiff Kolshi's retaliation claim still would be subject to summary judgment for an alternative reason. Specifically, the Court has already found that Defendant presented adequate evidence of a legitimate, nondiscriminatory (and non-retaliatory) reason to suspend Plaintiff Kolshi, so it is incumbent upon Plaintiff Kolshi to raise a genuine issue as to pretext. And Plaintiff Kolshi has not raised a genuine issue of material fact that the proffered reason was not the real reason and that instead his protected conduct was the real reason.

Therefore, the Court will grant summary judgment to Defendant on this Count as it relates to Plaintiff Kolshi.

d. Plaintiffs Gomez and Wahid

Defendant argues that Plaintiff Gomez's retaliation claim fails for several reasons: 1) it is time-barred, 2) he cannot show that he engaged in protected activity, and 3) he cannot show that Defendant took an adverse action against him. (Doc. No. 52 at 18). Defendant argues that Plaintiff Wahid's retaliation claim fails because 1) it is time-barred, 2) he cannot show that he engaged in a protected activity, 3) he cannot show a causal connection between his complaints and the promotion decisions, and 4) he cannot show pretext. (Doc. No. 52 at 27). In their Response,

Plaintiffs do not appear to discuss either Plaintiff Gomez or Plaintiff Wahid's retaliation claims. Defendant argues that the Court should deem these claims abandoned and dismiss them. (Doc. No. 81 at 14).

As discussed above in multiple places, the Court rejects Defendant's argument that the events underlying a claim of constructive discharge are excluded based on the statute of limitations even if the claim of constructive discharge is not barred by the statute of limitations. However, the Court agrees with Defendant that the retaliation claims of Plaintiff Gomez and Plaintiff Wahid are abandoned. Therefore, the Court will grant summary judgment to Defendant on Plaintiffs Wahid and Gomez's retaliation claims under Title VII and the THRA.

In summary, for the reasons discussed herein, the Court will grant Defendant's Motion as to all Plaintiffs' retaliation claims.

### C. Count III—Negligent hiring, retention, and supervision practices

Count III asserts claims, on behalf of all Plaintiffs, negligent hiring, retention, and supervision practices. Defendant argues that these claims fail because they are barred by the exclusive remedy provision of the Tennessee Worker's Compensation Act ("TWCA"). (Doc. No. 52 at 60). Plaintiffs respond that Defendant has misread the case law and that the exclusive-remedy provision is not triggered unless an employee suffers an injury or death. (Doc. No. 74 at 37). As Defendant asserts a single argument as grounds for summary judgment as to all Count III claims of all Plaintiffs, the Court will conduct its analysis as to all Plaintiffs collectively.

The TWCA includes the following exclusive-remedy provision:

The rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of the employee, the employee's personal representative, dependents or next of kin, at common law or otherwise, on account of the injury or death.

Tenn. Code Ann. § 50-6-108(a). "Pursuant to this section, workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury." *Valencia v. Freeland & Lemm Const. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003). "[F]or the TWCA to be applicable, courts have developed a two-pronged test: (1) the injury must arise out of the plaintiff's employment; and (2) the injury must have occurred during the course of plaintiff's employment." *Nettles v. Hotel Peabody, G.P.*, No. 2:09-CV-02776-JPM, 2010 WL 5093362, at *4 (W.D. Tenn. Dec. 8, 2010). In negligent retention, hiring, and supervision claims this test is easily met, as a plaintiff "must have been performing the duties of her employment and was at the work place at the time of the events that gave rise to these claims" and "would have to be rationally connected to her duties as an employee of Defendant . . . without this employment relationship, Plaintiff's employment and work duties would not exist, nor would her alleged injury." *Fonseca v. Golden Living Ctr.-Mountainview*, No. 4:09-CV-93, 2010 WL 3155984, at *5 (E.D. Tenn. Aug. 10, 2010); *see also Nettles*, 2010 WL 5093362, at *5 (discussing *Fonseca*).

Courts have routinely held that the exclusive remedy provision of the TWCA applies to negligent retention, hiring, and supervision claims. *Parker v. Comprehensive Logistic, Inc.*, No. 1:19-0013, 2019 WL 1242670, at *4 (M.D. Tenn. Mar. 18, 2019) ("Defendant raises a legally sound argument that any such [negligent retention of supervisors] claim would be barred by the exclusivity provision of the Tennessee Workers' Compensation Act."), *report and recommendation adopted sub nom. Parker v. Comprehensive Logistics Co.*, No. 1:19-CV-00013, 2019 WL 1515265 (M.D. Tenn. Apr. 8, 2019); *Bellomy v. Autozone, Inc.*, No. E200900351COAR3CV, 2009 WL 4059158, at *7 (Tenn. Ct. App. Nov. 24, 2009) (affirming summary judgment for negligent supervision and retention claim under the TWCA); *Davis v.*

*Northpoint Senior Servs.*, No. 3:14-CV-106-PLR-HBG, 2016 WL 6078337, at *7 (E.D. Tenn. Mar. 22, 2016) (granting summary judgment under the TWCA on negligent supervision and retention claims in race and age discrimination case); *Fonseca*, 2010 WL 3155984, at *6 ("The Court finds that Plaintiff's claims [negligent hiring, negligent supervision, and negligent retention of other employees] against her employer, grounded in negligence, are entirely covered by the exclusive remedy available through workers' compensation and cannot be asserted as separate tort claims."); *Davidson v. Golden Living Ctr.-Mountainview*, No. 4:09-CV-94, 2010 WL 3155989, at *6 (E.D. Tenn. Aug. 10, 2010) ("The Court finds that Plaintiff's claims [negligent hiring, negligent supervision, or negligent retention] against her employer, grounded in negligence, are entirely covered by the exclusive remedy available through workers' compensation and cannot be asserted as separate tort claims."); *Nettles*, 2010 WL 5093362, at *5 ("Plaintiff's negligent hiring, supervision, and retention claim falls within the scope of the TWCA. The claim is thus, barred by the exclusive remedy provision unless it falls within the intentional tort exception."). The Court holds likewise.

Plaintiffs argue that the TWCA should not apply because there has been no physical injury or death. However, courts have found that negligent supervision, hiring, and retention claims are premised on a kind of injury to the plaintiff—albeit an emotional, nonphysical injury— connected to the plaintiff's employment, and thus are within the scope of the TWCA. *Fonseca*, 2010 WL 3155984, at **4-5 (discussing injury in the context of gender discrimination case); *Davidson*, 2010 WL 3155989, at *6 (discussing injury in the context of gender and age discrimination case).

Though there are exceptions to preclusion under the TWCA for claims of sexual harassment or intentional conduct on the part of the employer, Count III asserts negligence claims

based on factual circumstances that did not involve sexual harassment.[137] *Davis*, No. 2016 WL 6078337, at *7; *Gray v. McDonald's Corp.*, No. 2:10-CV-2779-JPM-TMP, 2011 WL 13116678, at *5 (W.D. Tenn. Mar. 14, 2011) ("Plaintiffs' claims of negligent hiring, retention and supervision (Count XI) do not fall within the intentional tort exception. Courts have determined that such claims are barred by the exclusive remedy provision of the TWCA absent any allegations of an employer's actual intent to injure."); *see also Valencia*, 108 S.W.3d at 243 (noting that, in order to avoid preclusion by the TWCA under the intentional tort exception, there must be "actual intent . . . the actual intent to injure the employee"). Therefore, there is no applicable exception to the TWCA's exclusive-remedy provision.

Based on the preclusive effect of Tenn. Code Ann. § 50-6-108(a), the Court will grant Defendant's Motion on each Plaintiff's negligent hiring, retention, and supervision practices claims (Count III).

### D. **Count VI—Age discrimination**

In Count VI, an age discrimination claim is brought solely on behalf of Plaintiff Gomez. The claim is brought under the ADEA and the THRA, and the same analytical framework applies

---

[137] Plaintiffs argue that "[i]ntentional acts and creating a hostile work environment so intolerable that Plaintiffs were either forced to resign or terminated are not injuries that arise out of the course scope [sic] of employment as defined by the statute." (Doc. No. 74 at 37). But Plaintiffs' observation about intentional acts is irrelevant as to Count III, which is based on alleged negligence rather than intentional acts. Plaintiffs' observation as to hostile work environment likewise is simply inapplicable because, as has been noted previously herein, Plaintiffs did not bring any claims for a hostile work environment. As for the various other types of discrimination claims brought by Plaintiffs, courts have routinely held that these types of claims are not barred by the TWCA. *E.g.*, *Davis v. Northpoint Senior Servs.*, No. 3:14-CV-106-PLR-HBG, 2016 WL 6078337, at *7 (E.D. Tenn. Mar. 22, 2016) (allowing discrimination claims but explaining that "negligence claims arising from discrimination claims are not eligible for the same exception as sexual harassment cases and are instead covered by the TWCA exclusively."). And the Court is not barring any of Plaintiffs' discrimination claims—as opposed to negligent hiring, retention and supervision claims—based on the TWCA's exclusive remedy provision. Therefore, the Court disregards this particular argument of Plaintiffs.

under both the ADEA and THRA. *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). "A plaintiff may present either direct or indirect evidence to prove an ADEA violation." *Willard v. Huntington Ford, Inc.,* 952 F.3d 795, 806 (6th Cir. 2020). ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas* [ ] burden-shifting framework." *Willard*, 952 F.3d at 807. The Sixth Circuit has stated that "[t]o set forth a *prima facie* case of age discrimination using circumstantial [indirect] evidence, a plaintiff must establish the four elements of the well-known *McDonnell Douglas* test: 1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class." *Geiger*, 579 F.3d at 622.[138] But in truth, this is somewhat inexact. The second element can be satisfied by anything (not just *discharge*) that would constitute an adverse employment action for general discrimination purposes. *See Weatherby v. Fed. Exp.,* 454 Fed. Appx. 480, 489 (6th Cir. 2012). And, as noted elsewhere herein, "[t]he fourth element may be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007) (internal quotation marks omitted). Also, notably, in this context to be in a protected class means to be at least 40 years of age. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).

At the pretext stage (if it is reached), "[n]o matter the type of evidence presented, the plaintiff retains the burden of persuasion to demonstrate 'by a preponderance of the

---

[138] Notably, the above-referenced requirement for a plaintiff to show "but-for" causation does not manifest itself in the elements of an *indirect-evidence* prima facie case. Instead, the requirement manifests itself only at the pretext stage of the analysis (if it is reached); as noted, this requirement is part of the plaintiff's overarching burden of persuasion, which is "merged" with the plaintiff's burden to show pretext. *See Burdine*, 450 U.S. at 256. This is true in context of ADEA claims, and not just Title VII claims, based on an indirect-evidence theory. *See Willard*, 952 F.3d at 810.

evidence . . . that age was the "but-for" cause of the challenged employer decision.'" *Id.* (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009)). So, "unlike a Title VII discrimination plaintiff, an ADEA plaintiff cannot prove her case by establishing that age was simply a 'motivating factor'; instead, the plaintiff has 'the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action.'" *Reed v. Am. Cellular, Inc.*, 39 F. Supp. 3d 951, 960 (M.D. Tenn. 2014) (quoting *Gross*, 557 U.S. at 177).

Defendant primarily argues that 1) Plaintiff Gomez is unable to identify an adverse action, 2) Plaintiff Gomez is unable to show that his age was the but-for cause of an adverse action, and 3) Griffin's comment on which Plaintiff Gomez relies is a "stray remark" that does not establish age discrimination. (Doc. No. 52 at 15, 17). Notably, the first of these propositions challenges Plaintiff Gomez's ability to make a *prima facie* case, while the second and third are relevant at the pretext stage (if it is reached).

Perhaps in part to support this first proposition, Defendant cites testimony from Plaintiff Gomez's deposition that indeed suggests that Gomez merely speculated that potentially he could be negatively affected at work by his age indirectly and that no adverse employment action (such as actually losing his job or being replaced by a younger person) actually befell him because of his age. (*Id.*). These citations at least cast serious doubt on the notion that Plaintiff Gomez suffered an adverse employment action (whether due to his age or for any other reason) other than possibly constructive discharge. And Defendant takes specific aim at the notion that Plaintiff Gomez's resignation amounts to a constructive discharge. As noted above, that effort was successful, and Plaintiff Gomez has failed to point to evidence sufficient to reach a jury on the issue of constructive discharge. This is fatal to his indirect-evidence theory because he alleges no other adverse action.

It is equally fatal to his direct-evidence theory, which likewise requires an adverse employment action. But a direct-evidence theory would be unsuccessful in any event, for an alternative reason. Plaintiff Gomez may be implying (alternatively or exclusively) that he has presented direct evidence of age discrimination, namely evidence of Griffin calling him an "old man" on one occasion and evidence of Griffin and Dyer speaking about plans to recruit young people for supervisor positions while Plaintiff Gomez held a supervisor position.[139] (Doc. No. 74 at 46) (citing Doc. No. 67-1 at 185)).

The Sixth Circuit has been clear that there are four factors a district court should evaluate to determine whether statements constitute direct evidence of age discrimination:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 455 (6th Cir. 2007) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477–78 (6th Cir. 2002)). None of these factors is dispositive, and a court should take all relevant circumstances into account. *Id.*

It is true that these comments were made by a decision-maker (Griffin). However, Plaintiff Gomez has shown the Court no evidence that they were (1) related to the decision-making process,[140] (2) more than vague, isolated, ambiguous remarks, or (3) made near in time to his

---

[139]Again, as noted above, during this conversation, Griffin and Dyer did not specifically mention replacing Plaintiff Gomez. (Doc. No. 73 at ¶ 89).

[140] One may reasonably wonder what exactly the "decision-making process" is with respect to a constructive discharge. Indeed, one may reasonably wonder what "decision" is involved in a constructive discharge. In many cases, it is not the discharge itself, which (being constructive only) is not necessarily the result of a decision to discharge but rather the result of an environment wherein a reasonable person in the plaintiff's shoes would feel compelled to resign. To the extent that no decision is made to make the plaintiff resign by making his or her life miserable, the

termination. In fact, Plaintiff Gomez presents no evidence indicating when either of these comments were made or that they were linked to his (alleged) constructive discharge. Courts in this circuit have consistently held that a single comment or a few comments about the plaintiff's age do not amount to direct evidence under the factors noted by the Sixth Circuit. *See e.g.*, *Skelton*, 249 F. App'x at 454-56 (affirming summary judgment when comments such as "[Plaintiff] has been around since Christ was a baby" were not linked to a decisionmaker, were not related to the decision-making process, were "isolated and irrelevant," and were made at an unclear time); *Stefanski v. W.W. Grainger, Inc.*, 155 F. App'x 177, 182 (6th Cir. 2005) (finding comments such as "old as dirt," "old man," and "old news" directed at the plaintiff to not be direct evidence when they were not made in connection with an adverse action and were not shown to influence decision-making); They likewise have held that derogatory comments not directed towards the plaintiff do not qualify as direct evidence of age discrimination. *Gagne v. Nw. Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (finding no issue of material fact when supervisor commented that he "needed younger blood," as the comment was isolated and not directed at any individual), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Hart v. Ridge Tool Co.*, 544 F. Supp. 2d 634, 653 (N.D. Ohio 2008) (granting summary judgment when an employee made comment about hiring younger individuals, without specifically referencing the plaintiff). Therefore, the Court finds that Plaintiff Gomez has not shown direct evidence of age discrimination.

---

discharge itself is not the result of a decision; on the other hand, perhaps in some cases there was a "decision" (even if only tacit) to create the toxic environment, and perhaps this is the applicable decision in such cases. For his part, Plaintiff Gomez does not identify the applicable "decision" here, let alone the applicable "decision-making process," and he certainly does not explain how Griffin's comments relate to the decision-making process, whatever it is.

For the reasons discussed, the Court will grant summary judgment to Defendant on Plaintiff Gomez's age discrimination claim (Count VI).

### E.  <u>Count VII—Disability discrimination</u>

In Count VII, a claim under the Americans with Disabilities Act Amendments Act ("ADAAA")[141] and Tennessee Disability Act ("TDA") is brought solely on behalf of Plaintiff Omar.

The ADAAA prohibits employers from discriminating against a qualified individual on the basis of disability. 42 U.S.C. § 12112. The TDA prohibits the same: "There shall be no discrimination in the hiring, firing and other terms and conditions of employment . . . against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8-50-103(b). "Because they generally prohibit the same sorts of discriminatory acts, the ADA an[d] the TDA are analyzed utilizing the same standards, except that the TDA does not require that employers make a reasonable accommodation." *Garrett v. CSX Transportation, Inc.*, 321 F. Supp. 3d 812, 819 (M.D. Tenn. 2018); *see also Coffman v. Robert J. Young Co.*, 871 F. Supp. 2d 703, 717 (M.D. Tenn. 2012) (granting summary judgment when claim premised on failure to accommodate); *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 817 (M.D. Tenn. 2011) ("The language of the TDA differs from that of the ADA insofar as the former does not contain a 'reasonable accommodation' element. In fact, the Tennessee Court of Appeals has

---

[141] The ADAAA was enacted (effective January 1, 2009) to make amendments to the Americans with Disabilities Act (ADA) to, among other things, ensure "a broad scope of protection to be available under the ADA." *See Taylor v. Specialty Rest. Corp.*, No. 2:12-cv-44, 2014 WL 4922942, at *4 (S.D. Ohio Sept. 30, 2014) (quoting ADAAA).

repeatedly noted, albeit in unpublished opinions, that the Tennessee Code is silent regarding any obligation on the part of any employer to provide a reasonable accommodation and has therefore held that employers are not required to do so under the TDA."). This means that "to the extent the plaintiff's TDA discrimination claim is premised upon the defendant's failure to provide a reasonable accommodation, that claim must fail." *Id.* at 818 (granting summary judgment to defendant-employer on TDA discrimination based on failure to accommodate and on TDA retaliation claim asserting failure to accommodate as protected activity). Thus, there is no cause of action under the TDA for a failure to accommodate. *See Bryson v. Tennessee Dep't of Intell. & Developmental Disabilities*, No. M2012-02620-COA-R3CV, 2013 WL 4107208, at *3 (Tenn. Ct. App. Aug. 13, 2013) ("In this regard we also note that we have previously declined to impose a reasonable accommodation requirement under the Disability Act . . . Unlike its federal counterpart, Tenn. Code Ann. § 8–50–103(a) is silent on the subject of an employer's duty to reasonably accommodate a disabled employee. In the face of this silence, our courts have declined to impose such a duty. Instead, they agree that 'the portion of the THRA that prohibits discrimination on the basis or disability does not require employers to provide disabled workers with reasonable accommodations.' Thus, [Defendant] had no legal duty to accommodate [Plaintiff's] condition under Tennessee law, and [Plaintiff] has no claim for failure to accommodate.") (quoting *Anderson v. Ajax Turner Co.*, 01A01–9807–CH–00396, 1999 WL 976517 (Tenn. Ct. App. Oct. 28, 1999)).

The ADAAA follows the same *McDonnell Douglas* burden-shifting framework discussed above with respect to indirect evidence. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). To establish a *prima facie* case on an indirect-evidence theory, a plaintiff must show:

[1] she was disabled; [2] she was otherwise qualified to perform the essential functions of her job; [3] she suffered an adverse employment action; [4] her employer knew or had reason to know of her disability; and [5] either the position remained open or a non-disabled person replaced her.

*Id. Accord Arndt v. Ford Motor Co.*, 716 F. App'x 519, 529 (6th Cir. 2017) (citing *Gecewicz*).[142]

Additionally, "[t]he ADA bars discrimination 'because of' an employee's disability, meaning that it prohibits discrimination that is a 'but for' cause of the employer's adverse decision." *White v. Hoeganaes Corp.*, No. 3-12-0783, 2013 WL 5346277, at *3 (M.D. Tenn. Sept. 23, 2013).

As reflected above, the Amended Complaint alleges that at the time of his termination, Plaintiff Omar suffered from injuries to his shoulder and feet and was thereby limited in his lifting, walking, and standing; as a result, according to the Amended Complaint, he had a disability for purposes of the ADAAA. He further contends that he was qualified for his position (with or without reasonable accommodation) and yet was terminated as a result of his disability, in violation of the ADAAA and TDA. (Doc. No. 8 at ¶¶ 164-184).

Plaintiffs argue that Plaintiff Omar has shown the validity of his ADAAA claim because he has shown that he has a disability, because he requested time off as a reasonable accommodation of his disability, and because Defendant failed to engage in an interactive process with him. (Doc. No. 74 at 41). In its Reply, Defendant notes that Plaintiff Omar did not plead claims for failure to accommodate, or failure to engage in the interactive process. (Doc. No. 81 at 11). The Court agrees with Defendant. The Complaint only alleges that Plaintiff Omar suffered disparate treatment (*i.e.*,

---

[142] Citing *Ferrari*, 826 F.3d 885, 891 (6th Cir. 2016), Plaintiffs cite a different, three-element test. (Doc. No. 74 at 39). That test has been used in some opinions but has been expressly (and, in the view of the undersigned, wisely) rejected by the Sixth Circuit in favor of the above-stated five-element test. *See Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). In defense of Plaintiffs, the Court notes that regrettably the three-element test has been used at times even since *Whitfield*, including in *Ferrari*.

discrimination in the form of an adverse employment action, his termination) based on his disability, without also making a claim for failure to accommodate or failure to engage with Plaintiff Omar in an interactive process.[143] (Doc. No. 8). To state the former kind of claim is not to state the latter two kinds of claims. *See, e.g.*, *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020) (distinguishing disparate-treatment, failure-to-accommodate, failure-to-engage-in-the interactive process, and retaliation claims under the ADA); *E.F. by Fry v. Napoleon Cmty. Sch.*, No. 12-15507, 2019 WL 4670738, at *10 (E.D. Mich. Sept. 25, 2019) ("Plaintiff alleges *both* an intentional discrimination claim and a separate failure-to-accommodate claim."); *Konieczka v. Rest Haven Illiana Christian Convalescent Home, Inc.*, No. 2:18 CV 260, 2019 WL 2191256, at *2 (N.D. Ind. May 20, 2019) ("A failure to accommodate claim is separate and distinct from a discrimination claim, and is analyzed differently under the law. These types of claims are not reasonably related and an employer could not reasonably expect a failure to accommodate claim to develop from an investigation into a charge of disability discrimination.") (citing *Riley v. City of Kokomo*, 909 F.3d 182, 189–90 (7th Cir. 2018) and *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999)).

As has been previously noted, Plaintiffs cannot raise a new claim via their Response, and the Court will not consider Plaintiff Omar to have brought either a failure-to-accommodate claim or a failure-to-engage-in-the-interactive-process claim. *See e.g.*, *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary

---

[143] The word "accommodation" appears twice in the Amended Complaint, but in neither instance does it specifically claim that Plaintiff Omar requested a reasonable accommodation or that Defendant denied him one, let alone assert a claim based on any such denial. And the Amended Complaint makes no reference at all to Defendant's failure to engage in the interactive process, let alone assert a claim based on any such failure.

judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)) (collecting cases)).[144]

Plaintiff Omar did assert in the Amended Complaint a claim that his termination was the result of disability discrimination, *i.e.*, disparate treatment based on a disability. In the Response, Plaintiff Omar asserts only that his that condition with his feet (as opposed to his shoulder) constituted a "disability" as defined by the ADAAA at 42 U.S.C. § 12102(1). (Doc. No. 74 at 41). Plaintiff Omar does not claim, and the Court does not perceive, the existence of any direct evidence to support his claim of disability discrimination. So this claim stands or fails on an indirect evidence theory.

Defendant argues that Plaintiff Omar cannot establish an indirect-evidence *prima facie* case of disability discrimination. Specifically, Defendant relies on the observation that at his deposition Plaintiff Omar was able to articulate no separate factual basis for his claims of disability discrimination, and instead merely pointed back to the testimony from his deposition that he invoked in support of his (below-discussed) FMLA claims. (Doc. No. 52 at 42). Defendant argues

---

[144]     The Court also notes that even if Plaintiff Omar had brought a claim for failure to accommodate, his TDA claim (as contrasted with his ADA claim) could not possibly encompass such a claim. As noted above, the TDA imposes no duty upon employers an employer to reasonably accommodate an employee.

    Additionally, contrary to what Plaintiffs appear to suggest, (Doc. No. 74 at 41), a request for leave under the *FMLA* is not a request for reasonable accommodation under the *ADA*. *Puckett v. Yates Servs., LLC*, No. 3-15-0083, 2016 WL 741938, at *5 (M.D. Tenn. Feb. 24, 2016) ("FMLA leave is not a reasonable accommodation under the ADA; rather, it is a right enforceable under a separate statutory provision."). Plaintiffs appear to alternatively suggest that Plaintiff Omar requested a reasonable accommodation in the form of a request for time off independent of the FMLA. The Court need not address whether such alleged request would support a claim for failure to accommodate, given that Plaintiff Omar brought no such claim.

that Plaintiff Omar has "failed to proffer evidence that he had a disability, that he suffered an adverse action because of his disability, or that [Defendant] knew or had reason to know that he was disabled." (Doc. No. 52 at 42-43). Plaintiff Omar responds in opposition that "[Defendant] has not cited to any facts supporting this proposition" and thus has not met its burden on a summary judgment motion. (Doc. No. 74 at 39).

Plaintiff Omar has a point. A defendant-movant cannot meet its initial burden on motion for summary judgment merely by *claiming* that the plaintiff lacks evidence and essentially challenging the plaintiff to show otherwise; a defendant-movant must—by pointing to materials of record or otherwise—*show* (subject to the plaintiff's subsequent opportunity to show otherwise) that the plaintiff could not prove his claim by a preponderance. *See* Fed. R. Civ. P. 56(c)(1).[145] In other words, the defendant-movant must produce evidence *tending to show* (though not necessarily *conclusively showing*) that the plaintiff cannot raise a genuine issue as to any material fact.[146] *Nickols v. Morris*, 705 F. Supp. 2d 579, 584–85 (N.D. Tex. 2010) ("The party moving for summary

---

[145] The Court rejects cases that have indicated otherwise. *See, e.g.*, *O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 1:10CV0861, 2013 WL 7210503, at *3 (N.D. Ohio Mar. 12, 2013) ("[A summary judgment] movant in federal court is not required to . . . provide evidence to show that his opponent has no evidence"), *report and recommendation adopted in part, rejected in part on other grounds*, No. 1:10 CV 00861, 2014 WL 587171 (N.D. Ohio Feb. 14, 2014); *Goldcorp, Inc. v. United States*, No. 00-75043, 2002 WL 551042, at *6 (E.D. Mich. Mar. 27, 2002) ("At any rate, even if [the] affidavit were altogether stricken from the record, it appears that the Government still would be entitled to summary judgment in its favor. After all, this affidavit has been provided merely to prove a negative: namely, that there is no evidence that the IRS ever received the protective claim allegedly sent by Plaintiff on or before September 15, 1995. Presumably, then, the Government could have simply asserted this proposition in its brief, and left it to Plaintiff to introduce evidence calling this issue into question.").

[146] Notably, a defendant-movant typically can show that there is no genuine issue as to any material fact by showing that there is no genuine issue as to the existence of a fact (usually, the element of a claim) that absolutely needs to exist for the plaintiff to prevail. If the defendant-movant can make this showing, all other facts become immaterial (because the plaintiff necessarily will suffer summary judgment anyway), and thus it can be said that the plaintiff (being unable to show a genuine issue as to *one* material fact) cannot raise a genuine issue as to *any* material fact.

judgment has the initial burden of informing the Court of the basis for his motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law."), *aff'd*, 419 F. App'x 534 (5th Cir. 2011).

Seeking to shift the burden, Defendant has cited only one page of Plaintiff Omar's deposition, claiming essentially that it tended to show that no facts existed to support his disability-discrimination claim in particular. When asked who he thought was discriminating against him based on his disability, he referred to his prior testimony "a few minutes ago" in the deposition about when he "tried to take the time off and get [him]self fixed." (Doc. No. 70-1 at 65-66). Counsel for Defendant then asked whether he was referring to his testimony "related to [his] FMLA leave," and Plaintiff Omar confirmed that he was. (*Id.*) Counsel for Defendant then asked, "Any other facts that you believe support your claim that you were discriminated against because of a disability?" and Plaintiff Omar responded, "No, ma'am." (*Id.*)

This exchange does not suffice to make an initial showing that Plaintiff Omar lacks evidence to support a claim of disability discrimination, including evidence of multiple (especially the first and fourth) elements of a *prima facie* case of disability discrimination. Defendant needed to go a little further, explaining why Plaintiff Omar's prior testimony— initially given with respect to Plaintiff Omar's FMLA issues in particular but essentially incorporated into his testimony as to his basis for his ADA claim—suggested he lacked adequate evidence to support his ADA claim. The Court must insist that a defendant-movant take this kind of additional step; otherwise, it would tempt defendants to shift the burden merely by setting up a plaintiff with a deposition question to the effect that "beyond anything else that you have mentioned [which the defendant intends to invite the Court to ignore in considering what facts the plaintiff has to support a claim], do you have any facts to support the claim?" Allowing movants to shift their burden based *solely* on a

negative answer by the plaintiff to a single loaded question strikes the Court as a lousy idea. The Court can appropriately rely on this answer in finding that the defendant shifted the burden, but only *in conjunction with other information* (including information about what it was the plaintiff previously did testify to). By itself, this kind of answer will not do to shift the burden.

So Defendant cannot prevail at the first (*prima facie* case) stage of the indirect-evidence analysis. However, it has a shot to prevail at the third stage, if it can get that far. Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case [of disability discrimination], the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Here, Defendant has articulated (and, as also required, shown with evidence) that the reason for Plaintiff Omar's termination was Plaintiff Omar's repeated failures to return FMLA paperwork (or provide additional medical documentation) necessary for his continued absence to be excused rather than grounds for termination. (Doc. No. 52 at 33-34). Despite facing Defendant's specific assertion that he could not show pretext, (*Id*. at 38), Plaintiff Omar fails to do anything to show that this reason was pretextual or that the real reason for his termination was discrimination on the basis of his disability.

Thus, Plaintiff Omar's indirect-evidence theory of disability discrimination fails.

Therefore, because Plaintiff Omar lacks the alternative of a direct-evidence theory, the Court finds that Defendant is entitled to summary judgment on Plaintiff Omar's claim for disability discrimination (Count VII).

### F. **Count VIII—Interference and retaliation under the FMLA**

Count VIII asserts a claim for interference and retaliation under the FMLA solely on behalf of Plaintiff Omar. The FMLA entitles an eligible employee to twelve workweeks of leave during a twelve-month period for various reasons, such as "a serious health condition." 29 U.S.C. § 2612(a)(1). "The FMLA provides a private right of action to employees to protect their rights to such leave under two different theories: the 'interference' or 'entitlement' theory, under which employers may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights, 29 U.S.C. § 2615(a)(1); and the 'retaliation' or 'discrimination' theory, under which employers may not 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA, § 2615(a)(2)." *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010). "To prevail on either [his] interference claim or [his] retaliation claim, [Plaintiff] must prove that [he] was entitled to FMLA leave." *Id.* Count VIII asserts both theories, claiming that Defendant interfered with his FMLA rights and then retaliated against him for asserting such rights, by terminating him.

    a.  <u>FMLA interference</u>

To establish a claim "for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)." *Tennial*, 840 F.3d at 308. To be clear, a plaintiff must show these elements to establish a claim of FMLA interference, but a plaintiff need *only* show these elements. The plaintiff need not survive the second and third stages of an indirect-evidence framework under *McDonnell Douglas,* because *McDonnell Douglas*

is simply inapplicable.[147] The issue is not whether the plaintiff can show an indirect-evidence case under *McDonnell Douglas*, or show a direct-evidence case. These categories of theories, and the methods for establishing them, simply are inapplicable here. Instead of being the elements of an indirect-evidence *prima facie* case under *McDonnell* Douglas,[148] the five elements here are akin

---

[147] Plaintiff here seems to realize that *McDonnell Douglas,* though applicable to FMLA retaliation claims, does not apply to FMLA interference claims. (Doc. No. 74 at 45).

[148] *Demyanovich* states, quite clearly, that these are (merely) the elements of a *prima facie* case under the *McDonnell Douglas* indirect-evidence framework. *See Demyanovich, L.L.C.*, 747 F.3d at 42. But *Demyanovich,* and cases to like effect, appear to be simply wrong. The entire idea of allowing a Plaintiff to prevail on an indirect-evidence theory under *McDonnell Douglas* is to give plaintiff a shot of establishing discriminatory *intent*, in those situations where it is required, by *inference* even if (as so often naturally is the case) the plaintiff lacks *direct evidence* of discriminatory intent. That is, as explained above, the indirect-evidence theory enables a Plaintiff to raise an *inference* of discriminatory intent—thus putting the onus on the defendant-employer to rebut the inference via a showing of a legitimate and non-discriminatory reason—even without any evidence of the defendant-employer's actual intent. But the employer's intent is irrelevant to a claim of FMLA interference; whether or not the employer had discriminatory intent, the FMLA is violated if the employer interferes with the employee's rights under the FMLA, *See Seeger v. Cincinnati Bell Telephone Company, LLC*, 681 F.3d 274, 282 (6th Cir. 2012) ("[I]f an employer interferes with the FMLA-created right to medical leave… a violation has occurred,' regardless of the intent of the employer."). As Plaintiffs put it, "[t]he question in an interference case is whether the employer provided Plaintiff with the entitlements set forth in the FMLA, namely up to a twelve week leave or reinstatement after taking a medical leave." (Doc. No. 74 at 45). Exactly. The question is whether the employer failed to provide the employer FMLA-mandated entitlements; whether any such failure was the result of discriminatory intent has nothing to do with it. Moreover, if it really is true that an employer violates the FMLA by denying FMLA entitlements, then undertaking the next stage of *McDonnell Douglas* makes no sense. It should not matter whether the employer can show a "legitimate" reason for the violation, which would still be a violation even with a "legitimate" reason, and it should not matter whether the reason is "non-discriminatory" because (as just noted) discriminatory intent is irrelevant to a claim of FMLA interference. As best as the undersigned can tell, when assessing whether the employer had a legitimate and non-discriminatory reason for its actions, the Sixth Circuits asks whether the employer had a legitimate and non-discriminatory reason for taking *some action other than FMLA leave*. *See Demyanovich*, 747 F.3d at 431 (accepting, at the second stage of *McDonnell Douglas* analysis, the employers' "asserted two reasons for *terminating* [the plaintiff] that are purportedly unrelated to his FMLA request") (emphasis added). Asking whether the employer had legitimate reasons for terminating the plaintiff unrelated to his request for FMLA leave makes perfect sense on an *FMLA retaliation claim* asserting that the plaintiff was terminated in retaliation for requesting FMLA leave—especially since an FMLA retaliation claim, unlike in an FMLA interference claim, discriminatory (retaliatory) intent is required. *Tennial v. United Parcel Serv.,*

to the elements of a traditional tort theory, which simply do not entail the unique kinds of theories applicable to employment discrimination claims. The five elements either do or do not exist. So at the summary judgment stage, the question is whether Defendant has shown that Plaintiff cannot raise a genuine issue of material fact as to the existence of at least one of these five elements.[149]

"An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . .The employee shall provide, in a timely manner, a copy of such certification to the employer." 29 U.S.C. § 2613(a). "Such a request for medical certification must be in writing and must detail the employee's specific obligation to provide certification and the consequences of failing to do so." *Branham*, 619 F.3d at 572 (citing 29 C.F.R. §§ 825.301(b)(1)(ii), 825.305(d) (2006) (amended 2009)). "In addition, an employer may require an employee to report 'periodically' on her status and her intention to return to work. The employer may also require the employee to 'obtain subsequent recertifications on a reasonable basis.'" *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 554 (6th Cir. 2006) (quoting 29 U.S.C. § 2614(a)(5) and 29 U.S.C. § 2613(e)).

---

*Inc.*, 840 F.3d 292, 308 (6th Cir. 2016) ("A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer."). But that question makes no discernible sense on an *FMLA interference* claim, wherein the employer action at issue of course is the FMLA interference—which Sixth Circuit has indicated establishes an FMLA violation regardless of whether the reason for such interference was non-discriminatory. So the undersigned does not understand why "an employee may prove FMLA interference using the familiar burden-shifting framework articulated in *McDonnell Douglas* . . . ." *Demyanovich*, 747 F.3d at 427. The undersigned, who is either regrettably clueless or shrewdly onto a regrettable conflating of FMLA interference and FMLA retaliation theories, suggests that clarification on these matters would be helpful.

[149] Defendant has not briefed whether 1) Plaintiff Omar was an eligible employee, and 2) Defendant was a covered employer. As a result, the Court does not consider the burden to have shifted to Plaintiff Omar for purposes of summary judgment on elements one and two. Defendant's arguments instead focus on whether Plaintiff Omar was on FMLA leave at the time he was terminated, implicating elements number three, four, and five of the *prima facie* case.

The FMLA requires that "during any period that an eligible employee takes leave under section 2612 of this title, the employer shall maintain coverage under any 'group health plan' (as defined in section 5000(b)(1) of Title 26) for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave." 9 U.S.C. § 2614(c)(1); *Csanyi v. Regis Corp.*, 265 F. App'x 465, 467 (9th Cir. 2008) (finding defendant's failure to provide health insurance when plaintiff paid premiums during FMLA leave to be interference); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 100 (2002) (O'Connor, J., dissenting) (discussing employer's obligation to provide health insurance while employee takes FMLA leave).

Though not entirely clear, Plaintiff Omar's FMLA interference claim seems to be based on three primary contentions: 1) that he was fired during his FMLA leave, 2) that he was improperly denied health insurance benefits during his leave, and 3) that Defendant effectively pressured him to return to work by contacting his doctor's office and requesting that he be allowed to return to work under certain physical restrictions. (Doc. No. 74 at 44-46). Defendant argues that the claim should be dismissed because Plaintiff Omar did not return the FMLA medical certification form for his shoulder injury (his second injury, with the back injury being his first), and so his leave was not properly designated as FMLA leave. (Doc. No. 52 at 41). However, the Court finds that Defendant's argument is too incomplete to shift to Plaintiff the burden of showing a genuine issue of fact (which is quite material) as to whether Plaintiff Omar's insurance was terminated while on FMLA leave. Plaintiff Omar was, undisputedly, on FMLA leave after his first injury. Though Plaintiff Omar may eventually have gone off FMLA leave (due to not returning the FMLA medical certification form), he was on FMLA leave during some of the relevant time period. Instead of the argument put forth by Defendant, the Court finds that the issues here are more properly identified

as when Defendant terminated Plaintiff Omar's health insurance, and whether Plaintiff Omar was still on FMLA leave at that time. The answers to each of these questions could be "yes" (as indicated in the following paragraph), thus precluding summary judgment for Defendant, even if Defendant is correct that at some point Plaintiff Omar went off FMLA leave because he failed to return the certification form.

As the Court previously noted in the Factual Background section, there is a factual dispute regarding whether Defendant canceled Plaintiff Omar's health insurance during his FMLA leave. There is evidence to support a finding that Plaintiff Omar was on FMLA leave on the date his health insurance was canceled.

Asserting an alternative reason why it is not culpable of interference with Plaintiff Omar's FMLA right to continued insurance coverage, Defendant claims that Plaintiff Omar's health insurance was canceled because Plaintiff Omar did not pay the required premiums. (Doc. No. 81 at 12 n.6). Defendant might have a point if this claim were true. 142 Am. Jur. Proof of Facts 3d 1 (originally published in 2014) ("The statute requires an employer to maintain health benefits during an FMLA leave but only on the same conditions that the employee would have had if he had not been on leave. Thus, if the health insurance plan calls for the employee to pay part of the premiums and he fails to pay, it is not a violation of the FMLA if the insurance was canceled . . . ."). However, Defendant has cited no evidence in the record to support this claim. Therefore, despite this (unsupported) claim, there remains a genuine dispute of material fact regarding whether Defendant interfered with Plaintiff Omar's FMLA leave by, perhaps among other things, improperly canceling his health insurance.

Therefore, the Court will deny Defendant's Motion on Plaintiff Omar's FMLA interference claim (Count VII).[150]

###### b. FMLA Retaliation

Consistent with the Court's discussion of Title VII retaliation in connection with Count II above, FMLA retaliation claims can be established via an indirect-evidence theory. *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). And Plaintiff Omar must rely on such a theory because he does not claim to have any direct evidence of retaliation.

A plaintiff can establish an indirect-evidence *prima facie* case of retaliation under the FMLA via evidence that: "(1) he engaged in protected activity, (2) his employer was aware of the protected activity, (3) he was subject to an adverse employment action, and (4) there was a causal nexus between the protected activity and the adverse employment action." *Demyanovich*, 747 F.3d at 432–33; *Tennial*, 840 F.3d at 308.

The entirety of Defendant's argument regarding FMLA retaliation consists of the following:

> [Plaintiff] Omar also asserts a claim for FMLA retaliation. (Doc. 8). However, he has not articulated a basis for this claim, apart from speculation and conjecture that, had he returned to work and performed light duty, [Defendant] Tyson would have fired him. *Ferrair v. Ford Motor Co.*, 826 F.3d 885, 897-97 (6th Cir. 2016) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and, are not enough to defeat a well-supported motion for summary judgment."). The undisputed facts show that [Plaintiff] Omar was not retaliated

---

[150] The Court declines to parse this claim further by deciding whether there is a genuine issue of material fact as to whether Defendant interfered with Plaintiff Omar's rights in either of the other two suggested ways. Count VII thus will proceed to trial without any particular kind of interference precluded from the jury's consideration—with the proviso that the Court would at least entertain from Defendant an argument that Plaintiff Omar's termination cannot be presented to the jury as a form of FMLA interference, given the Court's finding that Defendant has presented a legitimate and non-discriminatory reason for Plaintiff Omar's termination (one that, in fact, necessarily suggests that Plaintiff Omar no longer was on FMLA leave, and thus no longer had any FMLA rights, at the time of his termination) and Plaintiff Omar has not raised a genuine issue as to whether that reason was pretextual.

against for requesting FMLA leave. He went out on medical leave on May 1, 2017 and never returned. Therefore, [Defendant] Tyson had no opportunity to commit any "retaliatory acts" against him. To the contrary, [Defendant] Tyson made several efforts to obtain certification paperwork from [Plaintiff] Omar; however, he ignored those efforts. [Defendant] Tyson reluctantly terminated [Plaintiff] Omar only after its efforts to assist him were ignored.

(Doc. No. 52 at 42). The Court concludes that this cursory discussion, unsupported by citation to any evidence, is insufficient to shift to Plaintiff the burden of establishing any elements of Plaintiff Omar's *prima facie* case. This is particularly true as to third element to the extent that Plaintiff Omar relies on cancelation of his insurance, which Defendant does not even mention. Defendant certainly does not deny having canceled (for whatever reason) Defendant's health insurance at some point, and canceling an employee's health insurance can constitute an adverse action. *See e.g.*, *Hayes v. SkyWest Airlines, Inc.*, No. 15-CV-02015-REB, 2019 WL 9272087, at *1 (D. Colo. July 3, 2019) ("Regarding the FMLA retaliation claim, [Defendant's] decision to cancel [Plaintiff's] health insurance was the type of materially adverse action which might have dissuaded a reasonable worker from exercising his rights under the FMLA.") (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) and *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 & n.2 (10th Cir. 2006)); *Jordan v. Atlanta Pub. Sch.*, No. 1:18-CV-994-JPB-WEJ, 2019 WL 8376000, at *5 (N.D. Ga. Dec. 19, 2019), *report and recommendation adopted*, No. 1:18-CV-00994-JPB, 2020 WL 3399914 (N.D. Ga. Mar. 5, 2020) ("[T]he undersigned REPORTS that plaintiff easily can establish a prima facie case given her protected FMLA request, followed by multiple adverse actions (plaintiff's initial termination despite her contract terms, cancelled health insurance . . . and plaintiff's ultimate termination), and the extremely close temporal proximity of those events to [Plaintiff's] notification to [Defendant] of her need for medical leave, her formal FMLA request, and her return from protected leave.").

Defendant conceivably still could prevail at the latter stages of the *McDonnell Douglas* inquiry. And indeed it does with respect to Plaintiff Omar's termination. The Court has already found that Defendant has proffered (with evidence) a legitimate, non-discriminatory reason for his termination and that Plaintiff has failed to raise a jury issue as to whether that reason was pretextual. So Plaintiff Omar's FMLA retaliation claim does not survive to the extent based on his termination.

However, the Court has previously found that it cannot accept Defendant's evidentiarily unsupported assertion that Plaintiff Omar's health insurance was canceled because Plaintiff Omar did not pay the premiums. Therefore, Defendant has not met its burden of production regarding a legitimate, nonretaliatory reason for the adverse action of canceling Plaintiff Omar's health insurance, and the burden never shifted to Plaintiff Omar to show pretext. Therefore, the Court finds that Defendant is not entitled to summary judgment on Plaintiff Omar's FMLA retaliation claim, which will proceed to trial based on (and only on) the alleged adverse action of the cancelation of his health insurance in particular.

**Motion to Sever**

Also pending before the Court is Defendant's Motion to Sever. (Doc. No. 33). Therein, Defendant argues that this Court should sever the claims or, in the alternative, hold separate trials as to each Plaintiff to avoid confusion. (*Id.*; Doc. No. 34). Plaintiffs opposed the Motion to Sever. (Doc. No. 43). The Court will deny the Motion to Sever as moot because only one Count (Plaintiff Omar's Count VIII FMLA interference and retaliation claim(s)), regarding one Plaintiff, will survive the Motion.[151]

---

[151] The Court notes that it has not conducted herein any specific analysis of a "mixed motive" theory of the kind authorized by 42 U.S.C. § 2000e-2(m). Plaintiffs neither pleaded, nor asserted

**CONCLUSION**

"Title VII does not mandate a general code of civility or good conduct in the workplace." *Davis v. City of Memphis Fire Dept.*, 940 F. Supp. 2d 786, 798 (W.D. Tenn. 2013) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80–81 (1998)). *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale*, 523 U.S. at 80)). If it (or other employment discrimination statutes) did, Plaintiffs might be in better shape on their claims. But it does not, and indeed courts "must ensure that it does not become a 'general civility code.'" *Blackburn v. Shelby Cty.*, 770 F. Supp. 2d 896, 930 (W.D. Tenn. 2011) (quoting *Faragher v, City of Boca Raton*, 524 U.S. 775, 788 (1998)). The way they do so is by ensuring that specific requirements embedded within Title VII for plaintiffs are satisfied before granting plaintiffs relief. *See Onacle,* 523 U.S. at 81.

So the Court here is not concerned with whether it approves of various offensive comments that, if particular evidence submitted by Plaintiffs is credited, were made and reflected what would be widely regarded as crudeness and bigotry. The Court's concern instead is whether, given the very specific applicable law and evidence involved here, Defendant has met its burden of showing that there is no genuine issue for trial on Plaintiffs' various claims. For the reasons discussed

---

in response to the Motion, a mixed-motive theory, and so the Court need not conduct a mixed-motive analysis distinct from the Title VII analyses it has conducted herein. *See Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 435-36 (6th Cir. 2012) (suggesting that the court must separately consider a mixed-motive theory on a defendant's motion for summary judgment only if the plaintiff pleaded it in the complaint or raised it in response to the motion); *Shoemaker v. ConAgra Foods, Inc.*, 219 F. Supp. 3d 719, 738 (E.D. Tenn. 2016) (suggesting that arguably the court need not separately consider a mixed-motive theory, because "[the] plaintiff has not pled a mixed motive claim in her complaint, nor has she argued such in opposition to the defendant's summary judgment motion aside from her cursory footnote.").

herein, Defendant has done so with respect to all but one of Plaintiffs' counts. The Court so concludes despite making, frankly, considerable effort to ensure that it is not selling Plaintiffs short, including (as indicated in numerous footnotes) by scouring the record (and construing it substantially in Plaintiffs' favor) seeking support for the most basic facts essential for Plaintiffs' claims, such as their national origin, religion, and race.

The Court will grant in part and deny in part the Motion. (Doc. No. 51). The Court will grant summary judgment to Defendant on the following Counts as they pertain to all Plaintiffs that brought that Count: Count I, Count II, Count III, Count IV, Count V, Count VI, Count VII (mislabeled Count VI in the Amended Complaint).

The Court will deny summary judgment on Plaintiff Omar's claim for interference and retaliation under the FMLA (Count VIII, mislabeled Count VII in the Amended Complaint).

The Court will deny as moot the Motion to Sever (Doc. No. 33).

An appropriate order will be entered.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE